UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **E. L. PHELPS, M.J. MCLISTER, D.J. WU, S.M. LISS, and W.F. SCHAEFER,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**JOHN CRUMPTON STOMBER, WILLIAM ELIAS CONWAY, JR., JAMES H. HANCE, JR., MICHAEL J. ZUPON, ROBERT BARCLAY ALLARDICE, III, HARVEY JAY SARLES, JOHN LEONARD LOVERIDGE, CARLYLE INVESTMENT MANAGEMENT L.L.C., T.C. GROUP, L.L.C., TCG HOLDINGS, L.L.C., and CARLYLE CAPITAL CORPORATION,**<br><br>**Defendants.** | Case No: 11 CIV 7271<br><br>Removed From:<br>Supreme Court of the State of New York<br>County of New York<br><br>Index No. 652425/2011<br><br>RECEIVED<br>OCT 14 2011<br>U.S.D.C. S.D. N.Y.<br>CASHIERS |

## NOTICE OF REMOVAL

PLEASE TAKE NOTICE that, pursuant to 28 U.S.C. §§ 1332(d)(2), 1441, 1446, and 1453, Defendants John Crumpton Stomber, William Elias Conway, Jr., James H. Hance, Jr., Michael J. Zupon, Robert Barclay Allardice, III, Harvey Jay Sarles, John Leonard Loveridge, Carlyle Investment Management L.L.C., TC Group, L.L.C., and TCG Holdings, L.L.C. (collectively, the "Undersigned Defendants"), by and through their undersigned attorneys, remove to this Court the action described in Paragraph 1 below.[1]

## THE REMOVED CASE

1. The removed case is a putative nationwide class action filed on or about September 1, 2011, in the Supreme Court of the State of New York, County of New York, styled

[1] The Undersigned Defendants appear for the purpose of removal only and for no other purpose. The Undersigned Defendants are not making a general appearance and expressly preserve and do not waive any and all rights, claims, and defenses of any nature whatsoever, including, without limitation, all defenses relating to jurisdiction, venue and arbitrability. *See, e.g.*, *Cantor Fitzgerald. L.P. v. Peaslee*, 88 F.3d 152,157 n.4 (2d Cir. 1996) ("Removal does not waive any Rule 12(b) defenses," including the "defense of lack of personal jurisdiction.").

*E.L. Phelps et al. v. John Crumpton Stomber et al.*, Index No. 652425/2011 (the "State Court Action").

## PAPERS FROM REMOVED ACTION

2. Pursuant to Rule 81.1(b) of the Local Civil Rules of the United States Courts for the Southern and Eastern Districts of New York and 28 U.S.C. § 1446(a), a true and correct copy of the summons and complaint (hereinafter "Complaint"), which is the only pleading served upon any of the Undersigned Defendants to date, is attached hereto as Exhibit A.

## THE UNANIMOUS CONSENT REQUIREMENT DOES NOT APPLY

3. The Undersigned Defendants join in this Notice of Removal and thereby consent to removal. The Class Action Fairness Act of 2005 ("CAFA"), which provides a basis for removal of this action, eliminates the requirement that all defendants unanimously consent to removal, and thus Carlyle Capital Corporation's ("CCC") absence from the Notice of Removal is of no moment. *See* 28 U.S.C. § 1453(b) ("such action may be removed without the consent of all defendants").

## VENUE

4. Venue in the Southern District of New York is proper under 28 U.S.C. § 1441(a), because this district embraces the County of New York, in which the State Court Action was originally filed. *See* 28 U.S.C. § 112(b). The Undersigned Defendants reserve the right to seek the transfer of this matter to another district.

## NOTICE TO ADVERSE PARTY AND STATE COURT

5. Pursuant to 28 U.S.C. § 1446(d), a true and correct copy of this Notice of Removal is being served on the Plaintiffs, and a copy is being filed with the Clerk of the Supreme Court of the State of New York, County of New York.

## BASES FOR FEDERAL SUBJECT MATTER JURISDICTION

6. This Court has original jurisdiction over this putative class action under CAFA because: (1) there is minimal diversity, *i.e.*, at least one member of the putative plaintiff class is a citizen of a State different from any one defendant, *see* 28 U.S.C. § 1332(d)(2)(A); (2) the number of putative class members exceeds 100, *see* 28 U.S.C. § 1332(d)(5)(B); and (3) the aggregate amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, *see* 28 U.S.C. § 1332(d)(2), 1453.[2] Although the burden rests on the removing party to demonstrate that CAFA's jurisdictional requirements are met, a party opposing jurisdiction under CAFA will bear the burden of demonstrating that any exception to CAFA jurisdiction applies. *Serrano v. 180 Connect, Inc.*, 478 F.3d 1018, 1022-24 (9th Cir. 2007). As set forth herein, the jurisdictional requirements under CAFA are satisfied in this case.[3]

---

[2] Defendants are not required to wait to remove until the state court has entered a class certification order. *See* 28 U.S.C. § 1332(d)(8) ("This subsection shall apply to any class action before or after the entry of a class certification order by the court with respect to that action.").

[3] In the alternative, the Undersigned Defendants remove this action pursuant to the Securities Litigation Uniform Standard Act of 1998 ("SLUSA"), 15 U.S.C. § 78bb *et seq.* For an action to be removed to federal district court under SLUSA, the following five requirements must be met: (1) the suit is a "covered" class action; (2) the action purports to be based on state or local law; (3) the action is based on allegations of material misrepresentations and omissions; (4) the action concerns a "covered security;" and (5) the action alleges that defendants misrepresented or omitted a material fact "in connection with the purchase or sale" of that security. *Merrill Lynch, Pierce, Fenner & Smith v. Dabit*, 547 U.S. 71, 83 (2006). The five requirements are met here.

First, this action is a "covered" class action as it involves questions of law or fact that predominate over questions affecting any individual persons and is (1) brought on behalf of more than 50 persons or prospective class members, Compl. ¶ 26, and (2) the purported class representatives seek damages on a "representative basis on behalf of themselves and other unnamed parties similarly situated." 15 U.S.C. § 78bb(f)(5)(B)(i). Second, this action is based on state or local law, as Plaintiffs assert fraud and negligent misrepresentation claims under New York and District of Columbia common law. *See* Compl. ¶¶ 141, 144. Third, the action is based on allegations of material misrepresentations and omissions, as Plaintiffs assert both fraud and negligent misrepresentation as causes of action. *See id.* Fourth, the "covered security" requirement is satisfied here because CCC invested some of the IPO proceeds in "covered securities." *See, e.g.*, *In re Beacon Assocs. Litig.*, No. 09 Civ. 777 (LBS), 2010 WL 3895582, at *34 (S.D.N.Y. Oct. 5, 2010) ("Although the shares of the Beacon Fund are not covered securities, the objective of the fund was to manage Plaintiffs' investment using a strategy that inevitably included the purchase and sale of covered securities. . . . These allegations are sufficient to meet SLUSA's broad requirement of a misrepresentation or omission *in connection with* the purchase or sale of a covered security."). Finally, the Complaint alleges misconduct "in connection with" the purchase or sale of covered securities. *See, e.g.*, Compl. ¶¶ 126–149.

**A. There Is Minimal Diversity.**

7. Minimal diversity of citizenship exists for two independent reasons under CAFA. First, the citizenship of at least one putative class member is different from that of at least one Defendant. 28 U.S.C. § 1332(d)(2)(A). Second, at least one putative class member is a citizen of a State, and at least one defendant is a citizen or subject of a foreign state. 28 U.S.C. § 1332(d)(2)(C).

**1. The Undersigned Defendants are Citizens of Numerous States.**

8. Defendant Carlyle Investment Management L.L.C. ("CIM") is a Delaware limited liability company with its principal place of business in Washington, D.C. Consequently, CIM is a citizen of Delaware and Washington, D.C. 28 U.S.C. 1332 § (d)(10) ("For purposes of this subsection and section 1453, an unincorporated association shall be deemed to be a citizen of the State where it has its principal place of business and the State under whose laws it is organized."); *see also Ferrell v. Express Check Advance of SC LLC*, 591 F.3d 698, 699 (4th Cir. 2010) ("for purposes of determining subject matter jurisdiction under [CAFA], a limited liability company is an 'unincorporated association' as that term is used in § 1332(d)(10), and, therefore is a citizen of the State under whose laws it is organized and the State where it has its principal place of business.").

9. Defendant TC Group, L.L.C. ("TCG") is a Delaware limited liability company with its principal place of business in Washington, D.C. Consequently, TCG is a citizen of Delaware and Washington, D.C.

10. Defendant TCG Holdings, L.L.C. ("TCG Holdings") is a Delaware limited liability company with its principal place of business in Washington, D.C. Consequently, TCG Holdings is a citizen of Delaware and Washington, D.C.

11. Defendant William Elias Conway, Jr. ("Conway") is an individual residing in and domiciled in Virginia. Compl. ¶ 13. Consequently, Conway is a citizen of Virginia.[4]

12. Defendant John Crumpton Stomber ("Stomber") is an individual residing in and domiciled in Connecticut. Compl. ¶ 14. Consequently, Stomber is a citizen of Connecticut.

13. Defendant James H. Hance ("Hance") is an individual residing in and domiciled in North Carolina. Compl. ¶ 15. Consequently, Hance is a citizen of North Carolina.

14. Defendant Michael J. Zupon ("Zupon") is an individual residing in and domiciled in New York. Compl. ¶ 16. Consequently, Zupon is a citizen of New York.

15. Defendant Robert Barclay Allardice, III ("Allardice") is an individual residing in and domiciled in New York. Compl. ¶ 18. Consequently, Allardice is a citizen of New York.

16. Defendant Harvey Jay Sarles ("Sarles") is an individual residing in and domiciled in Massachusetts. Compl. ¶ 19. Consequently, Sarles is a citizen of Massachusetts.

17. Defendant John Leonard Loveridge ("Loveridge") is an individual residing in and domiciled in Guernsey. Compl. ¶ 20. Consequently, Loveridge is a citizen of Guernsey.

### 2. The Putative Class Includes, at a Minimum, Citizens of At Least Three States.

18. On information and belief, Plaintiff E.L. Phelps ("Phelps") is an individual residing in and domiciled in Virginia.[5] Consequently, Phelps is a citizen of Virginia.

19. On information and belief, Plaintiff W.F. Schaefer ("Schaefer") is an individual

---

[4] For individuals, citizenship for diversity purposes depends on the person's domicile, as opposed to residence. A person's domicile is his "true, fixed and permanent home and place of habitation . . . to which, whenever he is absent, he has the intention of returning." *McCann v. Newman Irrevocable Trust*, 458 F.3d 281, 286 (3d Cir. 2006).

[5] Plaintiffs' domiciles are based on allegations of residence taken directly from addresses submitted by Plaintiffs in the action *Phelps et al. v. Stomber et al.*, Case 1:11-cv-01142-ABJ (D.D.C.), which Plaintiffs also have filed against the Undersigned Defendants. Although residence is not always equivalent to domicile for diversity purposes, an individual's residence "typically coincide[s]" with his domicile. Charles A. Wright & Arthur R. Miller, 13E Fed. Prac. & Proc. Juris. § 3611-12 (3d ed.). To the extent minimal diversity is not established by the facts set forth in this Notice (Defendants respectfully submit that it is), Defendants request leave to take appropriate discovery regarding the intent of these and/or other putative class members to remain in, or return to, their current residences.

residing in and domiciled in Maryland. Consequently, Schaefer is a citizen of Maryland.

20. On information and belief, Plaintiff M.J. McLister ("McLister") is an individual residing in and domiciled in Virginia. Consequently, McLister is a citizen of Virginia. According to the Complaint, McLister purchased CCC Restricted Depository Shares ("RDSs") and Class B shares in his capacity as trustee of a family trust. Compl. ¶ 3. A trust's citizenship, for diversity purposes, is based on the citizenship of its trustees and beneficiaries. *See Emerald Investors Trust v. Gaunt Parsippany Partners*, 492 F.3d 192, 205 (3d Cir. 2007) ("[T]he citizenship of both the trustee and the beneficiary should control in determining the citizenship of a trust."). Consequently the family trust is a citizen of Virginia, where McLister, as the trustee, is a citizen, as well as any additional states where the trust's beneficiaries are citizens.

