**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| **D.J. WU, DANIEL BERGMAN, ALNEIL ASSOCIATES, and MICHAEL GAD,**<br><br>Plaintiffs,<br><br>v.<br><br>**JOHN CRUMPTON STOMBER,  WILLIAM ELIAS CONWAY, JR., JAMES H. HANCE, JR., MICHAEL J. ZUPON, ROBERT BARCLAY ALLARDICE, III, HARVEY JAY SARLES, JOHN LEONARD LOVERIDGE, CARLYLE INVESTMENT MANAGEMENT, LLC, T.C. GROUP, LLC, TC GROUP HOLDINGS, LLC, and CARLYLE CAPITAL COROR ATION, LTD.,**<br><br>Defendants. | No. 11-cv-07271-PKC<br><br><br><br><u>**AMENDED COMPLAINT**</u> |

Plaintiffs D.J. Wu, Daniel Bergman, Michael. Gad and AlNeil Associates, on behalf of themselves and all others similarly situated, by their undersigned counsel, allege the following based upon the investigation of counsel, except as to the allegations specifically pertaining to their own acts, which are based upon personal knowledge.  The investigation of counsel included, among other things, a review of the public records pertaining to Carlyle Capital Corporation, Ltd. ("CCC" or "the Company") and related persons, court records pertaining to other proceedings involving CCC, press releases issued by CCC and affiliates, media and news reports about CCC and affiliates, and publicly available trading data pertaining to CCC's securities.

<u>**JURISDICTION**</u>

1.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A) and (C). Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and (c), as Defendant Allardice resides in this District all Defendants transacted

business in this District, and many of the acts and transactions constituting the violations of law alleged herein, occurred in this District.

## PARTIES

2.      Plaintiff D.J. Wu is a resident of Washington, D.C.  Plaintiff Wu, in her capacity as trustee of a family trust,  purchased  (a) 26,316 RDSs in the Offering (as defined below), and (b) 25,000 Class B Shares listed for trading on the Euronext exchange.  Her participation in the offering was solicited by her broker, a registered U.S. broker-dealer, who, according to the records of the Financial Industry Regulatory Authority, was employed at the time by CitiGroup Global Markets, Inc. ("CGM"), a registered U.S. broker-dealer, and one of the placement agents in the Offering.

3.      Plaintiff  Daniel Bergman is a resident of the State of New York.  Plaintiff Bergman, in his capacity as general partner of  Bergman Family, L.P., a Nevada limited partnership with its principal place of business in New York,  purchased  52,600 RDSs in the Offering.  Mr. Bergman's participation in the Offering was solicited by his broker, a registered U.S. broker-dealer employed at the time by Lehman Brothers, Inc. ("Lehman") also a U.S. broker-dealer, and one of the placement agents in the Offering.

4.      Plaintiff Michael Gad is a resident of the State of New York.  Plaintiff. Gad, as co-trustee of a family trust, purchased 26,300 RDSs in the Offering.  His participation in the Offering was solicited by his broker, a registered U.S. broker-dealer employed at the time by Lehman.

5.      Plaintiff AlNeil Associates, a New York partnership with its principal place of business in New York, purchased 15,800 RDSs in the Offering.  AlNeil's participation in the Offering was solicited by its broker, a registered U.S. broker-dealer employed at the time by Lehman.

6.      Defendant Carlyle Investment Management, LLC ("CIM") is a Delaware limited liability company.  CIM is registered with the United States Securities and Exchange Commission ("SEC") as an investment adviser under the Investment Advisers

Act of 1940.  CIM, pursuant to an investment management agreement with CCC, was, at all pertinent times, the investment manager of CCC, with full discretionary investment authority.   CIM has, at all pertinent times, transacted business continuously and systematically in New York.

7.      Defendant T.C. Group, LLC ("TCG") is a Delaware limited liability company with its principal place of business in Washington, D.C.   TCG has, at all pertinent times, conducted business continuously and systematically in New York

8.      Defendant TC Group, Holdings, LLC ("TCG Holdings") is a Delaware limited liability company with its principal place of business in Washington, D.C.  TCG Holdings has, at all pertinent times, conducted business continuously and systematically in New York.

9.      CIM, TCG and TCG Holdings and/or other affiliated entities do business as "The Carlyle Group."   There does not appear to be a business entity by that name, although CCC referred to TCG as "The Carlyle Group" in certain of its publicly disseminated documents.  TCG Holdings has, at all pertinent times, conducted business continuously and systematically in New York.

10.      CIM, TCG and TCG Holdings are hereinafter referred to as the "Carlyle Entities" or "Carlyle."

11.      Defendant William Elias Conway, Jr., a Virginia resident, is or was a managing director of CIM, a director of CCC, and the Chief Investment Officer of TCG.

12.      Defendant John Crumpton Stomber, a Connecticut resident with his principal place of business at all times in New York, was the Chief Executive Officer, Chief  Investment Officer and President, and a director, of CCC, a Managing Director of CIM, and a Managing Director of TCG.

13.      Defendant James H. Hance, a resident of North Carolina, was a Director of CCC from September 14, 2006 and at all relevant times thereafter.  Defendant Hance was, at all pertinent times until March 2007, the Chairman of the Board of CCC.

Defendant Hance was also, contemporaneously, a senior advisor to CIM.

14.     Defendant Michael J. Zupon, a resident of New York, was a Director of CCC from September 14, 2006 and at all relevant times thereafter.  Zupon was a founding member, Chief Investment Officer and Managing Director and Head of Carlyle's US Leveraged Finance Group and was a Partner and Managing Director of Carlyle.

15.     Each of Defendants Conway, Hance, Stomber and Zupon was also a member of an Investment Committee which was established for CCC and was chaired by Conway. As such, the Investment Committee was constituted exclusively by the CCC directors who were also principals, directors, officers and/or employees of TCG and/or CIM and/or other TCG affiliates.

16.     Defendant Robert Barclay Allardice, III, a resident of New York, was a Director of CCC from September 14, 2006 and at all relevant times thereafter.

17.     Defendant Harvey Jay Sarles, a resident of Massachusetts, was a Director of CCC from September 14, 2006 and at all relevant times thereafter.

18.     Defendant John Leonard Loveridge, a resident of Guernsey, was a Director of CCC from September 14, 2006 and at all relevant times thereafter.

19.     Defendant CCC is a Guernsey limited company.   It is presently in liquidation.

20.     CCC was a closed-end investment fund.  Although ostensibly a separate business enterprise, CCC was, in practice, an investment product created and managed at all times by CIM and TCG.  CCC had no full-time employees.

21.     CCC was controlled, at all levels, by Carlyle, its principals, employees, officers and other personnel responsible for its operations, including CCC's most senior officer, Defendant Stomber.

22.     CCC's Investment Committee consisted entirely of Carlyle employees and advisors.  CCC's six outstanding Class A shares, which were the only voting shares

issued by CCC, were held at all relevant times by persons who were employed as Managing Directors of Carlyle who thus had the power to select and did select the Board of Directors (the Class B Shares owned by certain Plaintiffs and members of the Aftermarket Class were non-voting shares). The Class A shareholders, as Carlyle employees, acted at the direction of Carlyle, affording it complete control of CCC. CCC's Board of Directors was led, and dominated by, Carlyle principals, employees and advisors.

23. Defendants Hance, Allardice, Sarles and Loveridge were, at all times relevant, through meetings of the CCC Board of Directors and otherwise, kept well-informed by Defendants Conway, Stomber and Zupon and the Carlyle Entities of all material facts bearing upon the financial and operating condition of CCC and the fact that its survival was at serious risk.

24. Defendants Stomber, Conway, Zupon, Hance, Allardice, Sarles and Loveridge are hereinafter referred to as the "Individual Defendants." Each of the Individual Defendants had the power to control, and exercised such control, over the documents and statements disseminated to the investing public in the name of CCC.

25. Because of the Individual Defendants' positions within and/or otherwise related to the Carlyle Entities, they each had access to adverse undisclosed material information about CCC's true financial condition and investments. They each were privy to such undisclosed information from internal corporate documents, communications among themselves and with other officers and employees of the Carlyle Entities as well as attendance at, and documents received during, meetings of management, and Boards of Directors. Each of the Individual Defendants knew or were deliberately reckless in not knowing of the adverse material facts which rendered the statements alleged herein false and misleading. Despite personal knowledge of the fundamentally deteriorated condition of CCC throughout the Class Period, each Individual Defendant was motivated to conceal such circumstances from investors while they concurrently were seeking further infusions

of critically-needed capital and supporting, artificially, the offering and market prices of CCC shares.

## CLASS ACTION ALLEGATIONS

26.     Plaintiffs bring this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of (1) an "Offering Class" consisting of all persons who purchased or otherwise acquired Class B Shares or RDSs of CCC in its Offering and were damaged thereby, and (2) an "Aftermarket Class" consisting of all persons who purchased or otherwise acquired Class B Shares of CCC in market purchases during the period from July 4, 2007 through March 17, 2008, inclusive (the "Class Period") and were damaged thereby.  Excluded from the Classes are the Defendants herein, officers and directors of the Carlyle Entities and CCC, members of their immediate families, the Placement Agents of the Offering (including their respective parents and affiliates) and the heirs, successor, affiliates or assigns of any of the foregoing. The definitions of the Classes are subject to discovery with respect thereto and may be amended at the time Plaintiffs file their motion seeking certification of the Classes by the Court. All references to the "Class" below refer to both the "Offering Class" and "Aftermarket Class" unless the content indicates one or the other.

27.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe there are, at a minimum, more than 500 members of the Class.

28.     CCC common stock traded on Eurolist by Euronext, an open and efficient market, during the Class Period.  Euronext is the fifth largest stock exchange in the world.  It has, since April 2007, been owned by the same ownership as the New York Stock Exchange, NYSE Euronext, Inc. ("NYSE Euronext"), a Delaware corporation. NYSE Euronext touts the combined enterprise as the "first global stock exchange."

29.     Upon information and belief, a majority of CCC shares purchased during the Class Period were, at all times, purchased by United States residents within the United States.  Thus, in addition to the fact that CCC was managed by Americans residing and conducting business in the United States, its RDSs and shares were purchased and owned principally by investors in the United States.

30.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. The following are questions of law and fact common to the Class:

- whether the Defendants engaged in acts or conduct in violation of the applicable common law, or the Civil Code of the Netherlands, as alleged herein;

- whether the Defendants made negligent, intentional and/or reckless misrepresentations and/or omissions of material facts regarding CCC to the investing public;

- whether such misrepresentations and/or omissions of material facts were essentially linked to the damages sustained by the Plaintiffs and the members of the Class;

- whether the Defendants acted knowingly or with deliberate recklessness in making false and misleading statements, or in withholding key information, in issuing false and misleading financial statements, news releases  and other communications to the investing public about the financial and operating condition of CCC;

- whether the prices of CCC shares during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so,  the proper measure of such damages.

31.     Plaintiffs' claims are typical of those of the Class because Plaintiffs and

the other members of the Class sustained damages arising out of the Defendants' wrongful conduct, in violation of applicable law.

32.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class actions and securities litigation.  Plaintiffs have no interests antagonistic to, or in conflict with, those of the Class.

33.     A class action is superior to other available methods for the fair and efficient adjudication of the controversy since joinder of all the members of the Class is impracticable.  Furthermore, because the damages suffered by most of the individual Class members may be relatively small, the expense and burden of individual litigation makes it impracticable for the Class members individually to redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

<u>**SUBSTANTIVE ALLEGATIONS**</u>

34.     During the Class Period, Defendants caused to be issued a series of false and misleading statements, and omitted material facts that were required to be disclosed, regarding the true operating and financial condition of CCC, in violation of applicable common law and, to the extent applicable, the Civil Code of the Netherlands and the laws of other countries wherein transactions in CCC securities were effectuated.

**About CCC, its Business Model and its Investment Guidelines**

35.     On May 18, 2006, Carlyle announced that Defendant Stomber would be joining Carlyle as a Managing Director in the Leveraged Finance Group. Carlyle announced that Stomber would help it to "develop new investment products and expand existing business lines."  Stomber joined Carlyle from Cerebrus Capital Management, L.P., a New York-based private equity firm.  Also joining Carlyle from Cerebrus was Defendant Stomber's associate, Mr. Trozzo, who also became a Managing Director of Carlyle.