21. On information and belief, Plaintiff D.J. Wu ("Wu") is an individual residing in and domiciled in Washington, D.C. Consequently, Wu is a citizen of Washington, D.C. According to the Complaint, Wu purchased CCC RDSs and Class B shares in her capacity as trustee of a family trust. Compl. ¶ 4. Consequently, the family trust is a citizen of Washington, D.C., where Wu, as the trustee, is a citizen, as well as any additional states where the trust's beneficiaries are citizens.

22. On information and belief, Plaintiff S.M. Liss ("Liss") is an individual residing in and domiciled in Maryland. Consequently, Liss is a citizen of Maryland. According to the Complaint, Liss purchased CCC shares in her capacity as trustee of a family trust. Compl. ¶ 5. Consequently, the family trust is a citizen of Washington, D.C., where Wu, as the trustee, is a citizen, as well as any additional states where the trust's beneficiaries are citizens.

**3. The Minimal Diversity Requirement is Satisfied**

23. Minimal diversity exists where "***any*** member of a class of plaintiffs is a citizen of

a State different from ***any*** defendant," *see* 28 U.S.C. § 1332(d)(2)(A) (emphasis added), which certainly is the situation here. *See also West Virginia ex rel. McGraw v. Comcast Corp.*, 705 F. Supp. 2d 441, 445 (E.D. Pa. 2010) ("For CAFA's minimal diversity requirements to be met, only one member of the plaintiff class—named or unnamed—must be diverse from any one defendant.") (quotation and internal punctuation omitted). Indeed, because the Undersigned Defendants are citizens of more than one state, by necessity at least one plaintiff must be diverse from at least one defendant.

24. For instance, Defendant Conway (a citizen of Virginia), standing alone, satisfies the CAFA minimal diversity requirement, as he is diverse from Plaintiffs Schaefer (a citizen of Maryland), Wu (a citizen of Washington, D.C.), and Liss (a citizen of Maryland), in addition to being diverse from each and every unnamed putative class member who is not a citizen of Virginia. This alone is sufficient to satisfy the minimal diversity requirement.[6]

25. Second, at least one putative class member is a citizen of a State, and at least one defendant is a citizen or subject of a foreign state. *See* 28 U.S.C. § 1332(d)(2)(C). For instance, all five putative class representatives are citizens of states (Maryland, Virginia, and Washington, D.C.), while Defendant Loveridge is a citizen of the Bailiwick of Guernsey, a foreign state. Consequently, the parties in this case also independently satisfy the CAFA minimal diversity requirement in this manner.

---

[6] Although not all of the defendants are diverse from all of the Plaintiffs (*e.g.*, both Defendant Conway and Plaintiff Phelps are citizens of Virginia), the lack of *complete* diversity is irrelevant for determining subject matter jurisdiction under CAFA. *See Smith v. Bayer Corp.*, __U.S. __, 131 S. Ct. 2368, 2374 n.1 (2011) ("The Class Action Fairness Act . . . now enables a defendant to remove to federal court certain class actions involving nondiverse parties."); *Serrano v. 180 Connect, Inc.*, 478 F.3d 1018, 1021 (9th Cir. 2007) ("[U]nder CAFA, complete diversity is not required . . . ."). Similarly, some of the Undersigned Defendants' New York citizenship is of no moment for removal purposes under CAFA. 28 U.S.C. § 1453(b) ("A class action may be removed . . . without regard to whether any defendant is a citizen of the State in which the action is brought . . . ."). In other words, the "forum defendant" rule does not apply to cases removed pursuant to CAFA.

## B. As Alleged, There Are One Hundred or More Class Members.

26. The Complaint alleges that "The members of the Class are so numerous that joinder of all members in impracticable" and that Plaintiffs "believe there are, *at a minimum, more than 500 members* of the Class." Compl. ¶ 26 (emphasis added). These allegations satisfy CAFA's 100 class member requirement. *See* 28 U.S.C. § 1332(d)(5)(B); *see also Frederico v. Home Depot, Inc.*, 507 F.3d 188, 197, 199 (3d Cir. 2007) (accepting allegations in plaintiff's complaint in a case removed under CAFA as to the number of putative class members being in the "thousands, if not . . . tens of hundreds of thousands, of individuals"); *Adighibe v. Clifton Telecard Alliance*, No. 07-cv-1250 (PGS), 2008 WL 940777, at *3 (D.N.J. Apr. 7, 2008) (allegation in complaint that "there are 'hundreds' of persons who are members of the class" satisfied CAFA's 100 class member requirement).

## C. The Aggregate Amount in Controversy Exceeds $5 Million.

27. While the Undersigned Defendants deny that Plaintiffs are entitled to recover any amount, the matter in controversy exceeds $5 million. Phelps and the purported class members seek to recover compensatory damages allegedly caused by their investments in CCC's $345 million IPO and their subsequent purchases on the aftermarket, as well as costs and expenses incurred in the litigation, including counsel fees and expert fees. Compl. ¶¶ 25, 79, B–C.

28. There is no allegation in the Complaint limiting damages to an amount below CAFA's $5 million jurisdictional threshold. Where, as here, the plaintiff "has not specifically averred in the complaint that the amount in controversy is less than the jurisdictional minimum," and the defendant asserts, based on the allegations in the plaintiff's complaint,[7] that more than

[7] Although the party asserting federal jurisdiction must establish *disputed* jurisdictional facts by a preponderance of the evidence, this standard does not apply where a removing defendant relies on the facts alleged in the plaintiff's complaint to establish federal jurisdiction. *See Frederico*, 507 F.3d at 198 (because defendant's "argument for jurisdiction is based on allegations made initially by [the plaintiff] herself . . . the present posture of the case is one

that amount is in controversy, then the case must remain in federal court unless "it does not appear to a *legal certainty* that [the plaintiff] cannot recover the jurisdictional amount." *Frederico*, 507 F.3d at 199 (emphasis in original). Notably, Plaintiff would have the burden of making this showing. *Id.* at 195 (in these circumstances, "the *challenger* to subject matter jurisdiction [must] prove, to a legal certainty, that the amount in controversy *could not exceed* the statutory threshold") (emphases in original). As the amount that was invested in CCC's $345 million IPO (and thus, the amount that Plaintiffs contend could potentially be recovered) is significantly larger than the $5 million CAFA amount in controversy requirement, it cannot be said *to a legal certainty* that Plaintiffs cannot recover the jurisdictional amount.

**D. Removal Is Timely.**

29. The Undersigned Defendants' removal of this action is timely. A notice of removal must be filed "within thirty days after the receipt by the defendant, through service or otherwise, of a copy of the initial pleading setting forth the claim for relief upon which such action or proceeding is based . . . ." 28 U.S.C. § 1446(b). In cases like this one, in which the complaint is filed before it is served, the thirty day removal period runs from the date of service. *See Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 347-48 (1999) ("[A] named defendant's time to remove is triggered by simultaneous service of the summons and complaint, or receipt of the complaint, 'through service or otherwise,' after and apart from service of the summons, but not by mere receipt of the complaint unattended by any formal service.") (*quoting* 28 U.S.C. § 1446(b)). This period is extended by an additional three days due to Plaintiffs' chosen method of service. *See* Fed. R. Civ. P. 6(d) (extending deadlines by three days when the party is served, *inter alia*, under Rule 5(E), which allows service by

---

where the relevant facts are not expressly in dispute between the parties"); *Zanger v. Bank of Am., N.A.*, No. 10-2480 (RBK/KMW), 2010 WL 3910142, at *3 (D.N.J. Oct. 1, 2010) ("because the party asserting federal jurisdiction relies on its opponent's factual allegations, the preponderance-of-the evidence standard is inapplicable").

electronic means if the recipient consents in writing, as occurred here).

30. In this case, Plaintiffs effected service of process on the Undersigned Defendants on September 14, 2011.[8] The Undersigned Defendants' Notice of Removal is therefore timely because it is filed within thirty-three days of that event (*i.e.* on or before October 17, 2011). *See* 28 U.S.C. § 1446(b); Fed. R. Civ. P. 6(d).

**CONCLUSION**

WHEREFORE, the Undersigned Defendants under 28 U.S.C. §§ 1332 and 1441, as amended in relevant part by CAFA, and authorized by 28 U.S.C. § 1453, respectfully request that this action be removed in its entirety from the Supreme Court of the State of New York, County of New York, to the United States District Court for the Southern District of New York.

Dated: New York, New York
October 14, 2011

Respectfully submitted,

SCHINDLER COHEN & HOCHMAN LLP

By: ____________________

Daniel E. Shaw
100 Wall Street, 15th Floor
New York, New York 10005
Telephone: (212) 277-6300
Facsimile: (212) 277-6333
E-Mail: DShaw@SCHlaw.com

*Attorneys for Defendants*

*Except for Carlyle Capital Corporation*

[8] The Undersigned Defendants are not aware of any service of process effected on Defendant Carlyle Capital Corporation.

OF COUNSEL:

Robert A. Van Kirk
Patrick H. Kim
Sarah F. Teich
Gregory D. Morin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
Telephone: (202) 434-5000
Facsimile: (202) 434-5029
E-Mail: RVanKirk@wc.com

*As Counsel for Defendants John Crumpton Stomber, William Elias Conway, Jr., James H. Hance, Jr., Michael J. Zupon, Carlyle Investment Management L.L.C., TC Group, L.L.C., and TCG Holdings, L.L.C.*

Gary A. Orseck, Esq.
Alison C. Barnes, Esq.
ROBBINS, RUSSELL, ENGLERT, ORSECK, UNTEREINER & SAUBER LLP
1801 K Street, N.W., Suite 411
Washington, D.C. 20006

*As Counsel for Defendants Robert Barclay Allardice, III, Harvey Jay Sarles, and John Leonard Loveridge*

# EXHIBIT A

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

**E. L. PHELPS, M.J. MCLISTER, D.J. WU, S.M. LISS, and W.F. SCHAEFER,**

Plaintiffs,

v.

**JOHN CRUMPTON STOMBER, WILLIAM ELIAS CONWAY, JR., JAMES H. HANCE, JR., MICHAEL J. ZUPON, ROBERT BARCLAY ALLARDICE, III, HARVEY JAY SARLES, JOHN LEONARD LOVERIDGE, CARLYLE INVESTMENT MANAGEMENT, LLC, T.C. GROUP, LLC, TC GROUP HOLDINGS, LLC, and CARLYLE CAPITAL CORPORATION,**

Defendants.

Index No. 652425/2011

**SUMMONS**

Plaintiffs designate New York County, where Defendant Allardice resides, and where Defendant T.C. Group, LLC maintains at least one officeas the place of trial.