36.     On August 29, 2006, CCC was formed as a limited company under the

8

laws of Guernsey, Channel Islands**.**  Guernsey is not part of the United Kingdom and Acts of Parliament are of no effect there unless formally adopted locally. Guernsey has its own banking, securities and corporate law.  The United Kingdom provides only for its international representation and defense.  Fund managers are attracted to incorporate in Guernsey because of its relatively lax regulatory regime.  Fund managers are attracted to Guernsey precisely because it is *not* part of the United Kingdom, and, more importantly, *not* part of the United States.  Carlyle caused CCC to be incorporated in Guernsey in order to attempt to evade, to the extent practicable, the registration requirements imposed pursuant to United States law.  CCC has no rational connection to Guernsey other than Carlyle's decision to incorporate it there.

37.     CCC was a closed end investment fund formed by, and managed at all times, and heavily promoted by, the Carlyle Entities. CCC shares were initially sold to investors through private placements, and later would become publicly traded commencing in July 2007. CCC's stated objective was to achieve superior annual profits and a dividend yield of at least 12% by investing in a purportedly diversified portfolio comprising residential mortgage backed securities ("RMBS") and leveraged financial assets, seeking to generate returns principally from the difference between the interest earned on the acquired assets and the cost of financing those assets through short term repurchase ("repo") agreements and other forms of financing. CCC purportedly was to conduct its business within strict Investment Guidelines ("Guidelines") in order to minimize risk and to provide a "safety-net" to protect CCC if there occurred excessive market volatility and other foreseeable events. In fact, CCC was a vehicle for the CCC Entities to capitalize on The Carlyle Group's reputation with so-called "private equity" investments and the investing public's need for fundamentally high-quality investments with significant cash returns. Carlyle's goal in creating CCC was to provide an opportunity to generate for Carlyle and its founders massive management, incentive and other fees charged to CCC which was, from the outset, anything but safe and sound

despite its apparently risk-free RMBS and other securities. It was, by the time its initial capital was invested in RMBS a "house of cards" only to be made more vulnerable to collapse by the time of its public offering discussed below.  As part of the scheme certain of the Defendants and/or other Carlyle insiders were given bonus shares, giving them an incentive to protect stock prices following the Offering.

26.      By the time of the commencement of the Offering, CCC was already in precarious financial health, which was well-concealed from potential investors, counterparties and others outside of CCC. In putting together its collection of RMBS and other financial assets, The Carlyle Entities caused CCC to acquire or commit to acquiring volatile, high-risk securities that could only be purchased using massive borrowing with the securities purchased serving as collateral.

38.      Under its repo agreements, CCC sold RMBS to its repo counterparties and agreed to repurchase the same RMBS back from them at a price equal to the original sale price plus accrued interest. The original sale price to the repo counterparty would be at a discount to the fair value of the security, being an initial margin known as a "haircut". While most of CCC's RMBS were the subject of repos, CCC did retain a small portion of its RMBS as unencumbered securities for the purpose of maintaining at least some liquid assets necessary to meet margin calls that were likely to result due to decreases in the value of the securities or increases in the amount of the haircuts that could be imposed on CCC by the counterparties when the RMBS were "re-financed" and/or subject to margin calls.

39.      Each of the Defendants was aware that the financing of CCC's investments in RMBS through repos utilizing extensive levels of leverage exposed CCC to extraordinary market and other substantial risks.  For example, if CCC were to borrow $20 billion to purchase $20 billion in RMBS, a 1% drop in the value of the securities, or a 1% increase in the haircut, would require it to put up an additional $200 million in collateral to avoid a default.  To attempt to contain those risks, as indicated above,

Defendants, on or about October 4, 2006, established certain risk management and "Investment Guidelines" for CCC. These Guidelines, although they provided CCC's Board and senior management with ample flexibility and gave them ample room to function within stated risk parameters, were intended to protect CCC from a "meltdown" or catastrophic failure of the type that ultimately occurred only months later and brought CCC to insolvency and liquidation.

40.     Most importantly, the Guidelines required "Minimum Liquidity" of "20% of Capital" as a "limit on total portfolio leverage."  This requirement was generally referred to by CCC as its "Liquidity Cushion" – an unencumbered minimum liquidity cushion was necessary to protect CCC's capital, by ensuring that cash and equivalents would be readily available to meet the requirements imposed by CCC's repo counterparties and other financiers.  Liquid assets would be necessary to meet any margin calls effected by these financiers in response to any decreases in market value of the financed assets and/or increases in collateral requirements.   The 20% liquidity cushion, and CCC's business model, more generally, were modeled, purportedly, to withstand market volatility of the order experienced in the Summer of 1998.

41.     The Guidelines also required CCC to maintain "minimum borrowing and liquidity capacity of 150% (with a target of 200%) of total investment assets."

42.     The Guidelines also limited the capital allocated to investments in RMBS to a maximum of 85% of CCC's total capital, a further key risk management measure under CCC's Business Model.

43.     CCC's business model identified a maximum leverage ratio of 19 times capital (in other words, it would not borrow more than 19 times its unencumbered investment capital).  By early 2007, at the time they began soliciting investments for CCC's private placements of $ 600 million from sales of Class B Shares, however, Defendants raised this threshold to 29 times capital.  In practice, leverage generally exceeded 30 times CCC's capital.

**The Initial Financing of CCC**

44.     At the first CCC Board of Directors meeting on October 6, 2006, Defendant Stomber informed the Board that Carlyle and CIM had already caused CCC to commit to purchase $2 billion in securities. Stomber then described CCC's Business Model and the use of leverage. Stomber "explained that [CCC] is operating with a 38% liquidity cushion which was on the conservative end of the spectrum." Defendant Hance, a CCC Director, and Stomber, informed the Board that "the most frequent questions received to-date in their fundraising activities related to the use of leverage," which the Individual Defendants, including employees of Carlyle, were describing to potential investors as "conservative." At a subsequent telephonic Board meeting on December 20, 2006, in discussing CCC's financial statements, Stomber informed the Board "that management had not, and did not intend, to utilize the maximum amount of leverage available under the [liquidity] cushion," essentially what was being told to prospective investors.

45.     By December 31, 2006, the first round of external investment in CCC was completed through a private placement of 13,154,000 shares at an issue price of $20 per Class B share, raising $263,080,000.

46.     On February 2, 2007, Defendants caused the Guidelines for CCC to be amended such that the minimum borrowing and liquidity capacity was reduced from 150% (with a target of 200%) to 125% (with a target of 150%) of total investment assets. The amendment was approved by CCC's Board at a meeting held on February 15, 2007. Stomber explained that the amendment was "prudent" and "advisable to give management flexibility to respond to changing market conditions."

47.     CCC issued a further 16,846,000 shares by way of a private placement on February 28, 2007, raising $336,920,000.  The total amount raised by CCC's private placements by that time was approximately $600 million. Upon information and belief, because of already asserted or likely prospective assertion of claims by the investors in

the initial CCC private placements (believed to be more than 30 investors), Carlyle has

been obtaining releases of such claims in exchange for valuable consideration which has

not been disclosed publicly.

### CCC Incurred Substantial Unrealized Losses, and its Business Model Was Failing, in Advance of the Offering

48.     At a March 5, 2007 Board meeting, Stomber informed the Board that CIM

would likely be entitled to an incentive fee on CCC's portfolio for the quarter ended

March 31, 2007 "and would be fully profitable for The Carlyle Group."

49.     At the same meeting, Carlyle officer William Greenwood gave the Board

an update on the status of the subprime mortgage market and the "related deterioration in

the credit market."  By the Spring of 2007, there was considerable turbulence in mortgage

markets.  There were bankruptcy filings of numerous mortgage originators, including

Ownit Mortgage Solutions, American Freedom Mortgage Inc., Mortgage Lenders'

Network USA and ResMae Mortgage Corp; and  indices that tracked the value of

mortgage-backed instruments had declined dramatically by early 2007.   Nonetheless,

the Board did not discuss what protective steps needed to be taken by its members and

management to ensure that CCC was prepared for further foreseeable deterioration in

financial markets and, in particular, in those in which RMBS were being created,

financed, bought and sold.

50.     The Defendants had, since the formation of CCC, planned to conduct a

broader offering (the  "Offering") subsequent to the first round private placement, for

purposes of, *inter alia*,  (1) generating huge profits for The Carlyle Group, its principals

and affiliates; (2) raising additional capital to attempt to compete with other highly

capitalized funds perceived by the Defendants to be competitors, and (3) to support an

ultimate public market for CCC shares that would enable the Defendants to further profit

from the sale of CCC shares they received as incentive compensation and otherwise.  By

March 2007, the Defendants had already commenced preparation of an offering memorandum (the "Offering Memorandum") for the Offering .

51.     At the March 5, 2007 CCC Board meeting, the Board reviewed the latest draft of the Offering Memorandum prepared by Defendants and focused in particular on the section entitled, "Management's Discussion and Analysis" ("MD&A").  Stomber told the Board that "the primary goal of the MD&A section was to inform a prospective shareholder that the overall investment strategy of [CCC] was to allocate capital and use leverage in a manner to maximize shareholder value and generate a steady dividend".  Stomber explained that therefore "the disclosure in the MD&A focused on the *liquidity cushion*, the *diversification of the portfolio* … and [CCC's] affiliation with Carlyle" (emphasis added), all of which were consistent with the  purportedly "relatively conservative" description of CCC made by the Defendants at the time of the private placements.  The foregoing discussions reflect a premeditated intent to draft a misleading Offering Memorandum that de-emphasized and/or did not disclose the risks involved in CCC's business model and the failures in it that had already transpired, while emphasizing CCC's and the Defendants' association with Carlyle, a brand name more commonly affiliated with more conservative forms of investment.

52.     With hundreds of millions of dollars already in hand from the initial round of private placements, Defendants caused CCC to continue to borrow aggressively, and to acquire RMBS.  By March 30, 2007, CCC had already acquired $17.3 billion of financial assets (including $16.5 billion of RMBS) and had incurred debt of $16.1 billion through repos.

53.     In April 2007, Stomber sought approval from the directors of CCC, on an alleged "one-time basis," to use the Liquidity Cushion to buy certain RMBS prior to the Offering, which entailed a reduction in the minimum Liquidation Cushion requirement to 15%.  The Board approved his request.

54.     By May 2007, Carlyle and CIM had consumed the majority of the capital available to CCC for the purchase of RMBS and sought to obtain further capital to increase the size of CCC's investment portfolio and, with it, CCC's leverage. Carlyle and CIM did not want to wait to receive the proceeds of the planned Offering in order to purchase more RMBS.

55.     On May 10, 2007, CCC entered into a term loan agreement with CitiGroup Global Markets Inc. ("CGM," one of the brokerage firms which would, ultimately, market the Offering to investors within the United States) which allowed CCC to borrow up to $191 million. The loan (the "Bridge Loan") was obtained in contemplation of the Offering and was required to be repaid from the proceeds of the Offering.  Due to the already precarious nature of CCC and its financial condition and the risk that the Offering would not take place as the Defendants planned, CGM charged CCC a high interest rate on the funds borrowed, to reflect the risk to it. By May 30, 2007, Carlyle and CIM had already caused CCC to borrow the entire amount available under the Bridge Loan and used the proceeds to finance the acquisition of additional RMBS in conjunction with further repo financing.

56.     By May 2007, as the Defendants were well-aware, conditions in global credit markets had deteriorated significantly since CCC's formation in late 2006. The increase in subprime mortgage defaults, first noted by the Board in February 2007, began to have an increasingly negative impact in the market for RMBS.  Widespread mortgage defaults were occurring in the United States, which eroded the value of certain RMBS and analogous assets.  Between November 2006 and June 11, 2007, the risk as measured by APV for each RMBS security increased an astounding 58%.

57.     During May 2007, CCC's portfolio suffered an unrealized loss of $41.6 million or 7% of CCC's net asset value, and further significant losses of up to $50 million were anticipated with materially greater losses foreseeable.  Moreover, margin calls for another $70 million were expected which would reduce the liquidity cushion below 20%,

and a number of CCC's lenders started to request haircuts of 3%, representing an increase in collateral required of 50%.

58.     On June 7, 2007 Stomber sent a lengthy email to the Board of CCC, informing the Board of substantial losses that CCC had sustained as a result of recent market events.  Stomber told the Board that as a consequence of a change in the "5 years swap rate," a $25 million unrealized gain had become an $8 million unrealized loss on CCC's mortgage-backed securities and that CCC's Net Asset Value had declined as a result. Stomber stated that "[t]oday was a wild day" in the market "where rates went up materially" and that CCC could sustain further significant losses of up to $50 million. Stomber warned the Board that the level of CCC's unrealized losses raised disclosure issues for the Offering. Most importantly, Stomber was aware and informed the Board that those events had negatively impacted CCC's Liquidity Cushion:

> Bad news is the price change has eroded the liquidity cushion as we make margin calls based on spread changes. The Liq Cushion stands at 23 percent but could be called down close to 20 percent – that is why we have it.