**TO THE ABOVE-NAMED DEFENDANTS:**

**YOU ARE HEREBY SUMMONED** to answer the complaint in this action, and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the plaintiff's attorney(s) within 20 days after the service of this summons, exclusive of the day of service, where service is made by delivery upon you personally within the state, or within 30 days after completion of service where service is made in any other manner. In case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Dated: September 1, 2011

/s/ Jonathan W. Cuneo
Jonathan W. Cuneo
Matthew E. Miller
CUNEO GILBERT & LADUCA, LLP
507 C Street, N.E.
Washington, DC 20002
(202) 789-3960

CUNEO GILBERT & LaDUCA, LLP
620 Fifth Avenue
New York, NY 10020
212-698-4504

Richard D. Greenfield
Marguerite R. Goodman
Ilene F. Brookler
GREENFIELD & GOODMAN, LLC
250 Hudson Street, 8th Floor
New York, N.Y. 10013
(917) 495-4446

*Co-Counsel for Plaintiffs and the Class*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| **E. L. PHELPS, M.J. MCLISTER, D.J. WU, S.M. LISS, and W.F. SCHAEFER,**<br><br>Plaintiffs,<br><br>v.<br><br>**JOHN CRUMPTON STOMBER, WILLIAM ELIAS CONWAY, JR., JAMES H. HANCE, JR., MICHAEL J. ZUPON, ROBERT BARCLAY ALLARDICE, III, HARVEY JAY SARLES, JOHN LEONARD LOVERIDGE, CARLYLE INVESTMENT MANAGEMENT, LLC, T.C. GROUP, LLC, TC GROUP HOLDINGS, LLC, and CARLYLE CAPITAL CORPORATION,**<br><br>Defendants. | Index No. 652425/2011<br><br>**COMPLAINT** |

Plaintiffs E. L. Phelps, M.J. McLister, D.J. Wu, S.M. Liss and W.F. Schaefer, on behalf of themselves and all others similarly situated, by their undersigned counsel, allege the following based upon the investigation of counsel, except as to the allegations specifically pertaining to their own acts, which are based upon personal knowledge. The investigation of counsel included, among other things, a review of the public records pertaining to Carlyle Capital Corp. ("CCC" or "the Company") and related persons, court records pertaining to other proceedings involving CCC, press releases issued by CCC and affiliates, media and news reports about CCC and affiliates, and publicly available trading data pertaining to CCC's securities.

## JURISDICTION

1. This Court has personal jurisdiction over the Defendants pursuant to CPLR §§ 301 and 302 because each of the Defendants either resides in New York or transacts business in New York and because many of the events giving rise to the causes of action alleged herein occurred in New York State. Venue is proper in New York County pursuant to CPLR § 503(a) because Defendant Allardice resides in New York County.

## PARTIES

2. Plaintiff E. L. Phelps is an individual who purchased in the United States during the Class Period: (a) 15,789 restricted depositary shares (restricted depositary shares ("RDSs")) each redeemable for one Class B share) in CCC's initial public offering (the "IPO") and (b) 15,789 Class B Shares of CCC listed for trading on the Euronext exchange.

3. Plaintiff M.J. McLister is an individual who, in his capacity as trustee of a family trust, purchased in the United States during the Class Period (a) 26,316 RDSs in the IPO, and (b) 54,225 Class B Shares listed for trading on the Euronext exchange.

4. Plaintiff D.J. Wu is an individual who, in her capacity as trustee of a family trust, purchased in the United States during the Class Period (a) 26,316 RDSs in the IPO, and (b) 25,000 Class B Shares listed for trading on the Euronext exchange.

5. Plaintiff S.M. Liss is an individual who, in her capacity as trustee of a family trust, purchased in the United States during the Class Period 15,790 RDSs in the IPO.

6. Plaintiff W.F. Schaefer is an individual who purchased in the United States during the Class Period 7,895 RDSs in the IPO.

7. Defendant CCC is a Guernsey limited company with nominal business addresses in Washington, D.C. and Guernsey until it ceased operations. It is presently in liquidation. Defendant CCC was operated by Defendant Stomber and his subordinates in

New York. All of CCC's senior officers, including but not limited to Defendant Stomber, Chief Financial Officer Randolph P. Green, Chief Risk Officer and Treasurer Patrick Trozzo, Chief Accounting Officer & Controller Vincent Rella and Chief Dealer William F. Greenwood, were based and conducted business in New York. Additionally, three of its seven directors worked or resided in the City of New York. Its four remaining directors were located in disparate locations (the Washington, D.C. area, the Boston area, North Carolina and Guernsey) and all conducted business within the city of New York. The IPO was constructed by the Defendants in New York, and the RDSs were issued in New York City, and the corresponding shares of CCC represented by those RDSs were held by Bank of New York, located in New York City.

8. Defendant Carlyle Investment Management, LLC ("CIM") is a Delaware limited liability company. CIM, pursuant to an investment management agreement with CCC, was, at all pertinent times, the investment manager of CCC, with full discretionary investment authority. CIM has, at all pertinent times, transacted business continuously and systematically in New York.

9. Defendant T.C. Group, LLC ("TCG") is a Delaware limited liability company with its principal place of business in Washington, D.C. TCG has, at all pertinent times, conducted business continuously and systematically in New York

10. Defendant TC Group, Holdings, LLC ("TCG Holdings") is a Delaware limited liability company with its principal place of business in Washington, D.C. TCG Holdings has, at all pertinent times, conducted business continuously and systematically in New York.

11. CIM, TCG and TCG Holdings and/or other affiliated entities do business as "The Carlyle Group." There does not appear to be a business entity by that name, although CCC referred to TCG as "The Carlyle Group" in certain of its publicly disseminated documents. TCG Holdings has, at all pertinent times, conducted business continuously and systematically in New York

12. CIM, TCG and TCG Holdings are hereinafter referred to as the "Carlyle Entities" or "Carlyle."

13. Defendant William Elias Conway, Jr., a Virginia resident, is or was a managing director of CIM, a director of CCC, and the Chief Investment Officer of TCG.

14. Defendant John Crumpton Stomber, a Connecticut resident with his principal place of business at all times in New York, was the Chief Executive Officer, Chief Investment Officer and President, and a director, of CCC, a Managing Director of CIM, and a Managing Director of TCG.

15. Defendant James H. Hance, a resident of North Carolina, was a Director of CCC from September 14, 2006 and at all relevant times thereafter. Defendant Hance was, at all pertinent times until March 2007, the Chairman of the Board of CCC. Defendant Hance was also, contemporaneously, a senior advisor to CIM.

16. Defendant Michael J. Zupon, a resident of New York, was a Director of CCC from September 14, 2006 and at all relevant times thereafter. Zupon was a founding member, Chief Investment Officer and Managing Director and Head of Carlyle's US Leveraged Finance Group and was a Partner and Managing Director of Carlyle.

17. Each of Conway, Hance, Stomber and Zupon were also members of an Investment Committee which was established for CCC and was chaired by Conway. As such, the Investment Committee was constituted exclusively by the CCC directors who were also directors, officers and/or employees of TCG and/or CIM and/or other TCG affiliates.

18. Defendant Robert Barclay Allardice, III, a resident of New York, was a Director of CCC from September 14, 2006 and at all relevant times thereafter.

19. Defendant Harvey Jay Sarles, a resident of Massachusetts, was a Director of CCC from September 14, 2006 and at all relevant times thereafter.

20. Defendant John Leonard Loveridge, a resident of Guernsey was a Director

of CCC from September 14, 2006 and at all relevant times thereafter.

21. CCC was controlled, at all levels, by Carlyle employees. First, CCC's management and investment committee consisted entirely of Carlyle employees and advisors, including CCC's most senior officer, Defendant Stomber. Second, CCC's six outstanding Carlyle's Class A shares, which were the only voting shares issued by CCC, were held at all relevant times by persons who were employed as Managing Directors of Carlyle who thus had the power to select the Board of Directors (the Class B Shares owned by certain Plaintiffs and members of the Aftermarket Class were nonvoting shares). Third, CCC's board of directors was led, and dominated by, Carlyle employees and advisors.

22. Defendants Hance, Allardice, Sarles and Loveridge were, at all times relevant, through meetings of the CCC Board of Directors and otherwise, kept well-informed by Defendants Conway, Stomber and Zupon and the Carlyle Entities of all material facts bearing upon the financial and operating condition of CCC and the fact that its survival was at serious risk.

23. Defendants Stomber, Conway, Zupon, Hance, Allardice, Sarles and Loveridge are hereinafter referred to as the "Individual Defendants." Each of the Individual Defendants had the power to control, and exercised such control, over the documents and statements disseminated to the investing public in the name of CCC.

24. Because of the Individual Defendants' positions within and/or otherwise related to the Carlyle Entities, they each had access to adverse undisclosed material information about CCC's true financial condition and investments. They each were privy to such undisclosed information from internal corporate documents, communications among themselves and with other officers and employees of the Carlyle Entities as well as attendance at, and documents received during, meetings of management, and Boards of Directors. Each of the Individual Defendants knew or were deliberately reckless in not knowing of the adverse material facts which rendered the statements alleged herein false

and misleading. Despite personal knowledge of the fundamentally deteriorated condition of CCC throughout the Class Period, each Individual Defendant was motivated to conceal such circumstances from investors while they concurrently were seeking further infusions of critically-needed capital and supporting, artificially, the offering and market prices of CCC shares.

## CLASS ACTION ALLEGATIONS

25. Plaintiff brings this action as a class action pursuant to the provisions of Article Nine of the CPLR on behalf of a Class consisting of all persons who purchased or otherwise acquired Class B Shares or RDSs of CCC in its IPO and in market purchases during the period from June 19, 2007 through March 17, 2008, inclusive (the "Class Period") and were damaged thereby ("the Class"), as well as a subclass (the "Share Purchaser Subclass") of purchasers of Class B Shares in the IPO and in market purchases from July 4, 2007 through March 17, 2008, inclusive. Excluded from the Class are the Defendants herein, officers and directors of the Carlyle Entities and CCC, members of their immediate families and the heirs, successors or assigns of any of the foregoing. The definition of the Class and Subclass are subject to discovery with respect thereto and may be amended at the time Plaintiffs files their motion seeking certification of the Class and sub-class by the Court. All references to the "Class" below refer to the "Class" and "Share Purchaser Subclass" unless the content indicates one or the other.

26. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, they believe there are, at a minimum, more than 500 members of the Class.

27. CCC common stock traded on Eurolist by Euronext, an open and efficient market, starting on July 4, 2007, and for the remainder of the Class Period. Euronext is the fifth largest stock exchange in the world. It has, since April 2007, been owned by the

same ownership as the New York Stock Exchange, NYSE Euronext, Inc. ("NYSE Euronext"), a Delaware corporation. NYSE Euronext touts the combined enterprise as the "first global stock exchange." American investors with typical brokerage accounts have identical access to purchase Euronext-traded securities as they do to securities traded on US-based exchanges such as the NYSE or NASDAQ.

28. A substantial majority of CCC shares purchased during the Class Period were, at all times, purchased by United States residents within The United States. Thus, in addition to the fact that CCC was managed by Americans residing and conducting business in the United States, its shares were purchased and owned principally by investors in the United States.

29. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. The following are questions of law and fact common to the Class:

- whether the Defendants engaged in acts or conduct in violation of American or other common law, or the Civil Code of the Netherlands, as alleged herein;
- whether the Defendants made negligent, intentional and/or reckless misrepresentations and/or omissions of material facts regarding CCC to the investing public;
- whether such misrepresentations and/or omissions of material facts were essentially linked to the damages sustained by the Plaintiffs and the members of the Class;
- whether the Defendants acted knowingly, with deliberate recklessness or negligently in making false and misleading statements, in issuing false and misleading financial statements, news releases and other communications to the investing public about the financial and operating condition of CCC; and

- whether the members of the Class have sustained damages and, if so, the proper measure of such damages.

30. Plaintiffs' claims are typical of those of the Class because Plaintiffs and the other members of the Class sustained damages arising out of the Defendants' wrongful conduct, in violation of applicable law.

31. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class actions and securities litigation. Plaintiffs have no interests antagonistic to, or in conflict with, those of the Class.

32. A class action is superior to other available methods for the fair and efficient adjudication of the controversy since joinder of all the members of the Class is impracticable. Furthermore, because the damages suffered by most of the individual Class members may be relatively small, the expense and burden of individual litigation makes it impracticable for the Class members individually to redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

33. During the Class Period, Defendants caused to be issued a series of false and misleading statements, and omitted material facts that were required to be disclosed, regarding the true operating and financial condition of CCC, in violation of the common law and, to the extent applicable, the Civil Code of the Netherlands.

### About CCC, its Business Model and its Investment Guidelines

34. On May 18, 2006, Carlyle announced that Defendant Stomber would be joining Carlyle as a Managing Director in the Leveraged Finance Group. Carlyle announced that Stomber would help it to "develop new investment products and expand existing business lines." Stomber joined Carlyle from Cerebrus Capital Management, L.P., a major New York-based private equity firm. Also joining Carlyle from Cerebrus was Defendant Stomber's associate, Mr. Trozzo, who also became a Managing Director

of Carlyle.