59.     Six days later, on June 13, 2007, Stomber sent a further email to CCC's Directors, entitled "Status of CCC".  The email, copies of which were provided to various Carlyle officers.  Stomber informed CCC's Directors that "[l]ast night we made the decision to postpone the Offering of CCC as a result of volatile market conditions, an uncertain MTM [marked-to-market] of our balance sheet and comps in the equity market trading down 10-25%." Stomber said that as of June 11, 2007, CCC's IFRS[1] net income

---

[1] CCC's financial statements and quarterly reports were prepared on the basis of International Financial Reporting Standards ("IFRS"),  issued by the International Accounting Standards Board, which includes accounting standards referred to as the "International Accounting Standards" ("IAS") issued by the former International Accounting Standards Committee.  IFRS varies in certain significant respects from United States Generally Accepted Accounting Principles ("GAAP"). In particular, IFRS allowed CCC to avoid recognizing publicly the material decline in the fair value of its investment assets as losses, facts well-known by the defendants but concealed from the investing public.  Under IFRS, CCC primarily classified its investments (including RMBS) as

"was on target for a 14.5% 2nd quarter" but he also noted that CCC's "Fair Value Reserve was down $63.9MM from inception and $76.2MM for the year," meaning that CCC had suffered unrealized losses in those amounts under IFRS.  Stomber then outlined CCC's "next steps for the immediate future," and stated:

> We are having a major liquidity event so I invoked "emergency powers" on the balance sheet. The liquidity cushion is currently at $148MM, which is technically above 20% of our current MTM equity position. But please take no comfort in that, we could be margin called for up to another $70MM and therefore bring the cushion down to about 11%. Therefore, we need independent Board Member approval to go under 20% - that is the purpose of the liquidity cushion – to be there so we don['t] not have to sell securities at depressed prices during a margin call. Therefore, I ask you for your formal approval.

60.    Stomber then referred to possible asset sales to free up capital and then referred to the "$200MM bank loan that was to be repaid with proceeds from the Offering" and said that there would be internal discussion as to how to manage it. Stomber identified the possibility of asking "the banks to convert at least 100MM to equity to mirror the original deal they had once committed to."

61.    Notwithstanding the additional risk to CCC's ability to survive, which fact was already known to each of the Defendants, on June 14, 2007, the Board resolved to reduce CCC's minimum Liquidity Cushion requirement from 20% to no less than 10% of Adjusted Capital.

62.    During June 2007, CCC's portfolio suffered an unrealized loss of $52 million or 9.4% of CCC's net asset value. When combined with the unrealized loss in

---

"available for sale" and gains and losses arising from changes in the fair value of those investments were recognized directly in equity as "fair value reserve (deficit)", unless the investments were sold or impaired. That is, the gains and losses from changes in fair value were generally not recorded as part of CCC's net income or loss.  Under U.S. GAAP, gains and losses arising from changes in the fair value of "available for sale" investments would have been recorded as part of CCC's net income or loss. By utilizing IFRS accounting, the Defendants, notwithstanding their own knowledge of the material deterioration of the value of CCC's investment portfolio and exposure to massive losses, were able to and did conceal these facts from prospective investors.

May 2007 of 7% of net asset value, CCC suffered a 16% loss to net asset value, equivalent to the 16% "worst case scenario" loss modeled (based on events in 1998) by CIM when Defendants established the minimum 20% Liquidity Cushion Investment Guideline. This highlighted the need to not only preserve minimum liquidity, but to increase and maintain a materially *higher* level of liquidity than the minimum of 20%.

63.     In the period June through to August 2007, at a time when CCC's financial viability was already at risk, CIM, Carlyle and the directors of CCC did not increase or even maintain CCC's minimum 20% Liquidity Cushion. This was despite the fact that it became clear to each of the Defendants that the minimum 20% Liquidity Cushion was not sufficient to meet margin calls attributable to the changes in the fair value of CCC's securities subject to repos as well as meeting increased "haircuts" from certain of CCC's repo counterparties.

64.     By the end of June 2007, in just nine months, CCC had acquired $21.8 billion of RMBS, representing 95% of CCC's total assets, financed by short term borrowings under repo agreements of $21.2 billion CCC's leverage ratio as at June 30, 2007 was 40.2 times, or 29.8 times by treating the Bridge Loan of $191 million as equity. Without the inclusion of the $191 million in proceeds of the Bridge Loan (which was required to be repaid to CCC's lenders), CCC's Liquidity Cushion was *less than zero* on June 30, 2007.  Including the proceeds of the bridge loan, CCC's Liquidity Cushion was $186,100,000 at June 30, 2007 comprised of cash and cash equivalents of $35,400,000 and unencumbered assets of $150,700,000, and represented 27% of adjusted capital.

65.     As at June 30, 2007, CCC's *reported* equity/net asset value was $552,629,000 and had fallen below the $600,000,000 in capital raised by way of private placement.

66.     Notwithstanding the calamitous performance of CCC, the management and incentive fees paid to CIM for the six months ended June 30, 2007 were $4,421,000 and $4,681,000 respectively. Other fees paid to Carlyle and CIM for the quarter as

reimbursement for purported overhead expenses relating to office rent, furniture, supplies and personnel salaries totaled $660,000. In addition, CCC "reimbursed" Carlyle and CIM $2,545,000 for its charges for "internal use software and other property". In other words, despite having lost in the range of $60 million of the capital of CCC (and much more under GAAP), Carlyle and CIM were paying themselves nearly $10 million for their purported  "services" and otherwise.

**Defendants Omitted Material Facts from the Offering Memorandum Concerning CCC's Grave Financial Condition and Proceeded With the Offering Against the Advice of the Offering's Placement Agents**

67.     In June 2007, the six brokerage firms that would serve as Placement Agents (defined below) in the proposed Offering advised Carlyle that, because of ongoing market volatility, CCC's Offering should be delayed. Various internal Carlyle communications indicate that the Defendants remained uncertain whether the Offering should or would proceed in light of instability in the fixed income and equity markets and their impact on CCC.  Defendants and the Placement Agents prepared and circulated among themselves various alternative "scripts" to use for communications to investors and journalists in the event that the Offering did not proceed at all, which Defendants had widely touted publicly.

68.     On June 14, 2007, Stomber sent a further email to CCC's Directors, with copies provided to certain Carlyle officers, announcing that, notwithstanding the decision the previous day to postpone the Offering, that, assuming all went well the following day, they intended to "file on Monday with the AFM [(the Netherlands' Authority for the Financial Markets)] and proceed with the Offering." Stomber sought Conway's specific consent to proceed with the Offering. Conway confirmed that he was "OK with a filing Monday and a go if things remain as they are."

69.     On or about June 19, 2007, Defendants caused CCC to issue and begin to disseminate an "Offering Memorandum" of that date.  The Offering was, at that time,

intended to consist of an offering by CCC of 18,874,420 newly issued Class B Shares and RDSs together with the sale by certain selling shareholders of 173,200 existing Class B Shares.  The Offering Memorandum stated that the initial offering price would be between $20 and $22 per Class B share. The Defendants were thus prepared to have new investors, such as Plaintiffs and the members of the Class, notwithstanding the already massive deterioration in CCC's financial condition and losses of more than $60 million, invest, through the Offering, at the same approximate share price as those investors who purchased shares through the private placements, before CCC's very survival had come into question.

70.    The Offering Memorandum was filed with the AFM in the Netherlands on or about June 19, 2007.  The document header on the copy filed with the AFM, and still available on the AFM website indicates that it was published by "ACE BOWNE OF NEW YORK," a reference to the New York office of Bowne & Co., Inc., a firm that, among other things, was engaged in the printing and preparation of securities offering documents for filing and other dissemination to the investing public.

71.    The Offering Memorandum described CCC's purported financial condition, including its capital allocation and use of leverage, as of March 31, 2007.  The omission of complete financial data for the period following March 31, 2007 rendered the Offering Memorandum misleading to a material extent, because, *inter alia*, as described above, CCC's financial condition had deteriorated significantly in the three months between March 31, 2007 and the Offering, when Plaintiffs purchased RDSs and other investors purchased Shares, by which date CCC's very survival was already in doubt.

72.    The Offering Memorandum contained an intentionally deceptive and very brief description of certain of CCC's "Recent Developments." The Recent Developments Section contained interim financial results through June 13, 2007 that were represented to be "based upon valuations of securities … provided to [CCC] by Interactive Data Pricing and Reference Data, Inc., an external pricing service."   This section contained statements

that  CCC's fair value reserves had declined by only $17.3 million between January 1, 2007 and June 13, 2007 (an increase $11.6 million from January 1 to March 31, 2007, and a decline of $28.9 million from March 31, 2007 through June 13, 2007).  The foregoing presentation, even assuming that it accurately conveyed the information obtained by CCC from IDPRD, was rendered misleading by the omission of the internal data previously relied upon by Defendants in their internal communications and assessment of CCC's performance.   As noted above, Defendant Stomber had told all Board members, on June 13, 2007, that the "Fair Value Reserve was down $63.9MM from inception and $76.2MM for the year."  Notably, in internal communications, the Defendants and other Carlyle personnel relied on internal calculations that differed from the IDPRD-provided information conveyed in the Offering Memorandum. If Defendants not omitted this material information from the Offering Memorandum, the Offering could not have taken place at any price, as no rational investor would have acquired CCC shares or RDSs.  The omission of material adverse recent developments was in violation of IAS 10, which requires, *inter alia*, that "When the events after the balance sheet date that do not involve adjustments are of such importance *that failure to disclose may affect the ability of users of financial statements for the evaluations and take economic decisions*, the entity shall disclose the following information, [f]or each of the major categories of events after the balance sheet date that do not involve adjustments: ( a) the nature of the event and (b) an estimate of its financial [impact], or a statement about the impossibility of making such an estimate." *Id*., ¶ 20 (emphasis added).   The financial reporting in the Offering Memorandum also failed to comply with provisions of the IFRS Conceptual Framework for Financial Reporting, Chapter 1, which provides, *inter alia,* that "the objective of general purpose financial reporting is to provide financial information about the reporting entity that is useful to existing and potential investors, lenders and other creditors in making decisions about providing resources to the entity." *Id*. at QB2.  The Offering Memorandum failed to comply with these directives because

the Defendants intentionally omitted material adverse information concerning recent developments.

73.     In the Offering Memorandum, Defendants further represented that the decline in fair value reserves between March and June 2007 was simply and purportedly "a result of changes in interest rates."  While literally true, this statement was rendered misleading by the omission of the fact that the decline was due in large part due to a dramatic increase in the haircuts charged by CCC's repo lenders, which threatened the viability of CCC's business model.  The use of the more innocuous term "interest rates" was rendered misleading by Defendants' material omission of the fact that the "haircuts" charged by repo lenders had increased substantially.

74.     In the Offering Memorandum, Defendants further represented that "we are targeting the payment of a dividend within a range of approximately $0.51 to $0.56 per Class B share (unaudited) for the quarter ending September 30, 2007 and within a range of approximately $0.53 to $0.58 per Class B share (unaudited) for the quarter ending December 31, 2007," and that "we do not believe that these changes in interest rates or the fluctuations in our fair value reserves and total equity per Class B share will affect our targeted dividends for the quarters ending September 30,2007 and December 31, 2007." These statements were rendered misleading by the material omission of disclosure of the calamitous declines in CCC's fair value reserves and massive impairment of its liquidity that had occurred as of the Offering, and were expected to occur in the near future, which had substantially reduced the prospects for achievement of the stated purported  dividend objectives.

75.     In the Offering Memorandum, the Defendants aggressively touted the relationship between CCC and Carlyle, touting Carlyle's status as "one of the world's largest private investment firms" that "combines global vision with local insight," and has in its employ "a team of 782 employees, including 416 investment professionals operating out of 29 offices in 18 countries…"   The Defendants further represented that

"[w]e have structured our relationship with Carlyle to ensure that our interests are closely aligned."  The foregoing statements were false and misleading in at least two respects. First, they falsely portrayed CCC as an investment product typical of Carlyle ventures. The Carlyle brand name is more closely associated with unusual investment opportunities offered to elite investors, when CCC would be an entirely different fund – a publicly traded investment fund utilizing a not-particularly-sophisticated (nor novel) business model.  Carlyle's resources would not provide CCC with any particular advantages. Second, to the contrary, the interests of Carlyle and CCC were *not* "closely aligned," as CIM and Carlyle had an interest in maximizing management fees paid to them from CCC, and in prolonging the operations of CCC (at least until the end of the lockup period on the sales of shares by insiders) and avoiding the recognition of losses that could jeopardize its ability to continue to operate.  It would have been in the interests of CCC to cease operations entirely, or at least to scale back its acquisitions of RMBS, in order to minimize losses.  The interest of Carlyle and CIM, however, were entirely different.