35. On August 29, 2006, CCC was formed as a limited company under the laws of Guernsey, Channel Islands. CCC was an investment fund heavily promoted by the Carlyle Entities before and following its incorporation. CCC shares were initially sold to investors through private placements, and later would become publicly traded as a result of a public offering commencing in June 2007. CCC's stated objective was to achieve superior annual profits and a dividend yield of at least 12% by investing in a purportedly diversified portfolio comprising residential mortgage backed securities ("RMBS") and leveraged financial assets, seeking to generate returns principally from the difference between the interest earned on the acquired assets and the cost of financing those assets through short term repurchase ("repo") agreements and other forms of financing. CCC purportedly was to conduct its business within strict Investment Guidelines ("Guidelines") in order to minimize risk and to provide a "safety-net" to protect CCC if there occurred excessive market volatility and other foreseeable events. In fact, CCC was a vehicle for the CCC Entities to capitalize on The Carlyle Group's reputation with so-called "private equity" investments and the investing public's need for fundamentally high-quality investments with significant cash returns. Carlyle's goal in creating CCC was to provide an opportunity to generate for Carlyle and its founders massive management, incentive and other fees charged to CCC which was, from the outset, anything but safe and sound despite its apparently risk-free RMBS and other securities. It was, by the time its initial capital was invested in RMBS a "house of cards" only to be made more vulnerable to collapse by the time of its public offering discussed below.

26. By the time of the commencement of CCC's private placements of securities, CCC was already in precarious financial health, which was well-concealed from potential investors, counterparties and others outside of CCC. In putting together its collection of RMBS and other financial assets, The Carlyle Entities caused CCC to

acquire or commit to acquiring volatile, high-risk securities that could only be purchased using massive borrowing with the securities purchased serving as collateral.

36. Under its repo agreements, CCC sold RMBS to its repo counterparties and agreed to repurchase the same RMBS back from them at a price equal to the original sale price plus accrued interest. The original sale price to the repo counterparty would be at a discount to the fair value of the security, being an initial margin known as a "haircut". While most of CCC's RMBS were the subject of repos, CCC did retain a small portion of its RMBS as unencumbered securities for the purpose of maintaining at least some liquid assets necessary to meet margin calls that were likely to result due to decreases in the value of the securities or increases in the amount of the haircuts that could be imposed on CCC by the counterparties when the RMBS were "re-financed" and/or subject to margin calls.

37. The Defendants were aware that the financing of CCC's investments in RMBS through repos utilizing extensive levels of leverage exposed CCC to extraordinary market and other substantial risks. For example, if CCC were to borrow $20 billion to purchase $20 billion in RMBS, a 1% drop in the value of the securities, or a 1% increase in the haircut, would require it to put up an additional $200 million in collateral to avoid a default. To attempt to contain those risks, as indicated above, Defendants, on or about October 4, 2006, established certain risk management and "Investment Guidelines" for CCC. These Guidelines, although they provided CCC's Board and senior management with ample flexibility and gave them ample room to function within stated risk parameters, were intended to protect CCC from a "meltdown" or catastrophic failure of the type that ultimately occurred only months later and brought CCC to insolvency and liquidation.

38. Most importantly, the Guidelines required "Minimum Liquidity" of "20% of Capital" as a "limit on total portfolio leverage." This requirement was generally referred to by CCC as its "Liquidity Cushion" – an unencumbered minimum liquidity

cushion was necessary to protect CCC's capital, by ensuring that cash and equivalents would be readily available to meet the requirements imposed by CCC's repo counterparties and other financiers. Liquid assets would be necessary to meet any margin calls effected by these financiers in response to any decreases in market value of the financed assets and/or increases in collateral requirements. The 20% liquidity cushion, and CCC's business model, more generally, were modeled, purportedly, to withstand market volatility of the order experienced in the Summer of 1998.

39. The Guidelines also required CCC to maintain "minimum borrowing and liquidity capacity of 150% (with a target of 200%) of total investment assets."

40. The Guidelines also limited the capital allocated to investments in RMBS to a maximum of 85% of CCC's total capital, a further key risk management measure under CCC's Business Model.

41. CCC's business model identified a maximum leverage ratio of 19 times capital (in other words, it would not borrow more than 19 times its unencumbered investment capital). By early 2007, at the time they began soliciting investments for CCC's private placements of $ 600 million from sales of Class B Shares, however, Defendants raised this threshold to 29 times capital. In practice, leverage generally exceeded 30 times CCC's capital.

**The Initial Financing of CCC**

42. At the first Board meeting on October 6, 2006, Defendant Stomber informed the Board that Carlyle and CIM had already caused CCC to commit to purchase $2 billion in securities. Stomber then described CCC's Business Model and the use of leverage. Stomber "explained that [CCC] is operating with a 38% liquidity cushion which was on the conservative end of the spectrum." Defendant Hance, a CCC Director, and Stomber, informed the Board that "the most frequent questions received to-date in their fundraising activities related to the use of leverage," which the Individual Defendants, including employees of Carlyle, were describing to potential investors as "conservative."

At a subsequent telephonic Board meeting on December 20, 2006, in discussing CCC's financial statements, Stomber informed the Board "that management had not, and did not intend, to utilize the maximum amount of leverage available under the [liquidity] cushion," essentially what was being told to prospective investors.

43. By December 31, 2006, the first round of external investment in CCC was completed through a private placement of 13,154,000 shares at an issue price of $20 per Class B share, raising $263,080,000.

44. On February 2, 2007, Defendants caused the Guidelines for CCC to be amended such that the minimum borrowing and liquidity capacity was reduced from 150% (with a target of 200%) to 125% (with a target of 150%) of total investment assets. The amendment was approved by CCC's Board at a meeting held on February 15, 2007. Stomber explained that the amendment was "prudent" and "advisable to give management flexibility to respond to changing market conditions."

45. CCC issued a further 16,846,000 shares by way of a private placement on February 28, 2007, raising $336,920,000. The total amount raised by CCC's private placements by that time was approximately $600 million.

**CCC Incurred Substantial Unrealized Losses, and its Business Model Was Failing, in Advance of its Ill-Advised IPO**

46. At a March 5, 2007 Board meeting, Stomber informed the Board that CIM would likely be entitled to an incentive fee on CCC's portfolio for the quarter ended March 31, 2007 "and would be fully profitable for The Carlyle Group."

47. At the same meeting, Carlyle officer William Greenwood gave the Board an update on the status of the subprime mortgage market and the "related deterioration in the credit market." By the Spring of 2007, there was considerable turbulence in mortgage markets. There were bankruptcy filings of numerous mortgage originators, including Ownit Mortgage Solutions, American Freedom Mortgage Inc., Mortgage Lenders' Network USA and ResMae Mortgage Corp; and indices that tracked the value of

mortgage-backed instruments had declined dramatically by early 2007. Nonetheless, the Board did not discuss what protective steps needed to be taken by its members and management to ensure that CCC was prepared for further foreseeable deterioration in financial markets and, in particular, in those in which RMBS were being created, financed, bought and sold.

48. The Defendants had, since the formation of CCC, planned to conduct an initial public offering ("IPO") of CCC Class B Shares, both for purposes of (1) raising additional capital to attempt to compete with other highly capitalized funds perceived by the Defendants to be competitors, and (2) to support a public market for CCC shares that would enable the Defendants to profit from the sale of CCC shares they received as incentive compensation. By March 2007, the Defendants had already commenced preparation of an offering memorandum (the "Offering Memorandum") for the IPO that, as an offering by a supposedly "foreign" company (even though it was managed almost exclusively by Americans in the United States) would avoid registration with and direct oversight by the US Securities and Exchange Commission.

49. At the March 5, 2007 CCC Board meeting, the Board reviewed the latest draft of the Offering Memorandum prepared by Defendants and focused in particular on the section entitled, "Management's Discussion and Analysis" ("MD&A"). Stomber told the Board that "the primary goal of the MD&A section was to inform a prospective shareholder that the overall investment strategy of [CCC] was to allocate capital and use leverage in a manner to maximize shareholder value and generate a steady dividend". Stomber explained that therefore "the disclosure in the MD&A focused on the *liquidity cushion*, the *diversification of the portfolio* … and [CCC's] affiliation with Carlyle" (emphasis added), all of which were consistent with the "relatively conservative" description of CCC made by the Defendants at the time of the private placements. The foregoing discussions reflect a premeditated intent to draft a misleading Offering Memorandum that de-emphasized the risks involved in CCC's business model, while

emphasizing the association with Carlyle, a brand name more commonly affiliated with more conservative forms of investment.

50. With hundreds of millions of dollars already in hand from the private placements, Defendants caused CCC to continue to borrow aggressively, and to acquire RMBS. By March 30, 2007, CCC had already acquired $17.3 billion of financial assets (including $16.5 billion of RMBS) and had incurred debt of $16.1 billion through repos.

51. In April 2007, Stomber sought approval from the directors of CCC, on an alleged "one-time basis," to use the Liquidity Cushion to buy certain RMBS prior to the IPO, which entailed a reduction in the minimum Liquidation Cushion requirement to 15%. The Board approved his request.

52. By May 2007, Carlyle and CIM had consumed the majority of the capital available to CCC for the purchase of RMBS and sought to obtain further capital to increase the size of CCC's investment portfolio and, with it, CCC's leverage. Carlyle and CIM did not want to wait to receive the proceeds of the planned IPO in order to purchase more RMBS.

53. On May 10, 2007, CCC entered into a term loan agreement with CitiGroup Global Markets Inc. (a corporate "sister" of one of the brokerage firms which would, ultimately, market the IPO to investors) which allowed CCC to borrow up to $191 million. The loan (the "Bridge Loan") was obtained in contemplation of the IPO and was required to be repaid from the proceeds of the IPO. By May 30, 2007, Carlyle and CIM had already caused CCC to borrow the entire amount available under the Bridge Loan and used the proceeds to finance the acquisition of additional RMBS in conjunction with further repo financing.

54. By May 2007, as the Defendants were well-aware, conditions in global credit markets had deteriorated significantly since CCC's formation in late 2006. The increase in subprime mortgage defaults, first noted by the Board in February 2007, began to have an increasingly negative impact in the market for RMBS. Widespread mortgage

defaults were occurring in the United States, which eroded the value of certain RMBS and analogous assets. Between November 2006 and June 11, 2007, the risk as measured by APV for each RMBS security increased an astounding 58%.

55. During May 2007, CCC's portfolio suffered an unrealized loss of $41.6 million or 7% of CCC's net asset value, and further significant losses of up to $50 million were anticipated with materially greater losses foreseeable. Moreover, margin calls for another $70 million were expected which would reduce the liquidity cushion below 20%, and a number of CCC's lenders started to request haircuts of 3%, representing an increase in collateral required of 50%.

56. On June 7, 2007 Stomber sent a lengthy email to the Board of CCC, informing the Board of substantial losses that CCC had sustained as a result of recent market events. Stomber told the Board that as a consequence of a change in the "5 years swap rate," a $25 million unrealized gain had become an $8 million unrealized loss on CCC's mortgage-backed securities and that CCC's Net Asset Value had declined as a result. Stomber stated that "[t]oday was a wild day" in the market "where rates went up materially" and that CCC could sustain further significant losses of up to $50 million. Stomber warned the Board that the level of CCC's unrealized losses raised disclosure issues for the IPO. Most importantly, Stomber was aware and informed the Board that those events had negatively impacted CCC's Liquidity Cushion:

> Bad news is the price change has eroded the liquidity cushion as we make margin calls based on spread changes. The Liq Cushion stands at 23 percent but could be called down close to 20 percent – that is why we have it.

57. Six days later, on June 13, 2007, Stomber sent a further email to CCC's Directors, entitled "Status of CCC". The email was copied to various Carlyle officers. Stomber informed CCC's Directors that "[l]ast night we made the decision to postpone the IPO of CCC as a result of volatile market conditions, an uncertain MTM [marked-to-market] of our balance sheet and comps in the equity market trading down 10-25%."