76.    The Offering Memorandum contained an exceedingly long "laundry list" of "boilerplate" "Risk Factors" describing possible adverse events that *might* conceivably occur, and *might* adversely impact CCC, in the future. None of such "Risk Factors" was intended to truly inform investors of the actual and then-present risks to CCC's survival that were already known to each of the Defendants at the time the Offering Memorandum was issued and disseminated by them. The Defendants, through their legal counsel who drafted it on their behalf, as well as other advisors and "experts" who participated therein, made sure that the Offering Memorandum, contained no description of the very serious adverse events that had already occurred, and had already caused very substantial unrealized losses, and, at the very least, should have raised serious doubt about the viability of CCC's business model. Such material non-disclosure of the real risks that had burdened and would continue to burden CCC was intentional and purposefully deceptive.

77.     On the issue of CCC's Liquidity Cushion, the Offering Memorandum stated:

> Our investment guidelines require us to hold unrestricted cash and cash equivalents and unencumbered U.S. agency or U.S. government securities (together, the "Liquidity Cushion") equal to no less than 20% of our Adjusted Capital. The Liquidity Cushion is intended to be sufficient to meet reasonably foreseeable margin calls on our financed securities.
> …
> The maintenance of an unencumbered Liquidity Cushion is fundamental to the management of a leveraged investment portfolio. Our current investment guidelines require a Liquidity Cushion equal to no less than 20% of our Adjusted Capital. The Liquidity Cushion is intended to be sufficient to meet reasonably foreseeable margin calls on our financed securities. We have performed extensive statistical testing of our expected portfolio, including testing during periods of significant financial market volatility and stress, to determine the level of this Liquidity Cushion, balancing the need for sufficient reserves with the desire to efficiently deploy capital. Our liquidity position is monitored by Carlyle and reviewed by our board of directors.

The foregoing representations, although literally true, were rendered misleading by (1) the failure to disclose the fact that CCC's Board of Directors had twice recently approved reductions in the Liquidity Cushion to 15%, and 10%, respectively, and (2) that Defendants knew that the Liquidity Cushion was likely to imminently fall (and remain) well below 20% due to impending margin calls about which the Defendants already knew were coming.

78.     On June 28, 2007, following panicked strategy sessions among themselves and their advisors, Defendants caused CCC to issue an announcement that it had postponed the pricing date for the Offering and that it would issue a supplemental Offering Memorandum containing a revised timetable for the global Offering, as well as changes to the terms of the Offering. On the same day, Stomber issued a letter to investors on behalf of CCC, stating that CCC was reducing the size of its offering to $300 million (from $415 million) at a price of $19 per share (from $22 per share).

79.     On June 29, 2007, Defendants caused CCC to issue a Supplemental Offering Memorandum, announcing a decrease in the number of Class B Shares and

RDSs being offered from 19,047,620 to 15,962,673 and that the Offering price would be $19 per Class B Share.

80.    The Offering was completed with sales of 18,183,873 Class B Shares and RDSs issued at $19 per share, raising gross proceeds of $345,494,000.  The Offering consisted principally of three components:  (1) a private placement of RDSs, pursuant to Rule 144A, 17 C.F.R. § 230.144A ( promulgated by the SEC pursuant to its authority under the Securities Act of 1933)  to U.S. institutional investors, (2) a private placement of RDSs, pursuant to Regulation D, 17 C.F.R. §§ 230.501 - 230.508, promulgated by the SEC pursuant to its authority under the Securities Act of 1933, to "accredited" individual investors and up to 35 non-accredited investors, and  (3) a private placement to investors in other nations of Class B Shares of CCC.  The Offering, thus, consisted exclusively of private placements, and none of the sales in the Offering by the Defendants and their Placement Agents occurred on any securities exchange.

81.    In most circumstances, an issuer marketing securities to United States investors must file a Registration Statement with the SEC, pursuant to Section 5 of the Securities Act.  There are, however, various exemptions to the registration requirement.

82.    One such exemption is the one provided in Regulation S, 17 C.F.R. §§ 230.901 - 230.90, promulgated by the SEC pursuant to the Securities Act, which applies to certain "offshore" issuances of securities by both domestic and foreign issuers of securities.  Regulation S provides that the registration requirement of the Securities Act only applies to "offers" and "sales" of securities that occur within the United States.

83.    Defendants did not rely, and could not have relied, on Regulation S with respect to the Rule 144A and Regulation D placements because it does not apply to securities offerings which are directed to persons in the United States.  It also, generally, does not apply to sales to United States investors, unless the transactions are executed on a foreign exchange.  For purposes of Regulation S, both the offers and sales of the RDSs covered by the Offering occurred in the United States.  Because of this fact, the

Defendants availed themselves of other exemptions to the registration requirement of Section 5 of the Securities Act, specifically, the Rule 144A and Regulation D exemptions referred to above. If the offers and sales of the RDSs had occurred outside of the United States, they would have qualified for the Regulation S exemption and it would not have been necessary for the Defendants to comply with Rule 144A or Regulation D.

84.     Depositary shares are United States securities issued by a "depositary" (typically a United States financial institution) that holds in trust corresponding securities in an enterprise whose shares trade or will trade on a foreign exchange. The depositary issues certificates in the form of "depositary receipts" to the beneficial owner of the depositary shares. The depositary receipts are negotiable securities that may be transferred to other United States investors. Depositary receipts may, or may not, be listed on a United States exchange.

85.     The RDSs sold in the Offering were issued by Bank of New York ("BNY"), a provider of depositary services, from its offices at its principal place of business in New York, New York. As indicated on the website of Bank of New York Mellon Corporation ("BNY Mellon," a successor to BNY") "[a] Depositary is a bank that issues Depositary Shares representing the securities of a non-U.S. issuer that the Depositary custodizes in the local market." Also as indicated on that website, depositary receipts are "negotiable U.S. securities." BNY Mellon's website lists, among its many depositary receipt programs, CCC, National Australia Bank, and Vivendi.

86.     The Offering Memorandum stated that the RDSs were "not issued by us [(CCC)]." The Offering Memorandum stated that RDS holders are not shareholders of CCC, and will not be recognized as shareholders of CCC.

87.     The Offering Memorandum stated that the RDRs representing the RDSs were negotiable securities, albeit with the restriction that they could only be transferred to U.S. persons if they were institutional investors or accredited investors.

88.     The RDSs were a different security from CCC's Class B Shares.  The RDSs were identified on Plaintiffs' transaction documents with a different description and CUSIP identifier (143070100) than that of CCC Class B Shares (G1989N-12-1).  The RDSs were assigned a unique International Securities Identification Number ("ISIN"), US1430701003, bearing the prefix "US" to denote that they were a United States security.  All depositary shares issued by BNY and BNY Mellon are assigned an ISIN with a "US" prefix.  The Class B shares were assigned the ISIN GG00B1VYV826, with the prefix "GG" denoting the issuer's place of incorporation (Guernsey).  The Class B shares traded under the ticker symbol "CCC" on Euronext, and traded under the ticker symbol "CARYF" once they became available on United States over-the-counter trading platforms in November 2007.  The RDSs were never listed on any exchange, nor were they ever available on any over-the-counter trading platforms.

89.     The Offering Memorandum identified as "managers" or "bookrunners" of the Offering five U.K.-based and UK-incorporated companies (that were, at the time, wholly-owned subsidiaries of United States entities that controlled them):  (1) Citigroup Global Markets Limited, (2) Bear, Stearns International Limited (n/k/a J.P. Morgan Markets Limited), (3) Goldman Sachs International, (4) J.P. Morgan Securities Ltd., and (5) Lehman Brothers International (Europe).  The Offering Memorandum further identified, as a sixth "manager" or "bookrunner," the London "branch" of Deutsche Bank, A.G. ( "Deutsche Bank", a German corporation with its principal place of business in Frankfurt, Germany).  These six entities identified as "bookrunners" and "managers" are collectively identified as the "London Banks" and each, with the exception of Deutsche Bank, was a wholly-owned subsidiary of one of the five principal United States brokerage firms which marketed CCC securities (together with a New York based subsidiary of Deutsche Bank) within the United States ("New York Banks") .

90.     The United States subscription agreement (the "Subscription Agreement," styled as a "Purchaser's Letter"), was incorporated in the Offering Memorandum.

91.     The Subscription Agreement expressly provides that it "shall be governed by and construed in accordance with the laws of the State of New York."

92.     The Regulation D Placement, according to the Offering Memorandum, was conducted by means of a direct sale by CCC to certain "accredited" United States investors.  According to the Subscription Agreement, the Regulation D Placement was limited to investors who had "a pre-existing business relationship" with one of the "Placement Agents." The United States Subscription Agreement, the form of which was an appendix to the Offering Memorandum, defines "Placement Agents" so as to include the London Banks and their "U.S. affiliates," including the New York Banks.  Plaintiffs adopt that definition for purposes of this complaint.

93.     All six of the London Banks had, at the time of the Offering, "U.S. Affiliates" that were licensed broker-dealers who sold securities in the United States.

94.     None of the Plaintiffs, and, upon information and belief, none of the Regulation D purchasers, had a "pre-existing business relationship" with any of the London Banks.  None of the London Banks were, or are, registered broker-dealers pursuant to the Exchange Act, nor otherwise licensed to sell securities in the United States, or in any one of the United States.  The only way for a United States investor to have had a relationship with any of the London Banks would be if the investor resided overseas (in a jurisdiction in which the London Banks were qualified to sell securities) for a time period and maintained separate securities accounts there, which, in addition to being unlikely, would be entirely fortuitous.  All of the Plaintiffs in this action, and in the related consolidated actions pending in Washington, were brokerage customers of one or more of the New York Banks.  Upon information and belief, all of the Regulation D investors were brokerage customers of one or more of the New York Banks or United States affiliates.

95.     CGM expressly represented on its confirmation statements pertaining to the Regulation D placement that it "acted as a principal in this transaction."

96.     On July 25, 2007, CCC filed a "Form D," incorporated by reference herein, with the SEC, pertaining to the Regulation D Placement.  In the Form D, CCC identified those persons who were paid, or who would be paid, remuneration for the solicitation of purchasers in the Regulation D Placement.  CCC identified six New York-based Delaware-incorporated broker-dealers registered with the SEC:  (1) CGM, (2) Deutsche Bank Securities, Inc. ("DBS"), (3) Goldman Sachs & Co. ("Goldman"), (4) Lehman, (5) Bear Stearns & Co., Inc. ("Bear"), and (6) JPMorgan Securities, Inc. ("JPMS") (collectively, the "New York Banks").  The Form D indicated that (1) CGM had solicited Regulation D investors in Arizona, California, Connecticut, the District of Columbia, Florida, Georgia, Illinois, Indiana, Maryland, Massachusetts, Minnesota, New Jersey, New York, Oregon, South Dakota, Texas, Virginia and Washington, (2) DBS had solicited Regulation D investors in California, Florida, Illinois, Maryland, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Vermont and Virginia, (3) Bear had solicited Regulation D investors in Georgia, Colorado, Florida, Massachusetts, Missouri, New Hampshire, New York, North Carolina, Oregon, Texas and Washington, (4) Goldman had solicited Regulation D investors in California, Massachusetts, New York, Texas and Washington, (5) JPMS has solicited Regulation D investors in Colorado, Delaware, Florida, Maryland, New Hampshire, New York, South Dakota and Virginia, and (6) Lehman had solicited Regulation    D investors in Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Illinois, Indiana, Kansas, Kentucky, Maryland, Massachusetts, Missouri, Nebraska, Nevada, New Hampshire, New Jersey, New York, Oklahoma, Pennsylvania, Rhode Island, South Carolina, Tennessee, Texas, Vermont, Virginia, and Washington.  The Form D was executed by New York-based Chief Accounting Officer & Controller Vincent Rella.  Mr. Rella represented on the Form D that his "business or residence address" was in Guernsey.