Stomber said that as of June 11, 2007, CCC's IFRS[1] net income "was on target for a 14.5% 2nd quarter" but he also noted that CCC's "Fair Value Reserve was down $63.9MM from inception and $76.2MM for the year," meaning that CCC had suffered unrealized losses in those amounts under IFRS. Stomber then outlined CCC's "next steps for the immediate future," and stated:

> We are having a major liquidity event so I invoked "emergency powers" on the balance sheet. The liquidity cushion is currently at $148MM, which is technically above 20% of our current MTM equity position. But please take no comfort in that, we could be margin called for up to another $70MM and therefore bring the cushion down to about 11%. Therefore, we need independent Board Member approval to go under 20% - that is the purpose of the liquidity cushion – to be there so we don['t] not have to sell securities at depressed prices during a margin call. Therefore, I ask you for your formal approval.

58. Stomber then referred to possible asset sales to free up capital and then referred to the "$200MM bank loan that was to be repaid with proceeds from the IPO" and said that there would be internal discussion as to how to manage it. Stomber identified the possibility of asking "the banks to convert at least 100MM to equity to mirror the original deal they had once committed to."

---

[1] CCC's financial statements and quarterly reports were prepared on the basis of International Financial Reporting Standards ("IFRS"), issued by the International Accounting Standards Board, which includes accounting standards referred to as the "International Accounting Standards" ("IAS") issued by the former International Accounting Standards Committee. IFRS varies in certain significant respects from United States Generally Accepted Accounting Principles ("GAAP"). In particular, IFRS allowed CCC to avoid recognizing publicly the material decline in the fair value of its investment assets as losses, facts well-known by the defendants but concealed from the investing public. Under IFRS, CCC primarily classified its investments (including RMBS) as "available for sale" and gains and losses arising from changes in the fair value of those investments were recognized directly in equity as "fair value reserve (deficit)", unless the investments were sold or impaired. That is, the gains and losses from changes in fair value were generally not recorded as part of CCC's net income or loss. Under U.S. GAAP, gains and losses arising from changes in the fair value of "available for sale" investments would have been recorded as part of CCC's net income or loss. By utilizing IFRS accounting, the Defendants, notwithstanding their own knowledge of the material deterioration of the value of CCC's investment portfolio and exposure to massive losses, were able to and did conceal these facts from prospective investors.

59. Notwithstanding the additional risk to CCC's ability to survive, on June 14, 2007, the Board resolved to reduce CCC's minimum Liquidity Cushion requirement from 20% to no less than 10% of Adjusted Capital.

60. During June 2007, CCC's portfolio suffered an unrealized loss of $52 million or 9.4% of CCC's net asset value. When combined with the unrealized loss in May 2007 of 7% of net asset value, CCC suffered a 16% loss to net asset value, equivalent to the 16% "worst case scenario" loss modeled (based on events in 1998) by CIM when Defendants established the minimum 20% Liquidity Cushion Investment Guideline. This highlighted the need to not only preserve minimum liquidity, but to increase and maintain a materially *higher* level of liquidity than the minimum of 20%.

61. In the period June through to August 2007, at a time when CCC's financial viability was already at risk, CIM, Carlyle and the directors of CCC did not increase or even maintain CCC's minimum 20% Liquidity Cushion. This was despite the fact that it became clear that the minimum 20% Liquidity Cushion was not sufficient to meet margin calls attributable to the changes in the fair value of CCC's securities subject to repos as well as meeting increased "haircuts" from certain of CCC's repo counterparties.

62. By the end of June 2007, in just nine months, CCC had acquired $21.8 billion of RMBS, representing 95% of CCC's total assets, financed by short term borrowings under repo agreements of $21.2 billion CCC's leverage ratio as at June 30, 2007 was 40.2 times, or 29.8 times by treating the Bridge Loan of $191 million as equity. Without the inclusion of the $191 million in proceeds of the Bridge Loan (which was required to be repaid to CCC's lenders), CCC's Liquidity Cushion was *less than zero* on June 30, 2007. Including the proceeds of the bridge loan, CCC's Liquidity Cushion was $186,100,000 at June 30, 2007 comprised of cash and cash equivalents of $35,400,000 and unencumbered assets of $150,700,000, and represented 27% of adjusted capital.

63. As at June 30, 2007, CCC's *reported* equity/net asset value was $552,629,000 and had fallen below the $600,000,000 in capital raised by way of private placement.

64. Notwithstanding the calamitous performance of CCC, the management and incentive fees paid to CIM for the six months ended June 30, 2007 were $4,421,000 and $4,681,000 respectively. Other fees paid to Carlyle and CIM for the quarter as reimbursement for purported overhead expenses relating to office rent, furniture, supplies and personnel salaries totaled $660,000. In addition, CCC "reimbursed" Carlyle and CIM $2,545,000 for its charges for "internal use software and other property". In other words, despite having lost in the range of $60 million of the capital of CCC (and much more under GAAP), Carlyle and CIM were paying themselves nearly $10 million for their "services" and otherwise.

**CCC Made Material Misrepresentations and Omissions in the Offering Memorandum Concerning its Grave Financial Condition, and Proceeded With its Ill-Advised IPO Against the Advice of its Underwriters**

65. In June 2007, CCC's underwriter banks (The so-called "bookrunners" or managers of the IPO) advised Carlyle that, because of ongoing market volatility, CCC's IPO should be delayed. Various internal Carlyle communications indicate that the Defendants remained uncertain whether the IPO should or would proceed in light of instability in the fixed income and equity markets and their impact on CCC. Defendants prepared various alternative "scripts" to use for communications to investors and journalists in the event that the IPO did not proceed at all, which Defendants had widely touted publicly.

66. On June 14, 2007, Stomber sent a further email to CCC's Directors, copied to certain Carlyle officers, announcing that, notwithstanding the decision the previous day to postpone the IPO, that, assuming all went well the following day, they intended to "file on Monday with the AFM and proceed with the IPO." Stomber sought

Conway's specific consent to proceed with the IPO. Conway confirmed that he was "OK with a filing Monday and a go if things remain as they are."

67. On or about June 19, 2007, Defendants caused CCC to issue and begin to disseminate an "Offering Memorandum" of that date. The IPO was, at that time, intended to consist of an offering by CCC of 18,874,420 newly issued Class B Shares and RDSs together with the sale by certain selling shareholders of 173,200 existing Class B Shares. The Offering Memorandum stated that the initial offering price would be between $20 and $22 per Class B share. The Defendants were thus prepared to have new investors, such as Plaintiff and the members of the Class, notwithstanding the already massive deterioration in CCC's financial condition and losses of more than $60 million, invest, through the IPO, at the same approximate share price as those investors who purchased shares through the private placements.

68. The Offering Memorandum described CCC's purported financial condition, including its capital allocation and use of leverage, as of March 31, 2007. This presented a materially inaccurate depiction of its financial condition, because, as described above, CCC's financial condition had deteriorated significantly in the three months between March 31, 2007 and the IPO, when Plaintiffs purchased RDSs and other investors purchased Shares.

69. The Offering Memorandum contained an intentionally deceptive and very brief description of certain of CCC's "Recent Developments." Defendants represented that CCC's fair value reserves had declined by only $17.3 million between January 1, 2007 and June 13, 2007 (an increase $11.6 million from January 1 to March 31, 2007, and a decline of $28.9 million from March 31, 2007 through June 13, 2007). This statement was blatantly false and misleading. As noted above, Defendant Stomber had told all Board members, on June 13, 2007, that the "Fair Value Reserve was down $63.9MM from inception and $76.2MM for the year." If Stomber had spoken with the same candor in the Offering Memorandum as he had with the Board, the IPO could not

have taken place. The failure to accurately report recent developments was in violation of IAS 10, which requires, inter alia, that "When the events after the balance sheet date that do not involve adjustments are of such importance that failure to disclose may affect the ability of users of financial statements for the evaluations and take economic decisions, the entity shall disclose the following information, [f]or each of the major categories of events after the balance sheet date that do not involve adjustments: ( a) the nature of the event and (b) an estimate of its financial [impact], or a statement about the impossibility of making such an estimate." *Id.*, ¶ 20. The financial reporting in the Offering Memorandum also failed to comply with provisions of the IFRS Conceptual Framework for Financial Reporting, Chapter 1, which provides, *inter alia,* that "the objective of general purpose financial reporting is to provide financial information about the reporting entity that is useful to existing and potential investors, lenders and other creditors in making decisions about providing resources to the entity." *Id.* at QB2.

70. The "financial data as of and for the period ended June 13, 2007" contained in the Offering Memorandum was represented to have been "based upon valuations of securities that have been provided to [CCC] by Interactive Data Pricing and Reference Data, Inc., an external pricing service." The Defendants relied upon the data contained in the Offering Memorandum because it was less accurate, and did not accurately reflect the true state of affairs at CCC. Notably, in internal communications, the Defendants and other Carlyle personnel relied on internal calculations which they knew to be more accurate.

71. In the Offering Memorandum, Defendants further represented that the decline in fair value reserves between March and June 2007 was simply and purportedly "a result of changes in interest rates." That statement was intentionally false and misleading. As the Defendants well knew, the decline was due in large part due to a dramatic increase in the haircuts charged by CCC's repo lenders, which threatened the

viability of CCC's business model. The use of the more innocuous term "interest rates" suggested a more generic, and considerably less threatening, macroeconomic change.

72. In the Offering Memorandum, Defendants further represented that "we are targeting the payment of a dividend within a range of approximately $0.51 to $0.56 per Class B share (unaudited) for the quarter ending September 30, 2007 and within a range of approximately $0.53 to $0.58 per Class B share (unaudited) for the quarter ending December 31, 2007," and that "we do not believe that these changes in interest rates or the fluctuations in our fair value reserves and total equity per Class B share will affect our targeted dividends for the quarters ending September 30,2007 and December 31, 2007." These statements were false and misleading, in that the calamitous declines in CCC's fair value reserves and massive impairment of its liquidity that had occurred to date, and were expected to occur in the near future, would render the issuance of dividends in the third and fourth quarters of 2007 entirely reckless and unrealistic, if capable of accomplishment at all.

73. In the Offering Memorandum, the Defendants aggressively touted the relationship between CCC and Carlyle, touting Carlyle's status as "one of the world's largest private investment firms" that "combines global vision with local insight," and has in its employ "a team of 782 employees, including 416 investment professionals operating out of 29 offices in 18 countries…" The Defendants further represented that "[w]e have structured our relationship with Carlyle to ensure that our interests are closely aligned." The foregoing statements were false and misleading in two respects. First, they falsely portrayed CCC as an investment product typical of Carlyle ventures. The Carlyle brand name is more closely associated with unusual investment opportunities offered to elite investors, when CCC would be an entirely different fund – a publicly traded investment fund utilizing a not-particularly-sophisticated (nor novel) business model. Carlyle's resources would not provide CCC with any particular advantages. Second, to the contrary, the interests of Carlyle and CCC were *not* "closely aligned," as

CIM and Carlyle had an interest in maximizing management fees paid from CCC, and in prolonging the operations of CCC (at least until the end of the lockup period on the sales of shares by insiders) and avoiding the recognition of losses that could jeopardize its ability to continue to operate. It would have been in the interests of CCC to cease operations entirely, or at least to scale back its acquisitions of RMBS, in order to minimize losses. The interest of Carlyle and CIM, however, were entirely different.

74. The Offering Memorandum contained an exceedingly long "laundry list" of "boilerplate" "Risk Factors" describing possible adverse events that *might* conceivably occur, and *might* adversely impact CCC, in the future. None of such "Risk Factors" was intended to truly inform investors of the actual and then-present risks to CCC's survival that were already known to each of the Defendants at the time the Offering Memorandum was issued and disseminated by them. The Defendants, through their legal counsel who drafted it on their behalf, made sure that the Offering Memorandum, contained no description of the very serious adverse events that had already occurred, and had already caused very substantial unrealized losses, and, at the very least, should have raised serious doubt about the viability of CCC's business model. Such material non-disclosure of the real risks that had burdened and would continue to burden CCC was intentional and purposefully deceptive.