97.     The Rule 144A placement, according to the Offering Memorandum, was conducted by means of (1) a sale by CCC of shares to certain "Initial Purchasers,"

followed by (2) a sale by the "Initial Purchasers" to certain United States institutional investors. The Subscription Agreement defines "Initial Purchasers" so as to include the London Banks "or their U.S. affiliates." Upon information and belief, (1) none of the Rule 144A purchasers acquired RDSs from any of the London Banks, none of whom were ever licensed to sell securities in the United States, and (2) all of the Rule 144A purchasers acquired their RDSs from one of the New York Banks.

98.     Although the form of the Subscription Agreement for United States investors was included as an appendix to the Offering Memorandum, United States broker dealers (including the stockbrokers of the Plaintiffs) generally obtained the forms by downloading them from the website netroadshow.com. The subscription documents for the Offering are still available on that website, following this link: http://www.netroadshow.com/content/CARL271u/pdf/pl.html. The instructions page to the subscription documents states "Attached please find the Purchaser Form to be completed in connection with the Carlyle Capital Corporation Limited global offering for Class B shares and Restricted Depositary Shares (RDSs)." The instructions page then states:

**BEFORE ANY RESTRICTED DEPOSITARY SHARES CAN BE ALLOCATED TO YOUR ACCOUNT THIS FORM MUST BE COMPLETED IN WHOLE AND RETURNED VIA FAX TO:**
                              **RICHARD CHAND**
                              **FAX (646) 291-5813**
                              **PH: (212) 723-7441**

The telephone number 212-723-7441 is, at present, a "non-working number at Citigroup" in New York. Mr. Chand was, at the time of the Offering, a registered broker and analyst employed by CGM in New York, New York. Mr. Chand is now employed by another registered broker-dealer in New York.

99.     In accordance with the foregoing instructions, completed Subscription Agreements were faxed to CGM in New York.

100.   The Rule 144A and Regulation D placements were transactions consummated entirely within the United States.   The offer preceding the sales of RDSs by the New York Banks was directed by CCC, the Defendants and their agents to persons located in the United States.   The seller, CCC, was located in the United States.   The seller's agents (United States-licensed broker dealers) were located in the United States. The buyers were located exclusively in the United States.   The RDSs were issued by BNY in the United States.

101.   On July 11, 2007, Defendants arranged for the $191 million bridge loan to CGM to be repaid using the funds raised through the Offering, together with $1,798,000 in interest on the two month loan.   CCC raised $345.5 million by way of this Offering. The total funds therefore raised by CCC through the private placements in December 2006 and February 2007 and the Offering in July 2007 exceeded $945 million.

102.   Following the completion of the Offering, approximately 3,503,600 Class B Shares were held by persons affiliated with CIM.   Substantially all of these shares were subject to 180-day lockup agreements pursuant to which the holders could not sell these shares.   The lockup agreements would expire on or about January 7, 2008.

103.   In light of the material adverse facts they and their advisors knew about the precarious condition of CCC and its business model, Defendants should never have proceeded with the Offering.   Defendants should have instead liquidated CCC's assets entirely, or at least liquidated a sufficient quantity of RMBS to sustain a 40% liquidity cushion.   These steps would have contained the losses incurred by CCC, and its then-current shareholders, at relatively modest levels.   The Defendants were unwilling to take these steps, however, as they would have forced CCC to acknowledge substantial (theretofore) unrealized losses, as well as the impossibility of achieving CCC's income and dividend objectives, and would have precluded CIM's further receipt of management fees (tied to the full $945 million being raised and invested) and, ultimately, the sale by insiders' of their incentive shares following the 180-day lockup period.   Instead, the

Defendants, aided and abetted by their advisors, defrauded a new group of investors, those who, like Plaintiffs, purchased CCC securities sold through the Offering.  In this sense, the Offering itself was inherently fraudulent, as it was designed in part to perpetuate the appearance that CCC remained profitable, or even viable.  If Defendants and the Placement Agents had made full and honest disclosures about CCC's condition as of late June and early July, 2007, it would have been impossible to conduct the Offering. Further, Defendants used the $345 million raised in the Offering for additional leveraged RMBS acquisitions instead of improving CCC's liquidity and its chances of survival.

**Defendants Continued to Misrepresent that CCC Would Follow a More Conservative Approach  Required by Its Investment Guidelines, While They Continued to Use Leverage in Excess of the Limits Imposed by Those Guidelines**

104.     On July 4, 2007, CCC Class B Shares were listed on Euronext.  The Defendants elected to cause CCC to trade on a foreign exchange in order to evade, to the extent practicable, the registration requirements and civil liability regime imposed by United States law.  CCC has no rational connection to the Netherlands other than Carlyle's decision to list CCC's shares there.

105.     In July 2007, Carlyle, CIM, and the directors of CCC, including Conway, failed to utilize the funds obtained from CCC's Offering in order to maintain and increase CCC's Liquidity Cushion but, in fact, used those funds to buy more RMBS. Upon information and belief, these irresponsible and extremely risky purchases were planned prior to the Offering and never disclosed in the Offering Memorandum. These purchases were made despite the fact that CCC had already sustained unrealized and undisclosed losses on its RMBS portfolio of approximately $63 million as of June 30, 2007, and that market conditions had clearly become much more volatile and had exacerbated the risks to CCC's ability to remain viable and solvent.

106.     Notwithstanding the grave circumstances facing CCC at the time of the Offering and thereafter, Defendants, in an upbeat July 27, 2007 letter to CCC's investors,

represented that the Second Quarter had been a success, with CCC earning an

"annualized return" of 12.88%, that was "consistent with" its "targeted performance":

> I am pleased to report that CCC had a net annualized return on average capital on $598 million of 14.67% for the quarter ending June 30, 2007. Measuring net return on average capital using both the proceeds from the private placement and the "pre-capital" from the bridge loan, CCC has a net annualized return on average capital for the second quarter of 12.88%, which is consistent with our targeted performance. Our agreements with investors in the private placement provided that the company would begin to pay dividends to our shareholders only after the completion of CCC's global offering. We intend to pay a dividend based on third quarter performance and will retain earnings this quarter. Had we paid a dividend for the second quarter equal to 90% of CCC's net annualized return on average capital, including pre-capital, the dividend yield per Class B share would have been 11.59%.

The foregoing statement s were rendered misleading by the omission of any discussion of

CCC's rapidly declining net asset value, because Defendants knew that CCC's net asset

value was a more accurate measure of the fund's performance, and was the principal

metric that Defendants relied upon internally.

107.    Defendants continued to represent that they were following CCC's

investment Guidelines. Stomber further represented as follows:

> We use leverage with each asset class to amplify returns, but we limit the amount of leverage we use by allocating a portion of our capital to a liquidity cushion. The liquidity cushion is comprised of cash, cash equivalents and unencumbered government securities. Under our current investment guidelines, we are required to maintain a liquidity cushion of at least twenty-percent of our adjusted equity. As CCC buys securities, we establish the liquidity cushion at settlement and use it to maintain margin during our holding period of the security. In the event that we receive a margin call on our levered securities, we can utilize the liquidity cushion to timely meet margin calls without having to make sales under potentially uncertain market conditions. We are proud to say that the model worked as we planned during the recent interest rate rise and we maintained our liquidity cushion in accordance with our investment guidelines.

> * * *

> Looking forward, we believe the current market conditions will allow CCC to invest the proceeds from the global offering into our chosen asset classes at higher spreads. We will likely reduce our use of leverage and focus on maintaining targeted performance rather than increase returns. Higher credit spreads and

increased volatility in the financial markets increases the risks of our portfolio. By reducing leverage, we believe we can offset the increase in risk associated with higher spreads and volatility while maintaining targeted returns. CCC's management team believes in the old fixed income adage "there are bold CIOs and there are old CIOs, but there are no bold, old CIOs". We will continue to manage your investment with a conservative view towards risk taking.

The foregoing statements were intentionally false and misleading. CCC's model had not "worked." Additionally, the statements were rendered false and misleading by the continuing failure to disclose the fact that CCC had departed from its investment guidelines. As Defendants had foreseen, market conditions had deteriorated drastically since late 2006. As measured by the market value of its assets, CCC had lost approximately $70 million since its inception. Nor had it effectively maintained the liquidity cushion the Defendants claimed would exist. The Board of CCC had twice granted exceptions to maintaining that cushion, a fact not disclosed to the public in the Offering Memorandum, in the Supplemental Offering Memorandum or otherwise. Additionally, the proceeds of the Bridge Loan were the only reason that CCC did not have a *negative* liquidity cushion at the time of the Offering.

108. At a July 26, 2007 Board meeting, Defendants Hance and Stomber explained that, in the July 27, 2007 shareholder letter, they had "consciously excluded any discussion of net asset value because they wanted investors to focus on the dividend potential." Furthermore, they explained: "net asset value was not the focus of [CCC's] management and was not how [CCC] was managed." The Defendants' diversion of attention to "dividend potential" was inherently deceptive, as a discussion of net asset value would have accurately depicted the present grave state of affairs at CCC, which had incurred substantial declines in net asset value to date. This discussion among the members of CCC's Board further evidences the Defendants' premeditated decision to issue a false and misleading Offering Memorandum, and to continue to mislead investors following the Offering, by de-emphasizing the (rapidly declining) net asset value of CCC and emphasizing its (increasingly illusory) prospects for future dividends.

109.    Also at the July 26, 2007 Board meeting, the Defendants caused the Board to approve the acquisition of a further (approximately) $1.5 billion in RMBS.   On July 30, 2007 and August 3, 2007, the Defendants caused CCC to purchase $1,429,089,180 and $73,550,172 of RMBS respectively, thereby continuing to deplete CCC's remaining liquidity at a time when it desperately needed to be increased.   Certain of CCC's repo counterparties were requesting haircuts in the range of 3 to 5% during July 2007 for RMBS repos with CCC. In particular, Bank of America LLC indicated to CCC that it was considering obtaining higher haircuts from CCC.

110.    By August 2007, CCC had little or no Liquidity Cushion available to it and drastically needed to reduce leverage and restructure its business model.   Even in August 2007, however, CCC did not sell any RMBS.    In August 2007, CCC had more than $21 billion of outstanding repo borrowings, employing leverage of 32 times capital.

111.    During August 2007, the repo financing relationship between Cantor Fitzgerald (which had previously provided $3 billion of repo financing to CCC) and CCC ceased following a $73 million margin call, which Carlyle and CIM refused to meet. Bank of America and JP Morgan refused to provide repo funding to CCC despite previously having open repo line availability of over $5 billion. Other repo counterparties such as Lehman, Bear, UBS Securities L.L.C., (another United States brokerage) and DBS continued to seek and require haircuts of 3 to 4%.

112.    On August 7, 2007, Stomber informed Conway and Hance that "FT [pricing] marked us down 30MM today" and that "Cantor made a margin call that we would not accept and we moved the RMBS." Stomber also said that he suspected "we may go below 20 percent on our liquidity cushion and will ask the independent directors for prior approval tonight or tomorrow to do so. Will ask at the next Board meeting for unilateral approval to go to 15 percent for 90 days so we get away from fire drills." Stomber concluded his email by stating:

I do not see this problem getting better in the short run – I expect it to get worse. As a public company, we need to stick to our mandate of being a safe investment and not chase the last 50-100 bps of dividend yield. Our dividend as it is remains superior to the competition.