75. On the issue of CCC's Liquidity Cushion, the Offering Memorandum stated:

> Our investment guidelines require us to hold unrestricted cash and cash equivalents and unencumbered U.S. agency or U.S. government securities (together, the "Liquidity Cushion") equal to no less than 20% of our Adjusted Capital. The Liquidity Cushion is intended to be sufficient to meet reasonably foreseeable margin calls on our financed securities.
>
> . . .
>
> The maintenance of an unencumbered Liquidity Cushion is fundamental to the management of a leveraged investment portfolio. Our current investment guidelines require a Liquidity Cushion equal to no less than 20% of our Adjusted Capital. The Liquidity Cushion is intended to be sufficient to meet reasonably foreseeable margin calls on our financed securities. We have performed extensive

> statistical testing of our expected portfolio, including testing during periods of significant financial market volatility and stress, to determine the level of this Liquidity Cushion, balancing the need for sufficient reserves with the desire to efficiently deploy capital. Our liquidity position is monitored by Carlyle and reviewed by our board of directors.

The foregoing representations were intentionally false and misleading, inasmuch as CCC's Board of Directors had twice recently approved reductions in the Liquidity Cushion to 15%, and 10%, respectively. Moreover, the Defendants knew that the Liquidity Cushion was likely to imminently fall (and remain) well below 20% due to impending margin calls about which the Defendants already knew were coming.

76. Defendants also made material omissions concerning CCC's financial condition, which was described in some detail above. These omissions included the failure to disclose the extent of the material decline in net asset value of CCC's portfolio, the actual reasons for such decline, the high-risk nature of the portfolio in the then-present economic environment and the additional margin calls the Defendants expected in the near future.

77. On June 28, 2007, following panicked strategy sessions among themselves and their advisors, Defendants caused CCC to issue an announcement that it had postponed the pricing date for the IPO and that it would issue a supplemental Offering Memorandum containing a revised timetable for the global offering, as well as changes to the terms of the offering. On the same day, Stomber issued a letter to investors on behalf of CCC, stating that CCC was reducing the size of its offering to $300 million (from $415 million) at a price of $19 per share (from $22 per share)

78. On June 29, 2007, Defendants caused CCC to issue a Supplemental Offering Memorandum, announcing a decrease in the number of Class B Shares and RDSs being offered from 19,047,620 to 15,962,673 and that the initial global offering price would be $19 per Class B Share.

79. On July 4, 2007, CCC Class B Shares were listed on Euronext. The IPO was completed on July 11, 2007, with sales of a further 18,183,873 Class B Shares issued

at $19 per share, raising gross proceeds of $345,494,000. The IPO consisted principally of two components: (1) a private placement to U.S. investors of RDSs, which were U.S. securities issued by Bank of New York that represented Class B Shares of CCC held by Bank of New York in its capacity as depositary, and (2) a private placement to investors in other nations of Class B Shares of CCC.

80. Also on July 11, 2007, Defendants arranged for the $191 million bridge loan to Citigroup to be repaid using the funds raised through the IPO, together with $1,798,000 in interest on the two month loan. CCC raised $345.5 million by way of this IPO. The total funds therefore raised by CCC through the private placements in December 2006 and February 2007 and the IPO in July 2007 exceeded $945 million.

81. Following the completion of the IPO, approximately 3,503,600 Class B Shares were held by persons affiliated with CIM. Substantially all of these shares were subject to 180-day lockup agreements pursuant to which the holders could not sell these shares. The lockup agreements would expire on or about January 7, 2008.

82. In light of the material adverse facts they and their advisors knew about the precarious condition of CCC and its business model, Defendants should never have proceeded with the IPO. Defendants should have instead liquidated CCC's assets entirely, or at least liquidated a sufficient quantity of RMBS to sustain a 40% liquidity cushion. These steps would have contained some of the losses incurred by CCC, and its then-current shareholders, at relatively modest levels. The Defendants were unwilling to take these steps, however, as they would have forced CCC to acknowledge substantial (theretofore) unrealized losses, as well as the impossibility of achieving CCC's income and dividend objectives, and would have precluded CIM's further receipt of management fees (tied to the full $945 million being raised and invested) and, ultimately, the sale by insiders' of their incentive shares following the 180-day lockup period. Instead, the Defendants, aided and abetted by their advisors, defrauded a new group of investors, those who, like Plaintiffs, purchased CCC securities sold through the IPO. If Defendants

and the Underwriters had made full and honest disclosures about CCC's condition as of late June and early July, 2007, it would have been impossible to conduct the IPO. To make matters worse, Defendants used the $345 million raised in the IPO for additional leveraged RMBS acquisitions instead of improving CCC's liquidity and its chances of survival.

**Defendants Continued to Misrepresent that CCC Would Follow a More Conservative Approach Required by Its Investment Guidelines, While It Continued to Use Leverage in Excess of the Limits Imposed by Those Guidelines**

83. In July 2007, Carlyle, CIM, and the directors of CCC, including Conway, failed to utilize the funds obtained from CCC's IPO in order to maintain and increase CCC's Liquidity Cushion but, in fact, used those funds to buy more RMBS. This was despite the fact that CCC had already sustain unrealized and undisclosed losses on its RMBS portfolio of approximately $63 million as of June 30, 2007, and that market conditions had clearly become much more volatile and had exacerbated the risks to CCC's ability to remain viable and solvent.

84. Notwithstanding the grave circumstances facing CCC at the time of the IPO and thereafter, Defendants continued to misrepresent that they were following CCC's investment Guidelines. In a July 27, 2007 letter to shareholders, Stomber represented as follows:

> We are proud to say that the model worked as we planned during the recent interest rate rise and we maintained our liquidity cushion in accordance with our investment guidelines. ...We will likely reduce our use of leverage and focus on maintaining targeted performance rather than increase returns. Higher credit spreads and increased volatility in the financial markets increases the risks of our portfolio. By reducing leverage, we believe we can offset the increase in risk associated with higher spreads and volatility while maintaining targeted returns.

The foregoing statements were intentionally false and misleading. CCC's model had not "worked." As Defendants had foreseen, market conditions had deteriorated drastically since late 2006. As measured by the market value of its assets, CCC had lost approximately $70 million since its inception. Nor had it effectively maintained the

liquidity cushion the Defendants claimed would exist. The Board of CCC had twice granted exceptions to maintaining that cushion, a fact not disclosed to the public in the Offering Memorandum, in the Supplemental Offering Memorandum or otherwise. Additionally, the proceeds of the Bridge Loan were the only reason that CCC did not have a *negative* liquidity cushion at the time of the IPO.

85. At a July 26, 2007 Board meeting, Hance and Stomber explained that, in the press release accompanying the June 30, 2007 quarterly results, they had "consciously excluded any discussion of net asset value because they wanted investors to focus on the dividend potential." Furthermore, they explained: "net asset value was not the focus of [CCC's] management and was not how [CCC] was managed." Attempting to divert attention to "dividend potential" was inherently deceptive, as a discussion of net asset value would have accurately depicted the present state of affairs at CCC, which had incurred substantial losses to date (albeit unrealized under IFRS accounting rules). This discussion among the members of CCC's Board further evidences the Defendants' premeditated decision to issue a false and misleading Offering Memorandum, by de-emphasizing the (rapidly declining) net asset value of CCC and emphasizing its (increasingly illusory) prospects for future dividends.

86. Also at the July 26, 2007 Board meeting, the Defendants caused the Board to approve the acquisition of a further (approximately) $1.5 billion in RMBS. On July 30, 2007 and August 3, 2007, the Defendants caused CCC to purchase $1,429,089,180 and $73,550,172 of RMBS respectively, thereby continuing to deplete CCC's remaining liquidity at a time when it desperately needed to be increased. Certain of CCC's repo counterparties were requesting haircuts in the range of 3 to 5% during July 2007 for RMBS repos with CCC. In particular, Bank of America LLC indicated to CCC that it was considering obtaining higher haircuts from CCC.

87. By August 2007, CCC had little or no Liquidity Cushion available to it and drastically needed to reduce leverage and restructure its Business Model. Even in

August 2007, however, CCC did not sell any RMBS. In August 2007, CCC had more than $21 billion of outstanding repo borrowings, employing leverage of 32 times capital.

88. During August 2007, the repo financing relationship between Cantor Fitzgerald (which had previously provided $3 billion of repo financing) and CCC ceased following a $73 million margin call, which Carlyle and CIM refused to meet. Bank of America and JP Morgan refused to provide repo funding to CCC despite previously having open repo line availability of over $5 billion. Other repo counterparties such as Lehman Brothers, Bear Stearns, UBS and Deutsche Bank continued to seek and require haircuts of 3 to 4%.

89. On August 7, 2007, Stomber informed Conway and Hance that "FT [pricing] marked us down 30MM today" and that "Cantor made a margin call that we would not accept and we moved the RMBS." Stomber also said that he suspected "we may go below 20 percent on our liquidity cushion and will ask the independent directors for prior approval tonight or tomorrow to do so. Will ask at the next Board meeting for unilateral approval to go to 15 percent for 90 days so we get away from fire drills." Stomber concluded his email by stating:

> I do not see this problem getting better in the short run – I expect it to get worse. As a public company, we need to stick to our mandate of being a safe investment and not chase the last 50-100 bps of dividend yield. Our dividend as it is remains superior to the competition.

90. On August 17, 2007, Stomber sent the following email from his Blackberry, entitled "Update for the Week" to CCC's Directors, copied to several Carlyle officers, which described the grave predicament that had befallen CCC:

> Joanne said I should give the Board an update for the week – I have spoken to you or you have received emails so I will quickly cover earlier events and focus on where we are currently at –
> 1. The current credit market meltdown is worse than 98 on a stat basis – pure fact
> 2. The liquidity cushion was designed to cover a 98 meltdown and then some. In 98, no repo dealer questioned a 2 percent haircut on floaters and prices were transparent

3. The subprime meltdown and the word mortgage has affected even the price of AAA US govt floating rate cap securities because of lack of buyers beyond what model prices suggest – not hiding behind a model, simply put for the first time in my career plain vanilla agency debt traded from a historic price of Libor minus 16 to Libor minus 11 – now back at minus 16. We buy plain vanilla securities overlaid with a cap that is very transparent in the market. This is not about exotic option model where it is difficult to price. The price of 5 year caps (a benchmark for our portfolio) is plain vanilla and quoted on Bloomberg.
4. Repo dealers have abandoned our FT third party pricing service and are marking securities to distressed prices. We have over 100MM of cash posted to repo dealers as margin over the MTM of the portfolio.
5. We have LH asking for 70MM of margin in the past 4 days and agreeing they have changed their MTM on repo to be more conservative and at levels to sell securities in size. They readily admitted today that prices in the market for 50MM blocks were significantly below their mark.
6. Our most pressing risk is to dealers suddenly saying all haircuts are at 3 percent – a 50 percent increase in margin or 1 percent on 23 bil of securities is 230MM. Facing this risk, I asked Carlyle to put in an additional 100MM of cash in unsecured note form after our 6 underwriting banks agree that –
1. They will maintain a 2 percent haircut going forward
2. They will honor their amount of line committed on a reasonable basis Bill C and I are meeting with the 6 IBs Monday to present our proposal. Early indications are the IBs want to work with us and solve the problem. After all, they just affirmed their DD on us and took us public – they should not be the very same banks that are not living up to agreements, especially on pricing of repos. The paradox – the market meltdown means the Fed can not raise rates – so our capped securities will not be at risk for rates going above the cap. Our FT pricing service showed a gain of 13MM last night. Our IFRS income and dividend target is on target. Meanwhile we were margin called today to the extent where we have about 5MM of cash left – Lehman was the worse example of a repo dealer where repo marks were 20 to 50 bps away from where new securities were being offered in the cash market. JPM went to a 3 percent haircut and we moved securities to Citi at 2 percent – Citi has been a total pro. On the other hand, JPM made the comment a couple of days ago that all counterparties are at 3 percent haircut – which implies all counterparties are the same and the securities they buy are the same. So much for sophisticated risk/credit models that new BIS standards must approve. Our plan that you approved is to – meet with the 6 underwriters Monday and tell them they must honor 2 percent haircuts and reasonable prices and if so, Carlyle will put 100MM of cash into CCC in unsecured note form. Now is not the time to tell you how we expect to finance repo in the future to remove this problem. It deals with a term repo market, guaranteed repo lines and not having securities bought on a ramped basis so we have concentrated risk to one general price level of RMBS securities. This all will be vetted at a future Board meeting. Bill has asked if I can …still digest solid foods? – wish that was my problem, but not an issue. I will likely have to listen to my taped speeches of Churchill during

> WWII for inspiration. Available all weekend for any question from anyone addressed. (emphasis added)

91. During a August 23, 2007, emergency meeting of the Board, Hance explained to the Board that:

> 1. in the last four weeks since the last board meeting, the mortgage markets in the US had gotten "decidedly worse";
> 2. CCC had faced substantial margin calls;
> 3. some of CCC's lenders had decreased the amount they were willing to lend CCC to 97% of the value of the underlying securities (that is, they increased the haircut to 3%);
> 4. CCC had gone through $200 million of liquidity; and
> 5. it was likely that CCC would draw down the full $100 million of the Carlyle loan.