113.    On August 17, 2007, Stomber sent the following email from his

Blackberry, entitled "Update for the Week" to CCC's Directors, copied to several Carlyle

officers, which described the grave predicament that had befallen CCC:

Joanne said I should give the Board an update for the week – I have spoken to you or you have received emails so I will quickly cover earlier events and focus on where we are currently at –
1. The current credit market meltdown is worse than 98 on a stat basis – pure fact
2. The liquidity cushion was designed to cover a 98 meltdown and then some. In 98, no repo dealer questioned a 2 percent haircut on floaters and prices were transparent
3. The subprime meltdown and the word mortgage has affected even the price of AAA US govt floating rate cap securities because of lack of buyers beyond what model prices suggest – not hiding behind a model, simply put for the first time in my career plain vanilla agency debt traded from a historic price of Libor minus 16 to Libor minus 11 – now back at minus 16. We buy plain vanilla securities overlaid with a cap that is very transparent in the market. This is not about exotic option model where it is difficult to price. The price of 5 year caps (a benchmark for our portfolio) is plain vanilla and quoted on Bloomberg.
4. Repo dealers have abandoned our FT third party pricing service and are marking securities to distressed prices. We have over 100MM of cash posted to repo dealers as margin over the MTM of the portfolio.
5. We have LH asking for 70MM of margin in the past 4 days and agreeing they have changed their MTM on repo to be more conservative and at levels to sell securities in size. They readily admitted today that prices in the market for 50MM blocks were significantly below their mark.
6. Our most pressing risk is to dealers suddenly saying all haircuts are at 3 percent – a 50 percent increase in margin or 1 percent on 23 bil of securities is 230MM. Facing this risk, I asked Carlyle to put in an additional 100MM of cash in unsecured note form after our 6 underwriting banks agree that –
1. They will maintain a 2 percent haircut going forward
2. They will honor their amount of line committed on a reasonable basis Bill C and I are meeting with the 6 IBs Monday to present our proposal. Early indications are the IBs want to work with us and solve the problem. After all, they just affirmed their DD on us and took us public – they should not be the very same banks that are not living up to agreements, especially on pricing of repos. The paradox – the market meltdown means the Fed can not raise rates – so our capped securities will not be at risk for rates going above the cap. Our FT pricing service showed a gain of 13MM last night. Our IFRS income and dividend target is on target. Meanwhile we were margin called today to the extent where we have

about 5MM of cash left – Lehman was the worse example of a repo dealer where repo marks were 20 to 50 bps away from where new securities were being offered in the cash market. JPM went to a 3 percent haircut and we moved securities to Citi at 2 percent – Citi has been a total pro. On the other hand, JPM made the comment a couple of days ago that all counterparties are at 3 percent haircut – which implies all counterparties are the same and the securities they buy are the same. So much for sophisticated risk/credit models that new BIS standards must approve.  Our plan that you approved is to – meet with the 6 underwriters Monday and tell them they must honor 2 percent haircuts and reasonable prices and if so, Carlyle will put 100MM of cash into CCC in unsecured note form.  Now is not the time to tell you how we expect to finance repo in the future to remove this problem. It deals with a term repo market, guaranteed repo lines and not having securities bought on a ramped basis so we have concentrated risk to one general price level of RMBS securities. This all will be vetted at a future Board meeting. Bill has asked if I can …still digest solid foods? – wish that was my problem, but not an issue. I will likely have to listen to my taped speeches of Churchill during WWII for inspiration.  Available all weekend for any question from anyone addressed. (emphasis added)

Stomber's references to "meeting with the 6 IBs" ([investment banks]) who "just affirmed their D[ue] D[iligence] on us and took us public" and the plan to "meet with the 6 underwriters" were references to the New York Banks.  These representations signify Stomber's perception, and the reality, that the true "underwriters" in the Offering were the New York Banks -- precisely the same entities that served as counterparties to many (if not most) of CCC's repo loans.  As of December 31, 2007, for example, CCC had outstanding repo obligations to, among others, five of the six New York Banks -- CGM, Bear, Lehman, JPMS and DBS.  CCC did not have any repo obligations to the London Banks, nor did it ever "meet with" the London Banks for any purpose.

114.    During a August 23, 2007, emergency meeting of the Board, Hance explained to the Board that:

1. in the last four weeks since the last board meeting, the mortgage markets in the US had gotten "decidedly worse";
2. CCC had faced substantial margin calls;
3. some of CCC's lenders had decreased the amount they were willing to lend CCC to 97% of the value of the underlying securities (that is, they increased the haircut to 3%);
4. CCC had gone through $200 million of liquidity; and

5. it was likely that CCC would draw down the full $100 million of the Carlyle loan.

According to Hance "[t]he overall effect of these events on [CCC] has been to diminish [CCC's] liquidity cushion below zero". As a result, CCC would need more cash if it was to be able "to make the repurchase roll on Monday," August 27, 2007. At the meeting, Stomber further told the Board that

> management is under no illusions of the impact of recent events on the portfolio and realizes that it needs to preserve capital where it can. Management believes it would be prudent to wind down the Company to its core level at this time.

115.   On a date between August 17, 2007 and September 17, 2007, CCC's capital allocated to RMBS exceeded 85% as a consequence of sales of CCC's assets other than RMBS assets. CCC's capital allocated to RMBS exceeded 85% at all times thereafter.

116.   If Defendants had accurately acknowledged CCC's actual losses, as they were obligated to do,  those losses would have exceeded $270 million as of August 31, 2007.  The Defendants, however, continued to engage in a concerted course of action designed to avoid the recognition of losses,  to conceal CCC's true financial condition and to continue generating fee income for CIM and affiliates. Moreover, Defendants intentionally concealed CCC's dire circumstances from existing holders of CCC securities and the investing public generally, all the while CCC was hurtling toward collapse.

117.   On August 27, 2007, Stomber issued a letter to CCC's investors in response to several of their requests "for information about the current status of CCC's investment portfolio."  The letter described the effects of recent market volatility upon CCC:

> This environment produced two adverse consequences for CCC: (i) a modest decline in the fair value of AAA rated US Government agency issued mortgage-backed securities, and (ii) an increase in collateral (margin) required by our lenders. As the fair value of our MBS portfolio declined, our lenders made margin calls to ensure that the amount of CCC's indebtedness did not exceed the fair

value of the underlying collateral. In addition, some of our lenders have recently decreased the amount they were willing to lend CCC to 97% of the fair value of the underlying securities, from the historical lending rate of 98% of fair value. Consequently, CCC's liquidity cushion has not been sufficient to meet recent margin calls. Management and the board have acted swiftly and definitively to address the dramatic change in our business environment.

A media release published by CCC on the same day included a description of the steps taken by CCC in order to meet its margin calls, which were described as having been taken "to create additional liquidity in the event of continued market volatility" and to "help us better weather the market conditions we are facing."

118.   The foregoing statements that management had acted "swiftly and definitively" to address the challenges facing CCC, and that management had taken steps to "create additional liquidity," were intentionally false and misleading.  The Defendants had not taken steps to address CCC's liquidity problems.  What needed to be done was simple – CCC needed to sell off all, or at least a substantial portion of, its RMBS holdings.  The Defendants did not want to do this, however, because it would have forced CCC to publicly acknowledge its (thus far) unrealized losses, and obliterated the façade of normalcy and the prospect of issuing a quarterly dividend.  The measures taken by the Defendants were attempts to put in place short-term solutions *to avoid the sale by CCC of RMBS assets*, which would have required CCC to realize and record the accompanying losses and/or to attempt to raise additional equity capital at market prices significantly below the Offering price, which would have been detrimental to Carlyle's reputation but would have been beneficial to CCC and those who invested in it.

119.   In the month of August 2007, CCC's net asset value had declined by approximately 24% from $843,483,058 at the end of July 2007 to $642,104,242 at the end of August 2007, a loss of some $200 million in one month.

120.   By September 17, 2007 the average price volatility of RMBS securities, as measured by the Defendants, was an astounding 140% higher than it was in November 2006.

121.    Defendant Stomber announced on September 11, 2007 at the annual Carlyle Investor Conference in Washington D.C. that fundamental revisions to CCC's business model were required and would be implemented, acknowledging that CCC's business model needed to be thoroughly restructured to reduce leverage and increase minimum liquidity cushion to at least 40%. In order to make it appear that they were doing something proactively, the Defendants publicly committed to "employ less leverage," "have more diversified asset classes," and concentrate on "improving and stabilizing sources" for CCC.

122.    The Defendants' announcements of September 10-11, 2007 were rendered misleading by their failure to disclose that they had no intention of employing, and were not employing, any material revisions to CCC's business model.  Specifically, they did not, in practice, impose or could they impose a 40% minimum liquidity requirement (they had not even complied with CCC's purported 20% minimum liquidity requirement), nor did they substantially reduce CCC's overall leverage.  Defendants chose to continue to operate CCC well outside the limits set in its initial guidelines and conceal this fundamental and most material fact from the investing public.

123.    Defendants' efforts to conceal the true state of affairs at CCC had prevented the price of its shares from collapsing completely.  By September 14, 2007, the market price of CCC shares had declined to approximately $14 per share, a relatively modest decline (given CCC's calamitous performance) from the Offering price of $19 per share.  If the true state of affairs at CCC had been known by the investing public, however, the shares would have traded for less than $1.00.

124.    On October 1, 2007, Stomber sent an email to CCC's Directors, copies of which were provided to several Carlyle officers, which requested approval for the suspension of the requirements (a) of a 20% minimum liquidity cushion, (b) that CCC maintain repo lines of a minimum of 125% of all borrowings, and (c) that a maximum of 85% of CCC's capital be allocated to RMBS.  The Board approved the requests.

125.    By November 13, 2007, CCC's Liquidity Cushion had further reduced to $19.9 million, which was 3% of Adjusted Capital.  Contrary to their representations to the investing public, Defendants had not taken the steps necessary to maintain, let alone increase, CCC's Liquidity Cushion.

126.    On November 13, 2007, the Board met.  The Board approved CIM's quarterly management fees (for the quarter ending September 30, 2007) of $3.9 million. The Board approved the repayment of an outstanding $100 million loan from Carlyle and the borrowing of an additional $100 million (at 10% interest) from Carlyle.  Defendants also amended the definition of "liquidity cushion" to include as liquid assets undrawn debt from Carlyle.  Thus, instead of taking steps to actually improve CCC's liquidity position, Defendants thus attempted to re-engineer the definition of "liquidity" to make CCC's position *appear* more favorable than it was.  The Board did not take any steps to actually address CCC's precarious liquidity problems and over-accumulation of RMBS-based assets.  At the same Board meeting, Hance informed the Board "that management was recommending several changes to [CCC's] investment guidelines based on its experiences during recent weeks" and Stomber stated that management recommended the suspension of certain requirements of CCC's Guidelines until March 31, 2008 "to give management increased flexibility to manage CCC through the liquidity crisis." Remarkably, despite not having available sufficient cash to do so, Stomber and other members of the Board advocated at the November 13, 2007 Board meeting that CCC should still plan to pay a dividend based on fourth quarter and year-end earnings.

127.    At the meeting of the Board of CCC on November 13, 2007, as proposed by Carlyle and CIM, the directors of CCC resolved to suspend the requirement that CCC maintain a minimum Liquidity Cushion until March 31, 2008.

128.    In his letter to shareholders accompanying CCC's Quarterly Report for the quarter ending September 30, 2007, issued on or about November 15, 2007, Stomber represented that he was "pleased to report that, while CCC was negatively affected by the

[liquidity] crisis, we successfully weathered the events of the third quarter by taking concrete steps in three critical areas," including "finish[ing] the quarter with improved liquidity," and "preserv[ing] our shareholders' long term equity as year-to-date Adjusted Net Income (net income or loss excluding the effects of non-cash compensation expense) is $11 million positive." The foregoing statements were false and misleading, as CCC had not "successfully weathered" the events of the quarter, and instead, suffered enormous unrealized losses. The statements that net income was positive, and that shareholders' "long term equity" had been "preserved" were terribly misleading, as CCC's declines in net asset value, the more important metric that was relied upon internally, evidenced tremendous (unrealized) losses and indicated an erosion of long-term equity.

129.    Defendants continued to deliberately de-emphasize net asset value, as Stomber dismissed the reduction in CCC's fair value reserves account as "principally driven by a supply/demand imbalance" in the market caused by the liquidation of asset backed commercial paper (ABCP) programs. Stomber represented that this imbalance had begun to level off as CCC allegedly "saw improved market conditions for" its securities at the end of the third, and beginning of the fourth quarter. Stomber further represented that "[b]ased upon current market conditions, the Board of Directors of CCC expects to approve a dividend payment based on fourth quarter earnings which would be paid in the first quarter of 2008."

130.    Defendants took no steps to (a) reduce RMBS assets; and (b) acquire assets with lower risk, such as AAA rated G7 government securities with a maturity of less than three years, in order to restore CCC's capital allocated to RMBS to at most 85%. CCC's capital allocated to RMBS as calculated by CIM increased to 94% by September 30, 2007 and continued to increase to 98% by December 31, 2007 and to 99.8% by January 15, 2008.

131.    The foregoing misrepresentations and omissions prevented the market price of CCC shares from collapsing.  After the price had fallen to a low of approximately $8 per share on or about November 9, 2011, the price rose to approximately $12 per share and traded in the range of $10-12 per share for the next three months.

132.    On or about January 7, 2008, the 180-day lockup period applicable to Class B Shares held by Carlyle insiders expired.  The Defendants and their cohorts were thereafter free to sell their shares.  On that date, CCC closed at a price of $11.00 per share.

**The Collapse of CCC**

133.    At a meeting of the Board of CCC on February 27, 2008, as proposed by Defendants, the directors of CCC resolved to suspend CCC's minimum 20% Liquidity Cushion requirement until September 30, 2008.