According to Hance "[t]he overall effect of these events on [CCC] has been to diminish [CCC's] liquidity cushion below zero". As a result, CCC would need more cash if it was to be able "to make the repurchase roll on Monday," August 27, 2007.

> management is under no illusions of the impact of recent events on the portfolio and realizes that it needs to preserve capital where it can. Management believes it would be prudent to wind down the Company to its core level at this time.

92. On a date between August 17, 2007 and September 17, 2007, CCC's capital allocated to RMBS exceeded 85% as a consequence of sales of CCC's assets other than RMBS assets. CCC's capital allocated to RMBS exceeded 85% at all times thereafter.

93. If Defendants had accurately recognized CCC's actual losses, as they were obligated to do, they would have exceeded a stunning $270 million as of August 31, 2007. The Defendants, however, continued to engage in a concerted course of action designed to avoid the recognition of losses, and to continue generating fee income for CIM and affiliates. Moreover, Defendants intentionally concealed CCC's dire circumstances from existing shareholders and the investing public generally, all the while CCC was hurtling toward collapse.

94. On August 27, 2007, Stomber issued a letter to CCC's shareholders in response to several of its shareholders' requests "for information about the current status of CCC's investment portfolio." The letter described the effects of recent market volatility upon CCC:

> This environment produced two adverse consequences for CCC: (i) a modest decline in the fair value of AAA rated US Government agency issued mortgage-backed securities, and (ii) an increase in collateral (margin) required by our lenders. As the fair value of our MBS portfolio declined, our lenders made margin calls to ensure that the amount of CCC's indebtedness did not exceed the fair value of the underlying collateral. In addition, some of our lenders have recently decreased the amount they were willing to lend CCC to 97% of the fair value of the underlying securities, from the historical lending rate of 98% of fair value. Consequently, CCC's liquidity cushion has not been sufficient to meet recent margin calls. Management and the board have acted swiftly and definitively to address the dramatic change in our business environment.

A media release published by CCC on the same day included a description of the steps taken by CCC in order to meet its margin calls, which were described as having been taken "to create additional liquidity in the event of continued market volatility" and to "help us better weather the market conditions we are facing."

95. The foregoing statements that management had acted "swiftly and definitively" to address the challenges facing CCC, and that management had taken steps to "create additional liquidity," were intentionally false and misleading. The Defendants had not taken steps to address CCC's liquidity problems. What needed to be done was simple – CCC needed to sell off all, or at least a substantial portion of, its RMBS holdings. The Defendants did not want to do this, however, because it would have forced CCC to recognize its (thus far) unrealized losses, and obliterated the façade of normalcy and the prospect of issuing a quarterly dividend. The measures taken by the Defendants were attempts to put in place short-term solutions *to avoid the sale by CCC of RMBS assets*, which would have required CCC to realize and record the accompanying losses or raise additional equity capital at market prices significantly below the IPO price, which

would have been detrimental to Carlyle's reputation but would have been beneficial to CCC and its shareholders.

96. In the month of August 2007, CCC's reported net asset value had declined by approximately 24% from $843,483,058 at the end of July 2007 to $642,104,242 at the end of August 2007, a loss of some $200 million in one month.

97. By September 17, 2007 the average price volatility of RMBS securities, as measured by the Defendants, was an astounding 140% higher than it was in November 2006.

98. Defendants announced on September 11, 2007 that fundamental revisions to CCC's business model were required and would be implemented, acknowledging that CCC's business model needed to be thoroughly restructured to reduce leverage and increase minimum liquidity cushion to at least 40%. Even then, however, CCC's excessively leveraged condition had already made it vulnerable to imminent collapse. In order to make it appear that they were doing something proactively, the Defendants publicly committed to "employ less leverage," "have more diversified asset classes," and concentrate on "improving and stabilizing sources" for CCC.

99. The Defendants' announcements of September 10-11, 2007 were false and misleading. They did not have any intention of employing, and did not employ, any material revisions to CCC's business model. Specifically, they did not, in practice, impose or could they impose a 40% minimum liquidity requirement, nor did they substantially reduce CCC's overall leverage. Defendants chose to continue to operate CCC well outside the limits set in its initial guidelines. In fact, all the while concealing their conduct from investors and existing shareholders, they expressly approved the suspension of the requirements (a) of a 20% minimum liquidity cushion, (b) that CCC maintain repo lines of a minimum of 125% of all borrowings, and (c) that a maximum of 85% of CCC's capital be allocated to RMBS.

100. On October 1, 2007, Stomber sent an email to CCC's Directors, copied to several Carlyle officers, which requested approval for the suspension of the requirements (a) of a 20% minimum liquidity cushion, (b) that CCC maintain repo lines of a minimum of 125% of all borrowings, and (c) that a maximum of 85% of CCC's capital be allocated to RMBS. The Board approved the requests.

101. In CCC's report for the quarter ending September 30, 2007, issued on or about November 15, 2007, Stomber represented that CCC's "20% liquidity cushion was adequate for the price changes on our AAA–rated Agency portfolio during this quarter." This statement was false and misleading, as the 20% Liquidity Cushion fell far short of the funding needed to meet then-current margin calls based on market price changes alone.

102. By November 13, 2007, CCC's Liquidity Cushion had further reduced to $19.9 million, which was 3% of Adjusted Capital. Contrary to their representations to the investing public, Defendants had not taken the steps necessary to maintain, let alone increase, CCC's Liquidity Cushion.

103. On November 13, 2007, the Board met. The Board approved CIM's quarterly management fees (for the quarter ending September 30, 2007) of $3.9 million. The Board approved the repayment of an outstanding $100 million loan from Carlyle and the borrowing of an additional $100 million (at 10% interest) from Carlyle. Defendants also amended the definition of "liquidity cushion" to include as liquid assets undrawn debt from the Carlyle. Thus, instead of taking steps to actually improve CCC's liquidity position, Defendants thus attempted to re-engineer the definition of "liquidity" to make CCC's position *appear* more favorable than it was. The Board did not take any steps to actually address CCC's precarious liquidity problems and over-accumulation of RMBS-based assets. At the same Board meeting, Hance informed the Board "that management was recommending several changes to [CCC's] investment guidelines based on its experiences during recent weeks" and Stomber stated that management recommended the

suspension of certain requirements of CCC's Guidelines until March 31, 2008 "to give management increased flexibility to manage CCC through the liquidity crisis." Remarkably, despite not having available sufficient cash to do so, Stomber and other members of the Board advocated at the November 13, 2007 Board meeting that CCC should still plan to pay a dividend based on fourth quarter and year-end earnings.

104. At the meeting of the Board of CCC on November 13, 2007, as proposed by Carlyle and CIM, the directors of CCC resolved to suspend the requirement that CCC maintain a minimum Liquidity Cushion until March 31, 2008.

105. Defendants took no steps to (a) reduce RMBS assets; and (b) acquire assets with lower risk, such as AAA rated G7 government securities with a maturity of less than three years, in order to restore CCC's capital allocated to RMBS to at most 85%. CCC's capital allocated to RMBS as calculated by CIM increased to 94% by September 30, 2007 and continued to increase to 98% by December 31, 2007 and to 99.8% by January 15, 2007.

106. On or about January 7, 2008, the 180-day lockup period applicable to Class B Shares held by Carlyle insiders expired. The Defendants and their cohorts were thereafter free to sell their shares.

## The Collapse of CCC

107. At a meeting of the Board of CCC on February 27, 2008, as proposed by Defendants, the directors of CCC resolved to suspend CCC's minimum 20% Liquidity Cushion requirement until September 30, 2008.

108. On February 27, 2008, CCC issued its annual report for the year ending December 31, 2007. Notwithstanding the fact that Defendants knew it was misleading to investors and shareholders, CCC reported net income of $16,790,000, under IFRS, for the year ended December 31, 2007. Stomber falsely represented that "[d]uring the fourth quarter our portfolio stabilized and we were able to generate returns consistent with our

near term targets." Stomber further represented that "[wle continue to run our business to preserve the value of our shareholders' equity."

109. These statements were false and misleading, as CCC was in perilous financial condition and on the verge of collapse. As at December 31, 2007, CCC had incurred a change in the fair value reserve deficit of $285,623,000 as part of its equity under IFRS and share-based compensation expense of $1,853,000. Under US GAAP, CCC would have reported a staggering loss of $266,987,000. CCC's Liquidity Cushion, as originally defined, was $27,181,000 as at December 31, 2007 (4.1% of Adjusted Capital) comprised of cash and cash equivalents of $11,751,000 and unencumbered RMBS of $15,430,000. According to the definition amended on November 13, 2007, CCC's Liquidity Cushion was $67,181,000 (10% of Adjusted Capital), comprised of cash and cash equivalents of $11,751,000, unencumbered RMBS of $15,430,000 and undrawn loan funds from Carlyle of $40,000,000.

110. On March 5, 2008, CCC issued a press release, indicating that, during the week between February 28 and March 5, it had received margin calls from lenders requiring it to post an additional $60 million of collateral. CCC could not meet all of those demands, which led at least one lender to send a default notice. On Thursday March 6, CCC shares were down 60% (from approximately $15 per share ) to $5.00 per share. The Dutch market regulator suspended trading in CCC after its shares closed on Thursday, March 6, 2008 at a price of approximately $5.00 per share.

111. On Tuesday March 11, 2008, trading in CCC shares re-opened. On March 12, 2008, CCC announced that "it expects lenders will soon take possession of substantially all" its remaining assets after it was unable to meet surging margin calls on its portfolio of residential-mortgage-backed securities." Shares of CCC lost 95% of their value, falling from approximately $3 per share to $0.15 per share.

112. On March 17, 2008, the Royal Court of Guernsey entered a "winding up" order directing that CCC be liquidated, and appointed certain liquidators to wind down

the affairs of, and liquidate, the enterprise. Alan Roberts and Neil Mather were appointed Joint Liquidators of CCC. On March 18, 2008, on March 18, 2008 Christopher Morris and Adrian John Denis Rabet were appointed Additional Joint Liquidators (the Joint Liquidators and Additional Joint Liquidators are collectively referred to as "the "Liquidators").

**CCC's Fraudulent Concealment, and the Belated Emergence of Facts Sufficient to Support a Claim of Securities Fraud**

113. In order to conceal the fraudulent scheme by which Defendants misrepresented the financial condition and business prospects of CCC, Defendants undertook deliberate and affirmative steps to conceal, both before, during and subsequent to the Class Period, facts sufficient to apprise Plaintiff and the Class of the existence of potential claims against the Defendants.