134.    On February 27, 2008, CCC issued its annual report for the year ending December 31, 2007.   Notwithstanding the fact that Defendants knew it was misleading to investors and shareholders and intentionally deceptive, CCC reported net income of $16,790,000, under IFRS, for the year ended December 31, 2007.  Stomber falsely represented that "[d]uring the fourth quarter our portfolio stabilized and we were able to generate returns consistent with our near term targets."  Stomber further represented that "[w]e continue to run our business to preserve the value of our shareholders' equity."  On February 27, 2008, CCC closed at a price of $12.00 per share.

135.    These statements were false and misleading, as CCC was in perilous financial condition and on the verge of collapse.  As at December 31, 2007, CCC had incurred a change in the fair value reserve deficit of $285,623,000 as part of its equity under IFRS and share-based compensation expense of $1,853,000. Under US GAAP, CCC would have reported a staggering loss of $266,987,000.  CCC's Liquidity Cushion,

as originally defined, was $27,181,000 as at December 31, 2007 (4.1% of Adjusted Capital) comprised of cash and cash equivalents of $11,751,000 and unencumbered RMBS of $15,430,000. According to the definition amended on November 13, 2007, CCC's Liquidity Cushion was $67,181,000 (10% of Adjusted Capital), comprised of cash and cash equivalents of $11,751,000, unencumbered RMBS of $15,430,000 and undrawn loan funds from Carlyle of $40,000,000.

136.    On March 5, 2008, CCC issued a press release, indicating that, during the week between February 28 and March 5, it had received margin calls from lenders requiring it to post an additional $60 million of collateral. CCC could not meet all of those demands, which led at least one lender to send a default notice. On Thursday March 6, CCC shares were down 60% (from approximately $15 per share ) to $5.00 per share. The AFM suspended trading in CCC on the Euronext market after its shares closed on Thursday, March 6, 2008 at a price of a $5.00 per share. CCC had closed at a price of $12.00 per share on the prior trading day, March 5, 2008.

137.    On Tuesday March 11, 2008, trading in CCC shares re-opened. On March 12, 2008, CCC announced that "it expects lenders will soon take possession of substantially all" its remaining assets after it was unable to meet surging margin calls on its portfolio of residential-mortgage-backed securities." Shares of CCC lost 95% of their value, falling from approximately $3 per share to $0.15 per share.

138.    On March 17, 2008, the Royal Court of Guernsey entered a "winding up" order directing that CCC be liquidated, and appointed certain liquidators to wind down the affairs of, and liquidate, the enterprise. Alan Roberts and Neil Mather were appointed Joint Liquidators of CCC. On March 18, 2008, on March 18, 2008 Christopher Morris and Adrian John Denis Rabet were appointed Additional Joint Liquidators (the Joint Liquidators and Additional Joint Liquidators are collectively referred to as "the Liquidators").

### The Defendants' Fraudulent Concealment of and the Belated Emergence of Material Facts Sufficient to Support a Claim of Securities Fraud

139.     In order to conceal the fraudulent scheme by which Defendants misrepresented the financial condition and business prospects of CCC, Defendants undertook deliberate and affirmative steps to conceal, before, during and subsequent to the Class Period, facts sufficient to apprise Plaintiffs and the Class of the existence of potential claims against the Defendants.

140.     During the Class Period, Defendants intentionally and repeatedly made misrepresentations participated in and/or aided and abetted by the Placement Agents, of material facts concerning, *inter alia*, the operating condition of CCC, the efficacy of CCC's business model, and the adequacy of its Liquidity Cushion. Additionally, Defendants refused to timely liquidate RMBS positions that would have increased CCC's Liquidity Cushion and, ultimately, reduced its losses.  They refused to do so because it would have forced CCC to acknowledge publicly those losses under IFRS, and because the reduction in its RMBS inventory would have eliminated any (scant existing) mathematical possibility of achieving Defendants' publicly proclaimed and unrealistically aggressive income and dividend objectives for CCC.

141.     While the collapse of CCC and failure of its business model became public knowledge in March 2008, Defendants continued, thereafter, to conceal from the general public, and even from the Liquidators, those facts sufficient to support claims under the common law, the Netherlands Civil Code or otherwise, including facts that would have been sufficient to apprise Plaintiffs and the Class that (1) Defendants' earlier representations were false and misleading, (2) Defendants omitted to disclose material facts that were necessary to be disclosed under the circumstances, and (3) Defendants had done so negligently, recklessly and /or intentionally.

142.    Upon information and belief, CCC's Liquidators, during the two years that followed their March 2008 appointment, began to investigate privately the circumstances of the management, and subsequent collapse, of CCC.

143.    The Liquidators' efforts, however, were repeatedly resisted by the Defendants and their legal counsel, who were aware of much of the wrongdoing alleged herein,.  The Liquidators have alleged that the Defendants have repeatedly obstructed their efforts to obtain custody of the complete books and records of CCC.  As alleged by the Liquidators, in the months immediately after CCC was ordered to be wound up, "certain books and records of CCC, were made available by Carlyle and CIM for inspection" by the Liquidators, "but these books and records made available for inspection and copying did not represent the complete books and records of CCC. In particular, the sources of the records did not include the directors and key personnel of CCC, email records were generally confined to the first three months of 2008 and the books and records inspected did not include a number of categories which would reasonably be expected to exist."

144.    Between March 2010 and July 2010, "despite extensive and repeated requests from the Liquidators, Carlyle and CIM have refused to produce the books and records of CCC to the Liquidators."  The Liquidators further allege that "[t]he only documents that Carlyle and CIM have produced are copies of 52 randomly selected documents produced on May 4, 2010 which Carlyle and CIM's counsel described as being 'the CCC documents that we have been able to access at a reasonable expense.'"

145.    The Liquidators further allege that "Carlyle and CIM have not produced any of their records to the Liquidators which relate to the affairs of CCC," and that they "have resorted to relying upon technical and untested objections to the Court's jurisdiction under Section 1782 of Title 28 of the United States Code."

146.    The Liquidators allege that director Harvey Jay Sarles produced certain emails and other records that were never produced by Carlyle (and, by implication, the other Defendants) to the Liquidators.

147.    The Liquidators further allege that, notwithstanding the fact that the 2007 annual report disclosed an asset of CCC described as "Investment in internal use software and other property", comprising computer software and hardware, with a book value purportedly exceeding $4 million, this computer software and hardware was retained by Carlyle and CIM and has never been returned to CCC or its Liquidators.

148.    On or about July 7, 2010, the Liquidators commenced various substantially identical civil actions against the former directors of CCC and others in various courts in Delaware, the District of Columbia, New York and Guernsey.  The Liquidators alleged that the Individual Defendants named herein breached their fiduciary duties to CCC, principally by causing it to acquire an excessive portfolio of RMBS, and to borrow excessively from repo lenders, without reserving adequate liquid assets to enable it to meet margin calls and increased "haircuts" being charged by repo lenders.

149.    If not for the repeated refusal of the Defendants named herein to cooperate with the Liquidators, the Liquidators would have been able to commence their actions much earlier than they did.

150.    The Liquidators' Complaint, which was not widely disseminated despite being filed publicly, revealed for the first time material adverse information known to the Defendants that was concealed by Defendants from the public during the Class Period and thereafter, including facts that indicate that the Defendants made material misrepresentations and omitted material facts, and did so negligently, with intent to defraud and/or recklessly.   Except for allegations as to Plaintiffs' allegations as to their own purchases of CCC securities, the Liquidators' Complaint is the principal source of previously undisclosed adverse information, and other previously nonpublic information, that forms the basis of Plaintiffs' allegations that Defendants made representations that

were not truthful, failed to disclose material adverse information, and did so with scienter.  Plaintiffs, believing them to be true, have copied factual allegations liberally from the Liquidators' Complaint.

151.    The Defendants' fraud was thereby effectively and indefinitely concealed from the public at least until July 7, 2010.  As a result of such concealment, the Plaintiffs and Class members were at no time prior to the commencement of the Liquidators' actions, on actual or constructive notice of the fraud committed by the Defendants or any others who participated in the offering and sale of CCC securities..

## CLAIMS FOR RELIEF

## COUNT I

### COMMON LAW FRAUD
**(by all Plaintiffs, on behalf of the Offering Class, against all Defendants)**

152.    Plaintiffs repeat and restate each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

153.    Defendants engaged and participated in a scheme, plan and continuous course of conduct to misrepresent and conceal the true operating and financial condition of CCC in order to facilitate the sale of RDSs and Class B shares in the Offering at a price of $19.00 per unit.  Such scheme was intended to and did operate as a fraud and deceit on Plaintiffs and members of the Class, in causing them to purchase CCC securities at in the Offering.

154.    The RDSs sold in the Regulation D and Rule 144A placements were securities (1) offered, bought and sold in the United States, as per the definitions contained in Regulation S, (2) sold pursuant to Regulation D and Rule 144A exemptions (and not pursuant to a Regulation S exemption for offshore offers and sales) to the registration requirements of the Exchange Act, (3)  issued in the United States by a United States depositary bank, (4) marketed exclusively by United States broker-dealers, (5) issued exclusively to United States residents, (6) sold pursuant to a

48

Subscription Agreement expressly governed by New York law, (7) issued pursuant to Subscription Agreements that were transmitted by brokers to CGM, a United States brokerage, in New York, (8) that represented the shares of an issuer (a) created by Americans (the Carlyle Defendants) (b) whose officers were all Americans, (c) that did business exclusively in the United States, (d) with six (of seven) directors based in the United States (the exception being one outside director, Defendant Loveridge, who contemporaneously served on the boards of 46 funds), (e) that borrowed exclusively from United States financial institutions, and (f) that acquired, exclusively, securities backed by United States RMBS from United States institutions.  The proceeds of the Regulation D and Rule 144A placements never left the United States (or, alternatively, merely circled back to the United States), as the majority of the proceeds were used to repay the Bridge Loan from CGM to CCC and the remainder was used principally to buy United States RMBS from United States brokerage firms.

155.    In furtherance of this unlawful scheme, plan and course of conduct, Defendants, individually and jointly, made untrue statements of material fact and/or failed to disclose material information in their possession regarding, *inter alia*, (a) the Company's precarious financial condition and (b) the adequacy of the Company's liquidity position and efficacy of its business model.

156.    As detailed herein, Defendants each knowingly or with deliberate recklessness, aided and abetted by their legal counsel and other advisors, committed manipulative or deceptive acts in furtherance of their fraudulent scheme in causing and/or permitting the dissemination of false and misleading Offering Memoranda (i.e. the Offering Memorandum and Supplemental Offering Memorandum).

157.    Each of the Defendants was a direct, necessary and substantial participant in the common course of conduct alleged herein.

158.    Defendants' scheme operated as a fraud or deceit on Plaintiffs and the members of the Class because the false and misleading statements concerning the

financial and operating condition of CCC enabled the Offering to be carried out at all and to be carried out at a price of $19 per Share or RDS.

159.    The Defendants' fraudulent conduct created the market for CCC securities.  CCC should never have carried out the Offering and could not have taken CCC public if not for the course of conduct described herein and the active participation therein by the placement agents of the Offering, including the New York Banks and the Defendants' legal counsel and advisors.

160.    At the time of said misrepresentations and omissions, Plaintiffs and the other members of the Class were ignorant of their falsity and had no reason to believe that the Defendants' written and uniform representations regarding CCC were not true, nor that the Defendants had failed to disclose material adverse information in the Offering Memoranda.  Had Plaintiffs and the other members of the Class known of the true operating and financial condition of CCC and of its other problems threatening its very existence as referred to herein, Plaintiffs and the other members of the Class would not have purchased or otherwise acquired CCC securities or, if they had purchased and/or otherwise acquired such securities, they would not have done so at the price that they paid.

161.    When the truth about the extent and severity of the deterioration of the financial and operating condition of CCC started to become apparent in March 2008, the prices of CCC securities plummeted. All or a significant portion of the decrease in the market prices of CCC securities was due to the disclosure, revelation and/or leakage of information inconsistent with Defendants' prior disclosures and other public filings and releases.

162.    The totality of the circumstances around the decline in the trading prices of CCC securities combine to negate any inference that the economic loss suffered by Plaintiffs and the other members of the Class was caused by changed market conditions, macroeconomic or industry factors or other facts unrelated to Defendants' fraudulent

conduct as described above.

163.    As a direct and proximate result of Defendants' fraudulent scheme to solicit participation in the Offering, Plaintiffs and the other members of the Class suffered economic losses in connection with their respective purchases of the Company's securities in the Offering.