114. During the Class Period, Defendants intentionally and repeatedly made misrepresentations participated in and/or aided and abetted by The Underwriters of the IPO, of material facts concerning, *inter alia*, the operating condition of CCC, the efficacy of CCC's business model, and the adequacy of its Liquidity Cushion. Additionally, Defendants refused to timely liquidate RMBS positions that would have increased CCC's Liquidity Cushion and, ultimately, reduced its losses. They refused to do so because it would have forced CCC to acknowledge publicly those losses under IFRS, and because the reduction in its RMBS inventory would have eliminated any (scant existing) mathematical possibility of achieving Defendants' publicly proclaimed and unrealistically aggressive income and dividend objectives for CCC.

115. While the collapse of CCC and failure of its business model became public knowledge in March 2008, Defendants continued, thereafter, to conceal from the general public, and even from the Liquidators, those facts sufficient to support claims under the common law or the Netherlands Civil Code, including facts that would have been sufficient to apprise Plaintiffs and the Class that (1) Defendants' earlier

representations were false and misleading, (2) Defendants omitted to disclose material facts that were necessary to be disclosed under the circumstances, and (3) Defendants had done so negligently, recklessly and /or intentionally.

116. Upon information and belief, CCC's Liquidators, during the two years that followed their March 2008 appointment, began to investigate privately the circumstances of the management, and subsequent collapse, of CCC.

117. The Liquidators' efforts, however, were repeatedly resisted by the Defendants. The Liquidators have alleged that the Defendants have repeatedly obstructed their efforts to obtain custody of the complete books and records of CCC. As alleged by the Liquidators, in the months immediately after CCC was ordered to be wound up, "certain books and records of CCC, were made available by Carlyle and CIM for inspection" by the Liquidators, "but these books and records made available for inspection and copying did not represent the complete books and records of CCC. In particular, the sources of the records did not include the directors and key personnel of CCC, email records were generally confined to the first three months of 2008 and the books and records inspected did not include a number of categories which would reasonably be expected to exist."

118. Between March 2010 and July 2010, "despite extensive and repeated requests from the Liquidators, Carlyle and CIM have refused to produce the books and records of CCC to the Liquidators." The Liquidators further allege that "[t]he only documents that Carlyle and CIM have produced are copies of 52 randomly selected documents produced on May 4, 2010 which Carlyle and CIM's counsel described as being 'the CCC documents that we have been able to access at a reasonable expense.'"

119. The Liquidators further allege that "Carlyle and CIM have not produced any of their records to the Liquidators which relate to the affairs of CCC," and that they "have resorted to relying upon technical and untested objections to the Court's jurisdiction under Section 1782 of Title 28 of the United States Code."

120. The Liquidators allege that director Harvey Jay Sarles produced certain emails and other records that were never produced by CCC to the Liquidators.

121. The Liquidators further allege that, notwithstanding the fact that the 2007 annual report disclosed an asset of CCC described as "Investment in internal use software and other property", comprising computer software and hardware, with a book value purportedly exceeding $4 million, this computer software and hardware was retained by Carlyle and CIM and has never been returned to CCC or its Liquidators.

122. On or about July 7, 2010, the Liquidators commenced various substantially identical civil actions against the former directors of CCC and others in various courts in Delaware, the District of Columbia, New York and Guernsey. The Liquidators alleged that the Individual Defendants named herein breached their fiduciary duties to CCC, principally by causing it to acquire an excessive portfolio of RMBS, and to borrow excessively from repo lenders, without reserving adequate liquid assets to enable it to meet margin calls and increased "haircuts" being charged by repo lenders.

123. If not for the repeated refusal of the Defendants named herein to cooperate with the Liquidators, the Liquidators would have been able to commence their actions much earlier than they did.

124. The Liquidators' Complaint revealed material adverse information known to the Defendants that was withheld from the public during the Class Period and thereafter, including facts that indicate that the Defendants made material misrepresentations and omissions, and did so with intent to defraud and/or recklessly. The Liquidators' Complaint is the principal source of previously undisclosed adverse information, and other previously nonpublic information, that forms the basis of Plaintiffs' allegations that Defendants made representations that were not truthful, failed to disclose material adverse information, and did so with scienter. Plaintiffs, believing them to be true, have copied factual allegations liberally from the Liquidators' Complaint.

125. The Defendants' fraud was thereby effectively and indefinitely concealed from the public at least until July 7, 2010. As a result of such concealment, the Plaintiff and Class members were at no time prior to the commencement of the Liquidators' actions, on actual or constructive notice of the fraud committed by the Defendants.

## CLAIMS FOR RELIEF

### COUNT I
### COMMON LAW FRAUD
### (by all Plaintiffs, on behalf of the entire Class, against all Defendants)

126. Plaintiffs repeat and restate each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

127. Defendants engaged and participated in a scheme, plan and continuous course of conduct to misrepresent and conceal the true operating and financial condition of the Company from approximately June 16, 2007 and continuing throughout the Class Period. Such scheme was intended to and did operate as a fraud and deceit on Plaintiffs and members of the Class, in causing them to purchase CCC securities at artificially inflated prices, both in the IPO and in the aftermarket.

128. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, individually and jointly, made untrue statements of material fact and/or failed to disclose material information in their possession regarding, *inter alia*, (a) the Company's financial condition and (b) the adequacy of the Company's liquidity position and efficacy of its business model.

129. As detailed herein, Defendants each knowingly or with deliberate recklessness committed manipulative or deceptive acts in furtherance of their fraudulent scheme including, *inter alia*, (a) causing and/or permitting the dissemination of false and misleading Offering Memoranda, news releases and other communications to the investing public; (b) preparing, approving and disseminating financial statements that overstated and misrepresented the operating and financial condition of CCC; and (c)

failing to take steps to correct the lack of sound internal controls and oversight risk management, and the deficiencies and material weaknesses therein.

130. Each of the Defendants was a direct, necessary and substantial participant in the common course of conduct alleged herein.

131. Defendants' scheme operated as a fraud or deceit on Plaintiffs and the members of the Class because the false and misleading statements concerning the financial and operating condition of CCC enabled the IPO to be carried out and, thereafter, caused and maintained the artificial inflation in the market price of CCC securities prices throughout the Class Period and until CCC collapsed in March 2008.

132. The Defendants' fraudulent conduct created the market for CCC securities. CCC should never have conducted the IPO, and could not have taken CCC public, nor could have CCC securities have continued to be publicly traded during the Class Period, if not for the course of conduct described herein and the active participation therein by the Underwriters of the IPO.

133. In ignorance of the fact that market prices of the CCC securities were artificially inflated and relying, directly or indirectly, on the false and misleading statements made by Defendants or upon the integrity of the market in which the securities traded and/or on the absence of material adverse information, certain Plaintiffs and other members of the Class acquired CCC securities on the aftermarket during the Class Period at artificially high prices and were damaged thereby.

134. At the time of said misrepresentations and omissions, Plaintiffs and the other members of the Class were ignorant of their falsity and had no reason to believe that the Defendants' public representations regarding CCC were not true, nor that the Defendants had failed to disclose material adverse information. Had Plaintiffs and the other members of the Class known of the true operating and financial condition of the Company and of its other problems as referred to herein, Plaintiffs and the other members of the Class would not have purchased or otherwise acquired CCC securities or, if they

had purchased and/or otherwise acquired such securities during the Class Period, they would not have done so at the artificially inflated prices that they paid.

135. As the truth about the extent and severity of the deterioration of the financial and operating condition, and inadequacy of internal controls, of CCC started to be released and become apparent to the market, the prices of CCC securities plummeted. All or a significant portion of the decrease in the market prices of CCC securities was due to the disclosure, revelation and/or leakage of information inconsistent with Defendants' prior disclosures and other public filings and releases.

136. The totality of the circumstances around the decline in the trading prices of CCC securities combine to negate any inference that the economic loss suffered by Plaintiffs and the other members of the Class was caused by changed market conditions, macroeconomic or industry factors or other facts unrelated to Defendants' fraudulent conduct as described above.

137. As a direct and proximate result of Defendants' fraudulent scheme to artificially inflate and maintain the market prices of CCC securities, Plaintiffs and the other members of the Class suffered economic losses in connection with their respective purchases and sales of the Company's securities during the Class Period.

138. The resulting collapse in the market prices of CCC securities was foreseeable at the time of the IPO and at all times of the Defendants' misrepresentations and omissions as described above. Indeed, despite being aware of the consequences of their fraudulent conduct, Defendants nevertheless knowingly engaged in the alleged misconduct, which, when the truth finally emerged, caused CCC securities market values to collapse.

139. As a result, in connection with the IPO and otherwise, the market for the Company's publicly traded securities promptly digested current information with respect to CCC from all publicly available sources and reflected such information in the price of the Company's securities. Under these circumstances, all purchasers of the CCC's

publicly traded securities during the Class Period suffered similar injury through their purchase thereof at artificially inflated prices.

140. The Carlyle Entities and CCC are liable under the doctrine of respondeat superior and the law of agency for the tortious conduct of Defendant Stomber and other persons in their employ.

141. By virtue of the foregoing, the Defendants have committed fraud under the common law of New York, the District of Columbia, Guernsey and the Netherlands, to the extent that any or all are applicable.

**COUNT II**
**NEGLIGENT MISREPRESENTATION**
**(by all Plaintiffs, on behalf of the entire Class, against all Defendants)**

142. Plaintiffs repeat and restate each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

143. Plaintiffs plead, alternatively to the foregoing allegations that Defendants acted recklessly or with intent to defraud, that Defendants acted negligently in disseminating false and misleading information and omitting information that was required to be disclosed under the circumstances.

144. By virtue of the foregoing, the Defendants have committed negligent misrepresentation under the common law of New York, the District of Columbia, Guernsey and the Netherlands, to the extent that any or all are applicable.

**COUNT III**
**VIOLATIONS OF §§ 6:162 and 6:194 OF THE CIVIL CODE OF THE NETHERLANDS**
**(by Plaintiffs Phelps, McLister and Wu, on behalf of the Share Purchaser Subclass, Against all Defendants)**

145. Plaintiffs repeat and restate each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

146. Under § 6:162, a person who commits a tortious act (unlawful act) against another person that can be attributed to him, must repair the damage that this other person

has suffered as a result thereof. Under § 6:194, a person who makes a misleading announcement concerning goods or services has acted tortiously. Under § 6:195, the Defendants cannot meet their burden of establishing that the Offering Memorandum and their other representations concerning CCC's business prospects were not misleading.

147. Plaintiffs and the Class relied, directly or indirectly, on the misleading Offering Memorandum by acquiring CCC securities, and/or acquiring them at a price that was higher than it would have been if the Offering Memorandum had not been misleading.

148. By intentionally, recklessly and/or negligently disseminating false and misleading information, and omitting from disclosure information that was required to be disclosed under the circumstances, in the Offering Memorandum and otherwise, the Defendants committed tortious acts against the Plaintiffs and member of the Class, and must repair the damage that they have suffered as a result thereof.

149. By virtue of the foregoing, the Defendants have committed violations of, and are liable under, §§ 6:162 and 6:194 of the Civil Code of the Netherlands.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

A. Determining that this action is a proper class action, certifying Plaintiffs as Class representative under Article Nine of the CPLR and appointing their counsel as Class Counsel;

B. Awarding compensatory damages in favor of Plaintiffs and the other members of the Class against Defendants for all damages sustained as a result of Defendants' wrongdoing in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon;

C. Awarding Plaintiffs and the other members of the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Such other and further relief as the Court may deem just and proper.

September 1, 2011

Respectfully Submitted,

/s/ Jonathan W. Cuneo
Jonathan W. Cuneo
Matthew E. Miller
CUNEO GILBERT & LADUCA, LLP
507 C Street, N.E.
Washington, DC 20002
(202) 789-3960

CUNEO GILBERT & LaDUCA, LLP
620 Fifth Avenue
New York, NY 10020
212-698-4504

Richard D. Greenfield
Marguerite R. Goodman
Ilene F. Brookler
GREENFIELD & GOODMAN, LLC
250 Hudson Street, 8th Floor
New York, N.Y. 10013
(917) 495-4446

*Co-Counsel for Plaintiffs and the Class*