164.    The Offering Memoranda constituted a uniform set of written representations that was transmitted by Defendants and the Placement Agents to all investors in the Offering.  Plaintiffs and the Class may be presumed to have relied on any material misrepresentations in and/or omissions from the Offering Memoranda by acquiring CCC securities at the Offering price in the Offering.

165.    The resulting collapse in the market prices of CCC securities was foreseeable at the time of the Offering and at all times of the Defendants' misrepresentations and omissions as described above.  Indeed, despite being aware of the consequences of their fraudulent conduct, Defendants nevertheless knowingly engaged in the alleged misconduct, which, when the truth finally emerged, caused CCC securities market values to collapse.

166.    CIM, TCG and CCC are liable under the doctrine of respondeat superior and the law of agency for the tortious conduct of Defendant Stomber and other persons acting on their behalf.  Each and every defendant is liable, to the extent he/it would not otherwise be liable, by conspiring with the other Defendants to commit this tort, and for aiding and abetting the other defendants.

167.    By virtue of the foregoing, the Defendants have committed fraud under the applicable common law.

## COUNT II

### NEGLIGENT MISREPRESENTATION
**(by all Plaintiffs, on behalf of the Offering Class, against all Defendants)**

168.    Plaintiffs repeat and restate each and every allegation contained in the

foregoing paragraphs as if fully set forth herein.

169.     Plaintiffs plead, alternatively to the foregoing allegations that Defendants acted recklessly or with intent to defraud, that Defendants acted negligently in disseminating false and misleading information and omitting information that was required to be disclosed under the circumstances.

170.     By virtue of the foregoing, the Defendants have committed negligent misrepresentation under the applicable common law.

### COUNT III

**VIOLATIONS OF §§ 6:162 and 6:194 OF THE
CIVIL CODE OF THE NETHERLANDS AND THE LAWS OF OTHER
COUNTRIES (OTHER THAN THE UNITED STATES) WHEREIN
TRANSACTIONS IN  CCC SECURITIES WERE EFFECTUATED
(by all Plaintiffs, on behalf of the Offering Class, Against all Defendants)**

171.     Plaintiffs repeat and restate each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

172.     Under § 6:162, a person who commits a tortious act (unlawful act) against another person that can be attributed to him, must repair the damage that this other person has suffered as a result thereof.   Under § 6:194, a person who makes a misleading announcement concerning goods or services has acted tortiously.   Section 5:14 of the Financial Supervision Act establishes the liability under § 6:162 of the Civil Code of those who prepare a misleading, inaccurate or inconsistent prospectus.   Under § 6:195, the Defendants cannot meet their burden of establishing that the Offering Memorandum and their other representations concerning CCC's business prospects were not misleading. Similarly, other countries have enacted substantively similar investor protection, anti-fraud and substantively similar laws which may provide recourse to members of the Class to the extent that they have significant contacts with such countries in connection with their purchases of CCC securities.

173.     The   Offering   Memoranda   constituted   a   uniform   set   of   written

representations that was transmitted to all investors in the Offering.  A typical investor would not have acquired CCC securities in the Offering, and/or would not have done so at the Offering price, if the information in the Offering Memorandum had been complete and correct.

174.    The Carlyle Entities and CCC are liable under the doctrine of respondeat superior and the law of agency for the tortious conduct of Defendant Stomber and other persons acting on their behalf.  Each and every Defendant is liable, to the extent he/it would not otherwise be liable, by conspiring with the other Defendants to commit this tort, and for aiding and abetting the other Defendants.

175.    By intentionally, recklessly and/or negligently disseminating false and misleading information, and omitting from disclosure information that was required to be disclosed under the circumstances, in the Offering Memorandum and otherwise, the Defendants committed tortious acts against the Plaintiffs and member of the Class, and must repair the damage that they have suffered as a result thereof.

176.    By virtue of the foregoing, the Defendants have committed violations of, and are liable under, §§ 6:162 and 6:194 of the Civil Code of the Netherlands and the laws of other countries (other than the United States) wherein transactions in CCC securities were effectuated.

## COUNT IV

### COMMON LAW FRAUD
**(by Plaintiff Wu, on behalf of the Aftermarket Class, Against all Defendants)**

177.    Plaintiffs repeat and restate each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

178.    By virtue of the foregoing, the Defendants have committed fraud under the applicable common law.

## COUNT V

### NEGLIGENT MISREPRESENTATION
**(by Plaintiff Wu, on behalf of the Aftermarket Class, Against all Defendants)**

179.   Plaintiffs repeat and restate each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

180.   By virtue of the foregoing, the Defendants have committed negligent misrepresentation under the applicable common law.

## COUNT VI

### VIOLATIONS OF §§ 6:162 and 6:194 OF THE CIVIL CODE OF THE NETHERLANDS AND THE LAWS OF OTHER COUNTRIES (OTHER THAN THE UNITED STATES) WHEREIN TRANSACTIONS INCCC SECURITIES WERE EFFECTUATED
**(by Plaintiff Wu, on behalf of the Aftermarket Class, Against all Defendants)**

181.   Plaintiffs repeat and restate each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

182.   Under § 6:162, a person who commits a tortious act (unlawful act) against another person that can be attributed to him, must repair the damage that this other person has suffered as a result thereof.   Under § 6:194, a person who makes a misleading announcement concerning goods or services has acted tortiously.   Section 5:14 of the Financial Supervision Act establishes the liability under § 6:162 of the Civil Code of those who prepare a misleading, inaccurate or inconsistent prospectus.   Under § 6:195, the Defendants cannot meet their burden of establishing that the Offering Memorandum and their other representations concerning CCC's business prospects were not misleading. Similarly, other countries have enacted substantively similar investor protection, anti-fraud and substantively similar laws which may provide recourse to members of the Class to the extent that they have significant contacts with such countries in connection with their purchases of CCC securities.

183.   Defendants engaged and participated in a scheme, plan and continuous course of conduct to misrepresent and conceal the true operating and financial condition

of the Company from approximately June 16, 2007 and continuing throughout the Class Period. Such scheme was intended to and did operate as a fraud and deceit on Plaintiff Wu and members of the Aftermarket Class, in causing them to purchase CCC securities at artificially inflated prices in the aftermarket

184. As detailed herein, Defendants each knowingly or with deliberate recklessness committed manipulative or deceptive acts in furtherance of their fraudulent scheme including, *inter alia*, (a) causing and/or permitting the dissemination of false and misleading Offering Memoranda, news releases and other communications to the investing public; (b) preparing, approving and disseminating financial statements that overstated and misrepresented the operating and financial condition of CCC; and (c) failing to take steps to correct the lack of sound internal controls and oversight risk management, and the deficiencies and material weaknesses therein.

185. Defendants' scheme operated as a fraud or deceit on Plaintiffs and the members of the Class because the false and misleading statements concerning the financial and operating condition of CCC enabled the Offering to be carried out and, thereafter, caused and maintained the artificial inflation in the market price of CCC securities prices throughout the Class Period and until CCC collapsed in March 2008. The Defendants exerted substantial control and influence over the information that was publicly available about the Company. There were, for all practical purposes, no independent (i.e., independent of Carlyle and its Placement Agents) sources of information about the Company.

186. In ignorance of the fact that market prices of the CCC securities were artificially inflated and relying on the integrity of the market in which the securities traded and/or on the absence of material adverse information, certain Plaintiffs and other members of the Class acquired CCC securities on the aftermarket during the Class Period at artificially high prices and were damaged thereby.

187. At the time of said misrepresentations and omissions, Plaintiffs and the

other members of the Class were ignorant of their falsity and had no reason to believe that the Defendants' public representations regarding CCC were not true, nor that the Defendants had failed to disclose material adverse information.  Had Plaintiffs and the other members of the Class known of the true operating and financial condition of the Company and of its other problems as referred to herein, Plaintiffs and the other members of the Class would not have purchased or otherwise acquired CCC securities or, if they had purchased and/or otherwise acquired such securities during the Class Period, they would not have done so at the artificially inflated prices that they paid.

188.   As the truth about the extent and severity of the deterioration of the financial and operating condition, and inadequacy of internal controls, of CCC started to be released and become apparent to the market, the prices of CCC securities plummeted. All or a significant portion of the decrease in the market prices of CCC stock was due to the disclosure, revelation and/or leakage of information inconsistent with Defendants' prior disclosures and other public filings and releases.

189.   The totality of the circumstances around the decline in the trading prices of CCC stock combine to negate any inference that the economic loss suffered by Plaintiffs and the other members of the Class was caused by changed market conditions, macroeconomic or industry factors or other facts unrelated to Defendants' fraudulent conduct as described above.

190.   As a direct and proximate result of Defendants' fraudulent scheme to artificially inflate and maintain the market prices of CCC securities, Plaintiffs and the other members of the Class suffered economic losses in connection with their respective purchases and sales of the Company's securities during the Class Period, which losses cannot presently be quantified.

191.   The resulting collapse in the market prices of CCC stock was foreseeable at the time of the Offering and at all times of the Defendants' misrepresentations and omissions as described above.  Indeed, despite being aware of the consequences of their

fraudulent conduct, Defendants nevertheless knowingly engaged in the alleged misconduct, which, when the truth finally emerged, caused CCC stock market values to collapse.

192.    Plaintiffs will rely, at least in part, upon the presumption of reliance established by the fraud-on-the-market doctrine.  At all relevant times, the market for CCC's publicly traded securities was an efficient market for the following reasons, among others:

      (a)      During the Class Period, the Company's Class B shares met the requirements for public listing and were listed and traded on Euronext, an efficient market.

      (b)      The Company regularly issued press releases which were carried by international news wires, and also issued periodic reports.  Each of these releases was publicly available and entered the public marketplace.

193.    As a result, in connection with the Offering and otherwise, the market for the Company's publicly traded securities promptly digested current information with respect to CCC from all publicly available sources and reflected such information in the price of the Company's securities.  Under these circumstances, all purchasers of the CCC's publicly traded securities during the Class Period suffered similar injury through their purchase thereof at artificially inflated prices.

194.    By intentionally, recklessly and/or negligently disseminating false and misleading information, and omitting from disclosure information that was required to be disclosed under the circumstances, in the Offering Memorandum and otherwise, the Defendants committed tortious acts against the Plaintiffs and member of the Class, and must repair the damage that they have suffered as a result thereof.

195.    By virtue of the foregoing, the Defendants have committed violations of, and are liable under, §§ 6:162 and 6:194 of the Civil Code of the Netherlands and the

laws of other countries (other than the United States) wherein transactions in CCC securities were effectuated. .

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

A.       Determining that this action is a proper class action, certifying Plaintiffs as Class representatives and appointing their counsel as Class Counsel;

B.       Awarding compensatory damages in favor of Plaintiffs and the other members of the Class against Defendants for all damages sustained as a result of Defendants' wrongdoing in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon;

C.       Awarding Plaintiffs and the other members of the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.       Such other and further relief as the Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand trial by jury of all issues that may be so tried.

October 27, 2011

Jonathan W. Cuneo
Matthew E. Miller
Joel Davidow
CUNEO GILBERT & LADUCA, LLP
507 C Street, N.E.
Washington, DC 20002
(202) 789-3960

Richard D. Greenfield
Marguerite R. Goodman
Ilene F. Brookler
GREENFIELD & GOODMAN, LLC
250 Hudson Street, 8th Floor
New York, N.Y.  10013
(917) 495-4446
*Co-Counsel for Plaintiffs and the Class*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that(1) a true and correct copy of the foregoing has been furnished via First Class Mail and electronic mail to the following counsel this 28th day of October, 2010:

| | |
|---|---|
| Daniel E. Shaw, Esq. | Jeremy Wessels, Esq. |
| SCHINDLER COHEN & HOCHMAN, LLP | Mourant Ozannes, LP |
| | PO Box 186 |
| 100 Wall Street | 1 Le Marchant Street |
| 15th Floor | St Peter Port |
| New York, New York 10005 | Guernsey |
| | GY1 4HP |

and (2) unexecuted copies were furnished by electronic mail on the 27th day of October, 2011, and executed copies have been furnished by electronic mail this 28th day of October, 2011, to:

| | |
|---|---|
| Gary A. Orseck, Esq. | Robert A. Van Kirk, Esq. (DC Bar No. 430588) |
| ROBBINS, RUSSELL, ENGLERT, ORSECK, | Sarah F. Teich, Esq. (DC Bar No. 979565) |
| UNTEREINER & SAUBER LLP | WILLIAMS & CONNOLLY LLP |
| 1801 K Street, NW | 725 Twelfth Street, NW |
| Suite 411 | Washington, DC 20005 |
| Washington, DC 20006 | |

_____
Matthew E. Miller