## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                      )
D.J. WU, *et al.*,                    )
                                      )
            Plaintiffs,               )
                                      )
       v.                             )          Civil Action No. 11-2287 (ABJ)
                                      )
JOHN CRUMPTON STOMBER, *et al.*,      )
                                      )
            Defendants.               )
_____)

## MEMORANDUM OPINION

> "*We may employ leverage without limit, which may result in the market value of our investments being highly volatile, limit our range of possible investments, and adversely affect our return on investments and the cash available for distributions.*"

                                     ***

> "*An investment . . . is suitable only for investors who are experienced in analyzing and bearing the risks associated with investments having a very high degree of leverage.*"

                                     ***

> "*We cannot assure you that that the Liquidity Cushion will be sufficient to satisfy margin calls on our financed securities that may arise in connection with highly unusual adverse market conditions.*"

                                     ***

> "*While borrowing and leverage present opportunities for increasing total return, they have the effect of potentially increasing losses as well . . . . [A]ny event which adversely affects the value of our investments would be magnified to the extent leverage is employed.*"

Carlyle Capital Corporation ("CCC") Offering Memorandum [Dkt. # 52-3] at 13–14.

       This case involves highly leveraged, highly speculative investment products. It raises the

question of whether plaintiffs were defrauded under the following circumstances:  they bought

shares in a company whose sole business consisted of buying residential mortgage-backed

securities on margin; the shares were made available only to a restricted group of sophisticated, wealthy investors; the shares were marketed with ominous warnings such as the ones above; and the very risks that were disclosed materialized when conditions in the real estate market and global economy deteriorated in 2008.

The consolidated complaint alleges claims of securities fraud under sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5. The complaint includes common law fraud and negligent misrepresentation allegations, as well as claims under the laws of the United Kingdom and the Netherlands. As plaintiffs have explained it, the gravamen of the complaint is that the CCC Offering Memorandum was materially false and misleading because while it disclosed that liquidity issues that would threaten the company *could* occur, it omitted information that would have alerted investors to the fact that those events were *already occurring*. Plaintiffs also contend that after the Offering, defendants continued to conceal the worsening financial condition of the company until CCC collapsed in March of 2008.

Defendants have moved to dismiss the consolidated complaint pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u–4, for failure to state a claim upon which relief can be granted. [Dkt. # 51 and # 52]. For the reasons set forth in more detail below, the Court will grant the motions to dismiss.

Essentially, this complaint is an attack on how CCC was managed, and ultimately, it questions the wisdom behind the adoption of its business model in the first place. But chiding CCC with the benefit of hindsight for its failure to resist the stampede to purchase mortgage-

backed securities is not the same thing as alleging fraud, particularly given the stringent standards of the PSLRA.

With respect to the counts related to the Offering, the complaint does not plausibly allege a securities fraud claim grounded on omissions because the Offering documents – in particular, the Supplemental Memorandum issued after the initial Offering was postponed – specifically placed buyers on notice of what CCC was doing and the fact that it had recently experienced the very reversals that plaintiffs claim should have been disclosed. So, this action lacks the defining element of fraud: a falsehood. The federal claims also fall short of supporting the necessary allegation that the alleged fraud caused the plaintiffs' losses. The common law claims related to the Offering suffer from the same flaws, and in addition, they fail to set forth facts that would support the element of actual reliance.

As for the claims based on sales of securities in the aftermarket, the federal claims are barred since the shares were purchased on a foreign exchange and not in the United States. And, if the Court were to go on to consider the common law aftermarket claims, it would find those allegations to be devoid of the necessary allegations of reliance as well.

## I.   BACKGROUND

### A.  The Parties

1. <u>Plaintiffs</u>

Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of two proposed classes. The first proposed class is the "Offering Class," which the complaint defines as "all persons who purchased or otherwise acquired Class B Shares or Restricted Depository Shares ("RDS") of CCC in its Offering and were damaged thereby" and a "U.S. Offering" subclass of U.S. residents. Compl. ¶ 30. The second proposed class is the

"Aftermarket Class," which the complaint defines as "all persons who purchased or otherwise acquired Class B Shares of CCC in market purchases from July 4, 2007 through March 17, 2008 . . . and were damaged thereby," and includes a "U.S. Aftermarket Subclass" of U.S. residents. *Id*. Plaintiffs estimate that there are at least 500 members of the Class. *See id.* ¶ 31.

The named plaintiffs in this action are:

- Plaintiff E.L. Phelps, a resident of Virginia who purchased (1) 15,789 RDSs in the Offering and (2) 15,000 Class B Shares listed for trading on the Euronext exchange in the aftermarket. *Id*. ¶ 4;

- Plaintiff M.J. McLister, a resident of Virginia who purchased (1) 26,316 RDSs in the Offering, and (2) 54,225 Class B Shares listed for trading on the Euronext exchange in the aftermarket. *Id*. ¶ 5;

- Plaintiff D.J. Wu, a resident of Washington, D.C. who purchased (1) 26,316 RDSs in the Offering, and (2) 25,000 Class B Shares listed for trading on the Euronext exchange in the aftermarket. *Id*. ¶ 6;

- Plaintiff S.M. Liss, a resident of Maryland who purchased 15,789 RDSs in the Offering. *Id*. ¶ 7;

- Plaintiff W.F. Schaefer, a resident of Maryland who purchased 7,895 RDSs in the Offering. *Id*. ¶ 8;

- Plaintiff Jonathan Glaubach who purchased 500 shares of CCC securities in the Offering. Glaubach Decl. ¶ 4 to Mot. for App't as Lead Pl. [Dkt. # 4-3];

    2.  Defendants

The consolidated complaint names the following institutional defendants:

- Defendant Carlyle Investment Management, LLC ("CIM"), a Delaware limited liability company with its principal place of business in Washington, D.C. Compl. ¶ 9.  Under an investment management agreement with CCC, CIM served as the investment manager of CCC and "had full discretionary investment authority."  *Id*. According to the Offering Memorandum, CIM was responsible for "the day-to-day management and operations of [CCC's] business."  CCC Offering Memorandum ("Off. Mem.") [Dkt. # 52-3] at 62–63;

4

- Defendant T.C. Group, LLC ("TCG"), a Delaware limited liability company with its principal place of business in Washington, D.C.  Compl. ¶ 10.  According to the complaint, TCG owned 75 percent of CIM.  *Id.*;

- Defendant TC Group Holdings, LLC ("TCG Holdings"), a Delaware limited liability company with its principal place of business in Washington, DC.  TCG Holdings was the holding company and managing member of TCG.  *Id.* ¶ 11;

- Defendant CCC, a Guernsey limited company that is currently in liquidation.  *Id.* ¶ 22.[1]

The complaint also names two groups of individual defendants.  The first group of

defendants, who are referred to as the "Carlyle Defendants," is:

- Defendant William Elias Conway, Jr., a resident of Virginia who served as managing director of CIM, a director of CCC, and the Chief Investment Officer of TCG.  *Id.* ¶ 14;

- Defendant John Crumpton Stomber, a resident of Connecticut who served as the Chief Executive Offer, Chief Investment Officer and President, and a director of CCC, as well as Managing Director of CIM and TCG.  *Id.* ¶ 15;

- Defendant James H. Hance, a resident of North Carolina who served as a Director of CCC from September 14, 2006 and at all relevant times thereafter.  *Id.* ¶ 16.  He also served as Chairman of the Board until March 2007 and was a senior adviser to CIM.  *Id.*;

- Defendant Michael J. Zupon, a resident of New York who served as a Director of CCC from September 14, 2006 and at all relevant times thereafter.  *Id.* ¶ 17.  According to the complaint, Zupon was a founding member, Chief Investment Officer, and Managing Director and Head of Carlyle's U.S. Leveraged Finance Group and a Partner and Managing Director of Carlyle.  *Id.*

The second group of individual defendants, who are referred to as the "Outside Directors," is:

---

[1]     On February 10, 2012, defendant CCC asked the Court for leave to file a responsive pleading thirty days after the Court rules on the motions to dismiss.  CCC's Mot. to Extend Time to Respond to Consol. Am. Compl. [Dkt. # 55] at 1–2.  They submitted that "[f]orcing the insolvent estate to litigate these claims as, in effect, an ancillary defendant is duplicative and wasteful of both the insolvent estate's assets and the Court's resources, as well as being futile."  *Id.*  The Court granted the motion.  Minute Order, Feb. 10, 2012.

- Defendant Robert Barclay Allardice, III, a resident of New York who served as a Director of CCC from September 14, 2006 and at all relevant times thereafter. *Id*. ¶ 19;

- Defendant Henry Jay Sarles, a resident of Massachusetts who was a Director of CCC from September 14, 2006 and at all relevant times thereafter. *Id*. ¶ 20;

- Defendant John Leonard Loveridge, a resident of Guernsey who was a Director of CCC from September 14, 2006 and at all relevant times thereafter. *Id*. ¶ 21.

## B. Factual Background

### 1. CCC's business model

As the complaint sets forth, CCC was a closed-end investment fund that was formed as a limited company under the laws of Guernsey on August 29, 2006. Compl. ¶ 40.[2] Although CCC was technically a separate business entity, the complaint alleges that CCC was "an investment product created and managed at all times by [defendants]." *Id*. ¶ 23. CCC's business model involved using highly leveraged financing in the form of repurchase loan agreements ("repos") to invest in residential mortgage-backed securities ("RMBS"). *Id*. ¶ 41; Off. Mem. at 45.

CCC shares were initially sold to investors through a private placement of Class B shares, which was completed by December 31, 2006 and raised over $260 million. Compl. ¶ 50. A second private placement was completed by February 28, 2007, raising over $336 million. *Id*. ¶ 52. The total amount of capital raised through the private placements was approximately $600 million. *Id*.

### 2. The Offering and Offering Memoranda

#### a. *Types of securities sold in the Offering*

The Offering ("Offering") was initially scheduled to take place in early July 2007. Off. Mem. at cover. There were two types of securities to be sold: Class B Shares and Restricted

---

2       All citations to "Compl." refer to the Consolidated Complaint filed on December 5, 2011. [Dkt. # 42].

Depository Shares ("RDSs").  Class B shares were issued from CCC and were sold only outside the United States to foreign investors.  Off. Mem. at cover.  RDSs were issued by the Bank of New York and sold to investors in the United States, as well as foreign investors.  *Id*.  The securities sold in the Offering were not widely available – only certain types of investors and investors in certain locations were permitted to purchase the securities.  In the United States, only qualified institutional buyers ("QIBs") and accredited investors were permitted to purchase RDSs.[3]  Similarly, in order to purchase either type of security, an investor was required to be a "qualified purchaser," meaning a QIB with at least $25 million in qualifying investments or an individual with at least $5 million in qualifying investments.  *Id*. at A-2.  Both types of securities were subject to transfer restrictions.  *See, e.g.*, *id*. at 136, 138.

### b.  The period preceding the issuance of the Offering Memorandum

In the months leading up to the Offering, the CCC Board of Directors ("the Board") reviewed drafts of the Offering Memorandum and took action on several issues related to the Offering.  *See, e.g.*, *id*. ¶¶ 53, 54, 56.  The Memorandum was ultimately issued on June 19, 2007.  *Id.* ¶ 74.

According to the Offering Memorandum, CCC had an investment guideline stating that the fund would maintain a "liquidity cushion" of 20 percent, meaning that "unrestricted cash and cash equivalents . . . [would be] equal to no less than 20% of [CCC's] [a]djusted [c]apital."  Off. Mem. at 7.  The liquidity cushion was set at 20% based on "extensive statistical testing of [CCC's] expected portfolio, including testing during periods of significant financial market

---

3       The Offering Memorandum defined QIBs as "institutional investors that own or invest on a discretionary basis at least $100 million of securities."  Off. Mem. at 145.  Similarly, accredited investors were defined as "qualified purchasers . . . which generally include most institutions, certain of [CCC's] management officials and individuals meeting specified net worth income tests."  *Id*.

volatility and stress . . . ." *Id.* at 50.  The purpose of the liquidity cushion was to enable CCC "to meet reasonably foreseeable margin calls on [its] financed securities." *Id.* at 50.  But CCC also informed potential investors that it could change its investment guidelines without a shareholder vote at any time with approval of a majority of directors.  *Id.* at 7.  In fact, the Offering Memorandum disclosed that it had already deviated from the guidelines in the past and "may do so again in the future." *Id.*

In its critique of the Offering, the complaint focuses on events that were occurring during the same time period.  It alleges that at some point in April 2007, the Board approved a request made by defendant Stomber to use the liquidity cushion to buy certain RMBSs prior to the Offering, which resulted in a reduction of the liquidity cushion to 15 percent.  *Id.* ¶ 58.  Also, during this period, CCC entered into a term loan agreement with CitiGroup Global Markets, Inc., which was one of the brokerage firms that agreed to market the Offering to U.S. investors. *Id.* ¶ 60.  CCC thus secured a bridge loan in the amount of $191 million, which was "obtained in contemplation of the Offering and was required to be repaid from the proceeds of the Offering." *Id.*

The complaint also alleges that on June 7, 2007, defendant Stomber informed the Board in an email that CCC had recently sustained substantial losses.  *Id.* ¶ 63.  It states:

> Stomber told the Board that as a consequence of a change in the "5 years swap rate," a $25 million unrealized gain had become an $8 million unrealized loss on CCC's mortgage backed securities and that CCC's New Asset Value had declined as a result.  Stomber stated that "[t]oday was a wild day" in the market "where rates went up materially" and that CCC could sustain further significant losses . . . . Most importantly, Stomber was aware and informed the Board that those events had negatively impacted CCC's Liquidity Cushion:  " . . . . The Liq Cushion stands at 23 percent but could be called down close to 20 percent – that is why we have it."

*Id.*

On June 13, 2007, Stomber announced to the Board that the Offering would be postponed because of "volatile market conditions" and the uncertainty of the valuation of CCC's balance sheet.  Compl. ¶ 64.  According to the complaint, he reported that "CCC's IFRS net income 'was on target for a 14.5% 2nd quarter, but he also noted that CCC's 'Fair Value Reserve was down $63.9MM from inception and $76.2MM for the year,' meaning that CCC had suffered unrealized losses in those amounts under IFRS." *Id.* [4]  Stomber went on:

> We are having a major liquidity event so I invoked "emergency powers" on the balance sheet.  The liquidity cushion is currently at $148MM, which is technically above 20% of our current MTM equity position.  But please take no comfort in that, we could be margin called for up to another $70MM and therefore bring the cushion down to about 11%.  Therefore, we need independent Board Member approval to go under 20% – that is the purpose of the liquidity cushion – to be there so we don['t] not have to sell securities at depressed prices during a margin call.  Therefore, I ask you for your formal approval.

*Id.* (alteration in original).  The complaint alleges that on June 14, 2007, the Board approved a resolution to give Stomber the authority he requested to reduce CCC's minimum liquidity cushion.  Compl. ¶ 66. [5]

Shortly thereafter, on June 19, 2007, CCC issued the original Offering Memorandum. *Id.* ¶ 74; Off. Mem. at cover.  The Offering Memorandum contained detailed information about the Offering, including explanations of the types of securities that were to be sold, CCC's business model and its associated risks, and the fund's financial status.

---

[4]    "IFRS" stands for "International Financial Reporting Standards," which are the accounting standards issued by the International Accounting Standards Board.  Compl. ¶ 64 n.1. IFRS, which differs from the Generally Accepted Accounting Principles (GAAP) used in the United States, is the standard under which CCC prepared its financial statements and quarterly reports.

[5]    There is no allegation, though, that at this time, the cushion actually dropped below 20 percent.

*c. The description of CCC's business model and associated risks in the Offering Memorandum*

The Offering Memorandum set forth CCC's business model in detail, particularly its use of leverage and the risks associated with such an approach.  The first page of the Memorandum summarized CCC's investment strategy in the following way:

> Our objective is to achieve attractive risk-adjusted returns for shareholders through current income and, to a lesser extent, capital appreciation.  We seek to achieve this objective by investing in a diversified portfolio of fixed income assets consisting of mortgage products and leveraged finance assets.  Our income is generated primarily from the difference between the interest income earned on our assets and the costs of financing those assets as well as from capital gains generated when we dispose of our assets.
>
> We use leverage to increase the potential return on shareholders' equity.  The actual amount of leverage that we will utilize, although not limited by our investment guidelines, will depend on a variety of factors, including type and maturity of assets, cost of financing, credit profile of the underlying assets and general economic and market conditions.

*Id*. at 1.  The Offering Memorandum emphasized that CCC would "utilize leverage extensively" and "without limit."  *Id*. at 5.  It noted that the fund's leverage ratio, which was defined as "debt directly incurred to finance investment assets to total equity," had already exceeded 26:1 by March 31, 2007, and that it was expected to exceed 29:1 after the Offering.  *Id*.

The Offering Memorandum also discussed the risk factors associated with CCC's business model, explaining:

- "We may change our investment strategy or investment guidelines at any times without the consent of shareholders, which could result in us acquiring assets that are different from, and possibly riskier than, the investment guidelines described in the offering memorandum."  *Id*. at 10.

- "We may change our investment strategy and/or capital allocation guidelines without a vote of our shareholders, provided that any change to our investment guidelines must be approved by a majority of our independent directors.  In the past, we have deviated from these guidelines with the approval of a majority of our independent directors and we may do so again in the future."  *Id.* at 7.

- "***We cannot assure you that the Liquidity Cushion will be sufficient to satisfy margin calls.***

  Despite extensive statistical testing of relevant data, the Liquidity Cushion is not designed to protect us under all possible adverse market scenarios.  Therefore, we cannot assure you that that the Liquidity Cushion will be sufficient to satisfy margin calls on our financed securities that may arise in connection with highly unusual adverse market conditions."  *Id*. at 14 (emphasis in original).

- "Our organizational, ownership and investment structure may create significant conflicts of interest that may be resolved in a manner which is not always in our best interests or those of our shareholders."  *Id.* at 10.

- "The price of Class B shares and the RDSs may fluctuate significantly and you could lose all or part of your investment."  *Id.* at 11.

With respect to the use of leverage, the Offering Memorandum warned:

- "We may employ leverage without limit, which may result in the market value of our investments being highly volatile, limit our range of possible investments, and adversely affect our return on investments and the cash available for distributions.  An investment in the Class B shares or RDSs is suitable only for investors who are experienced in analyzing and bearing the risks associated with investments having a very high degree of leverage."  *Id*. at 13.

- "Most leveraged transactions require the posting of collateral.  The amount of collateral required to be posted may increase rapidly in the context of changes in market value of the assets to which we have leveraged exposure[.]"  *Id*.

- "While borrowing and leverage present opportunities for increasing total return, they have the effect of potentially increasing losses as well . . . [A]ny event which adversely affects the value of our investments would be magnified to the extent leverage is employed.  Increased leverage also increases the risk that we will not be able to meet our debt service obligations, and consequently increases the risk that we will lose some or all of our assets to foreclosure or sale."  *Id*.

Finally, because CCC's business model depended heavily on RMBS assets and financing with repo agreements, the Offering Memorandum outlined the risks related to those circumstances:

- "If residential and/or commercial real estate property values decrease materially . . . we may realize material losses related to foreclosures or to the restructuring of our mortgage loans and the mortgage loans that back the mortgage-backed securities in our investment portfolio."  *Id.* at 12.

- "The adverse effect of a decline in the market value of our assets may be exacerbated in instances where we have borrowed money based on the market value of those assets.  If the market value of those assets declines, the lender may require us to post additional collateral to support the loan.  If we were unable to post the additional collateral, we would have to sell the assets at a time when we might not otherwise choose to do so."  *Id*. at 15.

### d.   The description of CCC's financial status in the Offering Memorandum

The Offering Memorandum provided information regarding CCC's financial status as of March 31, 2007, which was the end of the latest financial reporting period.  *Id*. ¶ 77; Off. Mem. at 8.  But in a section entitled "Recent Developments," the document also supplied updated financial information that was current as of June 13, 2007.  In particular, this section disclosed that prior to the Offering, CCC's fair value reserves had declined by $28.9 million between April and June 2007:

> As a result of changes in interest rates, we estimate that from April 1, 2007 to June 13, 2007, our fair value reserved declined by approximately $28.9 million (unaudited), from approximately $24.0 million (unaudited) as of March 31, 2007 to an estimated $(4.9) million (unaudited) as of June 13, 2007.

Off. Mem. at 8.

Ultimately, the Offering did not take place as scheduled.

### e.   Postponement of the Offering and the Supplemental Offering Memorandum

On June 28, 2007, CCC announced that it had postponed the Offering and that it would issue a Supplemental Offering Memorandum ("the Supplement") setting forth a revised timetable and changing the terms of the Offering.  Compl. ¶ 83.  The next day, CCC issued the Supplement, which stated that it was "supplemental to, forms part of and must be read in conjunction with the Offering Memorandum" and that it "amends and updates" any information in the Offering Memorandum.  Compl. ¶ 84; Supplemental Offering Memorandum ("Supp. Off.

Mem.") [Dkt. # 52-6] at 1.  The Supplement specifically notified investors that where it contained information inconsistent with Offering Memorandum, the Supplement superseded the earlier document.  Supp. Off. Mem. at 1.[6]

The Supplement stated that the number of Class B shares available in the Offering would be reduced from 19,047,620 to 15,962,673 and that the price of the shares would be reduced to $19, from the price range of $20–$22 stated in the Offering Memorandum.  Supp. Off. Mem. at 5.  In a section entitled "Recent Developments," the Supplement also disclosed:

> [F]rom April 1, 2007 to June 26, 2007, our fair value reserves declined by approximately $84.2 million (unaudited), from approximately $24.0 million (unaudited) as of March 31, 2007 to an estimated ($60.2) million (unaudited) as of June 26, 2007.

Supp. Off. Mem. at 8–9.

The Offering was completed on July 11, 2007.  Supp. Off. Mem. at 9.  More than 18 million Class B Shares and RDSs were sold in the Offering, raising over $345 million in proceeds for CCC.  Compl. ¶ 85.

### f.   The subsequent financial crisis and collapse of CCC

In the months following the Offering, CCC experienced a decline in the value of its investments.  The complaint alleges that, in August 2007, several of CCC's repo counterparties made substantial margin calls and sought "haircuts,"[7] which required CCC to provide more collateral for the loans used to finance the RMBS assets.  *Id*. ¶ 116.  These demands negatively affected CCC's liquidity cushion.  *Id*. ¶ 117.  Around August 7, 2007, Stomber sought and received permission from the Board to reduce the liquidity cushion to 15 percent for a period of

---

6    Because the Supplement is not paginated, the Court assigned the page numbers referenced in the citations by beginning to count on the cover page.

7    A "haircut" is the "difference between the amount of a loan and the market value of the collateral securing the loan."  Black's Law Dictionary 781 (9th ed. 2009).

ninety days. *Id*. On August 23, 2007, the Board held an emergency meeting, at which defendant Hance informed Board members that the recent market events had "diminished [CCC's] liquidity cushion below zero." *Id*. ¶ 119. Stomber allegedly told the Board at the meeting that "[m]anagement believes it would be prudent to wind down the Company to its core level at this time." *Id*.

On August 27, 2007, Stomber informed shareholders in a letter that the recent market volatility had resulted in increased margin calls and that "CCC's liquidity cushion has not been sufficient to meet recent margin calls." *Id*. ¶ 122. On September 11, 2007, the Carlyle Investor Conference took place in Washington, DC, at which Stomber said that "fundamental revisions to CCC's business model were required and would be implemented." *Id*. ¶ 126. He acknowledged that "CCC's business model needed to be thoroughly restructured to reduce leverage and increase minimum liquidity cushion to at least 40%." *Id*. According to the complaint, defendants made a commitment to (1) "employ less leverage"; (2) "have more diversified asset classes"; and (3) "improv[e] and stabiliz[e] sources." *Id*. But plaintiffs allege that despite these promises, defendants did not take any steps to maintain or increase the liquidity cushion, which had been reduced to 3 percent of CCC's adjusted capital by November 13, 2007. *Id*. ¶ 130.

At a meeting on November 13, 2007, the Board approved amendments to the definition of the term "liquidity cushion" to include undrawn debt from Carlyle as liquid assets. *Id*. ¶ 131. Plaintiffs allege that this revision made "CCC's position appear more favorable than it was" because "the Board did not take any steps to actually address CCC's precarious liquidity problems and over-accumulation of RMBS-based assets." *Id*. The Board met again on February 27, 2008, and voted to suspend the 20 percent liquidity cushion until September 2008. *Id*. ¶ 137. The same day, CCC issued its annual report for the year ending December 31, 2007, which

reported that "[d]uring the fourth quarter our portfolio stabilized and we were able to generate returns consistent with our near term targets." *Id*. ¶ 138; *see also* Ex. 3 to CD Mem. at 4 [Dkt. # 52-5].

But on March 5, 2008, CCC issued a press release announcing that "since filing its annual report on February 28, 2008, the Company ha[d] been subject to margin calls and additional collateral requirements totaling more than $60 million." *Id.* ¶ 140; Ex. 9 to CD Mem. at 1. The press release went on to say:

> Until March 5, the Company had met all of the margin requirements imposed by its repo counterparties. However, on March 5, the Company received additional margin calls from seven of its [thirteen] repo counterparties totaling more than $37 million. The Company has met margin calls from three of these financing counterparties that have indicated a willingness to work with the Company during these tumultuous times, but did not meet the margin requirements of the four other repo financing counterparties. From this group of four counterparties, one notice of default has been received by the Company and management expects to receive at least one additional default notice.

*Id.* One week later, on March 12, 2008, CCC issued another press release announcing:

> [A]lthough it has been working diligently with its lenders, the Company has not been able to reach a mutually beneficial agreement to stabilize its financing. The Company expects that its lenders will promptly take possession of substantially all of the Company's remaining assets.
>
> The only assets held in the Company's portfolio as of today are the U.S. government agency AAA-rated residential mortgage-backed securities (RMBS). During the last seven business days, the Company received margin calls in excess of $40 million. As the Company was unable to pay these margin calls, its lenders proceeded to foreclose on the RMBS collateral. In total, through March 12, the Company has defaulted on approximately $16.6 billion of its indebtedness. The remaining indebtedness is expected soon to go into default.

Ex. 10 to CD Mem. at 1; *see also* Compl. ¶ 141.

On March 17, 2008, CCC entered liquidation, and the Royal Court of Guernsey appointed liquidators "to wind down the affairs of, and liquidate, the enterprise." *Id*. ¶ 142.

CCC's liquidators filed suit in Delaware Chancery Court against the Carlyle entities and CCC's former directors, alleging breach of fiduciary duty claims under Delaware and Guernsey law. *Carlyle Capital Corp. v. Conway, et al.*, No. 10-5625 (Del. Ch. July 7, 2010).

## C. The Cases Before the Court

### 1. The consolidated cases

There are currently four related cases pending before the Court:

- *Phelps v. Stomber, et al*., 11-cv-1142.  Plaintiffs filed this action on June 21, 2011, alleging violations of federal securities law;

- *Phelps v. Carlyle Capital Corp.*, 11-cv-1143.  Plaintiffs filed this action on June 21, 2011, alleging the same violations of federal securities law as *Phelps v. Stomber*;

- *Glaubach v. Carlyle Capital Corporation Limited*, 11-cv-1523.  Plaintiff Jonathan Glaubach filed this related case on August 24, 2011, asserting one claim under the laws of the United Kingdom;

- *Wu v. Stomber*, 11-cv-2287.  Plaintiff Wu and four other plaintiffs filed this action in New York state court, asserting claims for common law fraud, negligent misrepresentation, and violations of Dutch statutory laws.  The case was removed to federal court and transferred to this Court on December 27, 2011.

On October 7, 2011, the Court granted plaintiffs' motion to consolidate both of the *Phelps* actions, 11-cv-1142 and 11-cv-1143, and the *Glaubach* action, 11-cv-1523.  Order, Oct. 7, 2012 [Dkt. # 22].  At the time of the consolidation, the *Wu* action had not yet been transferred to this Court, so it was not consolidated with the others.  Defendants have also filed a pending motion to dismiss [Dkt. # 26] in the *Wu* case.  The Court considers the motion to dismiss in the *Wu* case here, and an identical memorandum opinion will be filed in both the *Phelps* and *Wu* cases.

### 2. Lead plaintiff

Immediately after filing the complaint in the *Phelps* action, a group of plaintiffs referred to as the "McLister Group," filed a motion for appointment as lead plaintiff [Dkt. # 3] under

Section 21(d)(a)(3)(B) of the Exchange Act, 15 U.S.C. § 78u-4(a)(3)(B), as amended by Section 101(a) of the Private Securities Litigation Reform Act of 1995. Soon thereafter, plaintiff Glaubach filed a competing motion for appointment as lead plaintiff. [Dkt. # 4]. Because the Court found that the McLister Group best satisfied the requirements and purpose of the lead plaintiff procedure in the PSLRA, it granted their motion and denied Glaubach's motion. [Dkt. # 37]. Glaubach subsequently filed a motion for reconsideration [Dkt. # 40], which was denied. [Dkt. # 64].

### 3. The consolidated complaint

Plaintiffs filed a consolidated complaint on December 5, 2011. [Dkt. # 42]. The complaint includes eleven counts: the first six address the Offering and the remaining five address the subsequent sale of CCC shares on the aftermarket.

- Count I alleges a violation of Section 10(b) of the Exchange Act and Rule 10b-5 on behalf of the U.S. Offering Subclass against defendants Stomber, CCC, CIM and TCG. Compl. ¶¶ 156–71;

- Count II alleges a violation of Section 20(a) of the Exchange Act on behalf of the U.S. Offering Subclass against all defendants. *Id*. ¶¶ 172–74;

- Count III alleges a common law fraud claim on behalf of the Offering Class against all defendants. *Id*. ¶¶ 175–77;

- Count IV alleges a common law negligent misrepresentation claim on behalf of the Offering Class against all defendants. *Id*. ¶¶ 178–80;

- Count V alleges a violation of Dutch prospectus liability and tort law on behalf of the Offering Class against all defendants. *Id*. ¶¶ 181–86;

- Count VI alleges a violation of Section 90 of the Financial Services and Markets Act ("FSMA") of 2000, a law of the United Kingdom, on behalf of the Offering Class against all defendants. *Id*. ¶¶ 187–91;[8]

---

[8] Lead plaintiffs took the position that Count VI should be withdrawn. Tr. of Mot. Hr'g, Afternoon Session ("PM Tr."), at 42–43 (May 23, 2012). Therefore, the Court permitted plaintiff Glaubach to file an opposition to defendants' motion to dismiss that claim, [Dkt. # 70], which he had originally advanced.

- Count VII alleges a violation of Section 10(b) of the Exchange Act and Rule 10b-5 on behalf of the U.S. Aftermarket Subclass against all defendants. *Id.* ¶¶ 192–206;

- Count VIII alleges a violation of Section 20(a) of the Exchange Act on behalf of the U.S. Aftermarket Class against all defendants. *Id.* ¶¶ 207–08;

- Count IX alleges a violation a common law fraud claim on behalf of Aftermarket Class on behalf of the Aftermarket Class against all defendants. *Id.* ¶¶ 209–10;

- Count X alleges a common law negligent misrepresentation claim on behalf of the Aftermarket Class against all defendants. *Id.* ¶¶ 211–12;

- Count XI alleges a violation of Dutch prospectus liability and tort law on behalf of the Aftermarket Class against all defendants. *Id.* ¶¶ 213–227.

4. <u>Motions to dismiss</u>

On January 17, 2012, defendants TCG, TCG Holdings, CIM, Stomber, Conway, Hance, and Zupon ("the Carlyle Defendants") moved to dismiss all of the claims against them under Federal Rule of Civil Procedure 12(b)(6) and the PSLRA for failure to state a claim upon which relief can be granted. Carlyle Defendants' Mot. to Dismiss and Mem. in Supp. ("CD Mem.") [Dkt. # 52]. The same day, defendants Allardice, Sarles, and Loveridge (the "Outside Directors") moved to dismiss the nine claims filed against them under Rules 12(b)(6) and 9(b). [Dkt. # 51]. The Outside Directors were not named in Counts I and VII (the section 10(b) claims) – they argued that the claims filed against them under section 20(a) of the Exchange Act were insufficient to state a plausible claim. With respect to the common law and foreign law claims, the Outside Directors joined the arguments advanced by the Carlyle Defendants in their motion. The Court held a motions hearing on the motions to dismiss on May 23, 2012.

## II.   STANDARD OF REVIEW

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v.*

*Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted); *accord Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In *Iqbal*, the Supreme Court reiterated the two principles underlying its decision in *Twombly*: "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." 556 U.S. at 678. And "[s]econd, only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id*. at 679.

A claim is facially plausible when the pleaded factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. A pleading must offer more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action," *id*., quoting *Twombly*, 550 U.S. at 555, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*.

When considering a motion to dismiss under Rule 12(b)(6), the complaint is construed liberally in plaintiff's favor, and the Court should grant plaintiff "the benefit of all inferences that can be derived from the facts alleged." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). Nevertheless, the Court need not accept inferences drawn by plaintiff if those inferences are unsupported by facts alleged in the complaint, nor must the Court accept plaintiff's legal conclusions. *See Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002); *Kowal*, 16 F.3d at 1276. In ruling upon a motion to dismiss for failure to state a claim, a court may ordinarily consider only "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take

judicial notice."  *Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002) (citations omitted).

For claims alleging fraud, Federal Rule of Civil Procedure 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b). And securities fraud claims are governed by the heightened pleading standard set forth in the PSLRA, which exceeds even the standard set forth in Rule 9(b).  In its effort to curb potentially abusive lawsuits, the PSLRA requires plaintiffs to "specify each statement alleged to have been misleading [and] the reasons why the statement is misleading" and to "state with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind." 15 U.S.C. § 78u–4(b)(1)–(2); *see also Plumbers Local No. 200 Pension Fund v. Wash. Post Co.*, 831 F. Supp. 2d 291, 294 (D.D.C. 2011).

In order to assure itself that it had distilled all of the fraud allegations from plaintiffs' sixty-five page, 227 paragraph consolidated complaint, so that it could properly assess them under these standards, the Court ordered plaintiffs to prepare a supplemental memorandum after the hearing on the motions.  Plaintiffs were ordered to create a chart that listed every statement in the Offering documents that they alleged was false as well as every omission that they alleged was actionable because it rendered the Offering documents to be false.  PM Tr. 63–68. Defendants were then permitted to complete a second column pointing out when and where they contended the allegedly omitted facts had actually been disclosed and responding to the alleged affirmative misrepresentations as well.  *Id.*

### III.   ANALYSIS

Plaintiffs' claims can be divided into four categories, which the Court will discuss in turn:  (1) federal securities claims pertaining to the Offering; (2) federal securities claims

pertaining to the aftermarket; (3) common law claims pertaining to the Offering; and (4) common law claims pertaining to the aftermarket.  For the reasons set forth below, these claims will be resolved as follows:

- Federal Offering Claims:  dismissed for failure to allege a materially misleading statement or omission and failure to allege loss causation;

- Federal Aftermarket Claims:  dismissed under *Morrison v. National Australia Bank*, 130 S. Ct. 2869 (2010).

- Common Law Offering Claims:  dismissed on the same grounds and for failure to plead reliance;

- Common Law Aftermarket Claims:  in the absence of federal claims, the Court declines to exercise jurisdiction, but it notes a failure to plead reliance in any event.

### A. Federal Offering Claims

#### 1. *Morrison v. National Australia Bank*

Counts I and II allege claims under federal securities law related to the Offering.  Counts VII and VIII allege claims under federal securities law pertaining to the aftermarket.  Defendants seek dismissal of all of these claims under the Supreme Court's decision in *Morrison v. National Australia Bank*, 130 S. Ct. 2869, 2883 (2010).  Since the analysis of *Morrison*'s application to the Offering claims and the aftermarket claims is intertwined, the Court will discuss both sets of claims in this section, but only the aftermarket claims will be dismissed on these grounds.

In *Morrison*, the Supreme Court held that Section 10(b) does not apply extraterritorially to foreign securities transactions.  *Id.* at 2877–78, 2883.  Rejecting what had become known as the "conduct and effects" test, the Court set forth a bright-line "transactional" test for determining whether a securities purchase is within the scope of section 10(b).  The Court held that section 10(b) covers:  (1) "the purchase or sale of a security listed on an American stock

exchange," or (2) "the purchase or sale of any other security in the United States." *Id*. at 2888.

The Court reasoned:

> [W]e think the focus of the Exchange Act is not upon the place where the deception originated, but upon purchases and sales of securities in the United States. Section 10(b) does not punish deceptive conduct, but only deceptive conduct "in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered."

*Id*. at 2884, citing 15 U.S.C. § 78j(b).

With respect to the first part of the *Morrison* test, the parties agree that neither the RDSs nor the Class B shares was listed on an American stock exchange. Mem. of Points and Authorities in Opp. to Motions to Dismiss ("Pls.' Opp.") [Dkt. # 56] at 40; CD Mem. at 25; *see also* Compl. ¶ 93; Off. Mem. at 33, 145. Rather, plaintiffs contend that they meet the second part of the *Morrison* test because both the RDSs and Class B shares were "bought or sold in the United States." *Id*.

> a.   No Class B shares were purchased in the Offering, and the Class B shares sold in the aftermarket were purchased on a foreign exchange.

Taking the Class B shares first, there is no allegation in the complaint that any plaintiff purchased Class B shares in the Offering in the United States. Indeed, the Offering Memorandum specifically states that "the Class B shares [could] not be offered or sold within the United States or to U.S. persons." Off. Mem. at cover. Plaintiffs do not dispute this. *See* PM Tr. at 17 (stating at oral argument that no plaintiff bought any Class B shares at the time of the Offering).

With respect to the Class B shares purchased in the aftermarket, the complaint alleges that Class B shares were only listed on the foreign exchange, Euronext. Compl. ¶¶ 32, 109. But plaintiffs argue that the fact that the shares were sold on a foreign exchange is not dispositive

under *Morrison*.  Their position is that *Morrison* addressed what they describe as a "foreign cubed transaction," involving "foreign plaintiffs, a foreign issuer, and a foreign exchange."  Pls.' Opp. at 44.  Plaintiffs contend that by contrast, this case involves a "U.S. purchaser, a U.S. issuer, and a foreign stock exchange."  *Id.*  They argue that CCC was actually a U.S. company, even though it was incorporated under the laws of Guernsey, and that Euronext was actually a U.S. exchange because while it is located in the Netherlands, it was owned by a Delaware company.  *Id*. at 44–45.  Although plaintiffs acknowledge that other courts have extended *Morrison*'s holding to "foreign-squared transactions (those involving a U.S. purchaser, foreign issuer, and foreign stock exchange), they state that "no court has yet extended *Morrison* to a fact pattern involving a U.S. purchaser, a U.S. issuer, and a foreign stock exchange."  *Id*. at 44.

But plaintiffs' effort to label everything "Made in America" to get around *Morrison* requires the Court to ignore allegations in the complaint and information contained in the Offering documents referenced in the complaint.  According to plaintiffs' own allegations, CCC is not a U.S. company – it was incorporated under the laws of Guernsey.  Compl. ¶ 40.  And Euronext is not a U.S. exchange.  The exchange is located in the Netherlands.  Off. Mem. at cover (stating that Euronext is the "regulated market of Euronext Amsterdam . . . .").  Plaintiff points to no authority that would suggest that there is any significance to the fact that a foreign exchange was owned by a U.S. entity.  To the contrary, *Morrison* specifically directed courts to focus on the geographic location of the *transaction*, 130 S. Ct. at 2884, and here, the aftermarket purchase of Class B shares occurred on a foreign exchange.  The Court notes that other courts that have considered similar questions after *Morrison* have treated Euronext as a foreign exchange.  Carlyle Defendants' Reply Brief in Supp. of Mot. to Dismiss ("CD Reply") [Dkt. # 63] at 7, citing *In re Vivendi Universal, S.A. Sec. Litig.*, No. 02 Civ. 5571 (RJH) *et al.*, ---

F. Supp. 2d ---, 2012 WL 280252, at *1 (S.D.N.Y. Jan. 27, 2012); *In re Société Générale Sec.

*Litig.*, No. 08 Civ. 2495 (RMB), 2010 WL 3910286, at *5 (S.D.N.Y. Sept. 29, 2010).[9]   So, the

aftermarket securities claims do not survive the motion to dismiss under *Morrison*.

> b.   *No RDSs were purchased in the aftermarket, and the RDSs sold in the Offering were "bought or sold" in the United States.*

The complaint does not allege that plaintiffs purchased RDSs in the aftermarket, so the

Court is only concerned with RDSs that were purchased in the Offering.   *See, e.g.,* Compl. ¶¶ 4,

5, 6, 7, 8 (alleging that each plaintiff purchased RDSs in the Offering).   Plaintiffs point to the

following allegations in the complaint as support for the conclusion that the RDSs were

purchased in the United States for *Morrison* purposes:

- The RDSs were sold to U.S. investors in the Offering under Regulation D, 17 C.F.R. §§ 230.501–230.508, and Rule 144A, 17 C.F.R. § 230.144A, which are the two registration exemptions applicable to securities sold in the United States. *Id.* ¶ 85.

- The RDSs were issued by the Bank of New York, which described them as "U.S. securities" on their website. *Id.* ¶ 90.

- The subscription documents were transmitted to Citigroup Global Markets, a U.S. brokerage-dealer in New York. *Id.* ¶ 94, 104.

- CCC hired six New York-based broker-dealers for "solicitation of purchasers" throughout the United States. *Id.* ¶ 101.

- U.S. investors were only permitted to purchase RDSs in the Offering because they were not eligible to buy Class B shares. *Id.* ¶¶ 92, 93.

- In addition, the complaint alleges that the plaintiffs were residents of the United States and that their participation in the Offering was solicited by their stockbrokers, who were registered U.S. broker-dealers. *Id.* ¶¶ 4–8.

---

9       In addition, the fact that plaintiffs insist that Dutch law should apply to the common law claims pertaining to the aftermarket because the Netherlands is the jurisdiction with the most significant relationship to aftermarket claims, *see* Pls.' Opp. at 57–58, undercuts their argument here that Euronext is actually an American exchange.

Taking these allegations together, there is no question that the RDSs were "bought and sold in the United States," and defendants do not appear to challenge that conclusion seriously. Rather, their primary contention is that the RDSs sold here were "tethered" to the Class B shares sold only on the foreign exchange. CD Mem. at 27.

> What we really have here is we have a[n] actual security that has to be traded on the foreign exchange. So the loop is not completed. If I buy an RDS, it's not over. There has to be a corresponding purchase of a Class B share.

Tr. of Mot. Hr'g, Morning Session ("AM Tr."), at 54 (May 23, 2012). Under those circumstances, defendants urge the Court to look at the "economic reality" underlying the transaction and to conclude that purchasing an RDS was "a transaction that has a necessary foreign connection" for *Morrison* purposes. *Id.* at 50.

In support of this argument, defendants point to several post-*Morrison* cases from courts in other districts. CD Mem. at 27–28, citing *Société Générale*, 2010 WL 3910286, at *6–7 and *Elliott Associates v. Porsche Automobil Holdings SE*, 759 F. Supp. 2d 469, 477 (S.D.N.Y. 2010). In *Société Générale*, the plaintiffs had purchased securities known as American Depository Receipts ("ADRs") in the United States, which are similar to RDSs in that they represent the shareholder's ownership of a foreign security traded on a foreign exchange. 2010 WL 3910286, at *1. The court determined that because "trade in ADRs is considered to be a predominately foreign securities transaction," section 10(b) did not apply. *Id.*, at *4 (internal quotation marks omitted). *Elliot* concerned the purchase of securities-based swap agreements that referenced the share price of a foreign stock. 759 F. Supp. 2d at 470. The district court observed that the swap agreements at issue were "the functional equivalent of trading the underlying [company's] shares on [a foreign] exchange" and therefore the "economic reality" is that such agreements are "essentially 'transactions conducted upon foreign exchanges and markets,' and not 'domestic

transactions' that merit the protection of [section] 10(b)." *Id.* at 476, citing *Morrison*, 130 S. Ct. at 2882, 2884. The court therefore dismissed the section 10(b) claims on those grounds.

Relying on these cases, defendants suggest that the Court employ an "economic reality" or "functional equivalent" test to determine whether the claims are barred under *Morrison*. AM Tr. at 50. But, in the Court's view, the "functional equivalent" gloss that the *Elliot* and *Société Général* courts have developed is inconsistent with the bright line test set forth by the Supreme Court in *Morrison*, which focuses specifically and exclusively on where the plaintiff's purchase occurred. The Supreme Court was clear in its holding that "the focus of the Exchange Act is not upon the place where the deception originated, but upon purchases and sales of securities in the United States." *Morrison*, 130 S. Ct. at 2884. While defendants' contention that an investor could not purchase an RDS in the United States without a corresponding overseas transaction may be true, it does not change the fact that a purchase in the United States still took place.[10]

In sum, the Court concludes the following with respect to *Morrison*:

- The federal securities claims with respect to the Offering are not barred by *Morrison* because plaintiffs' purchases of RDSs constituted a "purchase or sale of [a] security in the United States." *Id.* at 2993.

- The federal securities claims with respect to the aftermarket are barred by *Morrison* because the Class B shares were purchased on a foreign exchange and therefore were not bought or sold in the United States. Accordingly, Counts VII and VIII are dismissed with prejudice.

---

10      The *Elliott* case relied upon by defendants is also distinguishable on other grounds. In *Elliott*, because the issuer sponsored the sale in the United States, the court emphasized that it was "loathe to create a rule that would make foreign issuers with little relationship to the U.S. subject to suits here simply because a private party in this country entered into a derivatives contract that references the foreign issuer's stocks." 759 F. Supp. 2d at 476. Those factual circumstances are not present here, where CCC's RDS program was purposefully sponsored by the issuer to make shares available for purchase in the United States. *See* Off. Mem. at 113.

2. *Statute of limitations*

Defendants next contend that the federal securities claims pertaining to the Offering are time-barred.[11]   This is a close question, which the Court need not resolve in this case.

Federal securities claims are governed by a two year statute of limitations which begins to run "[two] years after the discovery of the facts constituting the violation[.]" 28 U.S.C. § 1658; *see also Merck & Co. v. Reynolds*, 130 S. Ct. 1784, 1790 (2010).   The Supreme Court has explained that "discovery of the facts constituting the violation 'encompasses not only those facts that the plaintiff actually knew, but also those facts a reasonably diligent plaintiff would have known.'"   *Merck*, 130 S. Ct. at 1796.   And, in *Merck*, the Court made it clear that "the facts constituting the violation" to be known or discovered include facts showing scienter.   *Id*.   Accordingly, the question the Court must resolve is when the limitations period began to run in this case.

The complaint was filed on June 21, 2011.   [Dkt. # 1].   Defendants argue that the latest possible date that a reasonably diligent plaintiff would have discovered the facts underlying the alleged violation is February 27, 2008 – the date that CCC issued its 2007 annual report for the year ending December 31, 2007.   CD Mem. at 17; AM Tr. at 13–14.[12]   Plaintiffs do not dispute that the annual report contained significant financial information about the company, but they maintain that they did not discover, and could not have discovered, "the facts constituting the violation" until the liquidators' complaint was filed, because that document provided them with the internal Board communications that support the necessary scienter allegations.   Pls.' Opp. at

---

11      This analysis also applies to the federal aftermarket claims (Counts VII and VIII).

12      Indeed, defendants contend that most of the relevant facts were publicly available by the Fall of 2007.   CD Mem. at 17.

79–83, 85–86.   The gist of the complaint is that defendants fraudulently concealed the true financial nature of the company by misrepresenting and omitting material information, and plaintiffs point to the internal communications as the critical evidence allegedly revealing the difference between what CCC officials knew and what they stated publicly.  *See id.*  Under plaintiffs' theory, the operative date when the limitations period began running was July 7, 2010, when the liquidators filed their complaint.[13]

But the *Merck* test is not simply what these plaintiffs know – it asks what a reasonably diligent plaintiff could have known.   Are plaintiffs' claims time-barred as defendants claim because there is no allegation that they even *attempted* to undertake an investigation – that is, there were no reasonably diligent efforts made to obtain the information at all?  Or, can the Court presume, as plaintiffs ask it to do, that no diligent investigation *could* have unearthed the internal emails because that is not the sort of information that is typically available to investors in advance of litigation?  Plaintiffs may well be correct that it is unlikely that the Board would have handed over its internal communications absent the compulsion of a lawsuit.  But it strikes the Court that adopting the plaintiffs' approach would mean that the statute of limitations would be

---

13      Plaintiff's claim that the statute of limitations did not begin to run until the liquidators' complaint was filed is somewhat inconsistent with the allegation in paragraph 220 of the complaint that "as truth about the extent and severity of the deterioration of the financial and operating condition, and inadequacy of internal controls, of CCC started to be released and became apparent in the market, the prices of CCC securities plummeted.  *All or a significant portion of the decrease in the market prices of CCC stock was due to the disclosure, revelation, and/or leakage of information inconsistent with [d]efendants' prior disclosures and other public filings and releases.*"  Compl. ¶ 220 (emphasis added); *see also id.* ¶ 145 ("The collapse of CCC and the failure of its business model became public knowledge in March 2008 . . . ."); *id.* ¶ 165 ("the truth started to become apparent in March of 2008").  If, according to plaintiffs, it was the disclosure of information inconsistent with prior public statements that caused the stock prices to drop in March of 2008, then the alleged difference between the true financial picture and the company's public pronouncements was known to potential plaintiffs at that time.  But plaintiffs submit that the limitations clock did not start ticking because in order to sue, they needed more than that:  they needed specific facts that would satisfy the PSLRA's high threshold for scienter.

held in abeyance in just about every securities fraud case, and that would be inconsistent with *Merck*.

The Supreme Court did provide some guidance in *Merck*, as it instructed courts to apply an objective test, not a test that turns on what a particular plaintiff actually did:

> We conclude that the limitations period in [28 U.S.C. § 1658] begins to run once the plaintiff did discover or a reasonably diligent plaintiff would have "discover[ed] the facts constituting the violation" – whichever comes first. In determining the time at which "discovery" of those "facts" occurred, terms such as "inquiry notice" and "storm warnings" may be useful to the extent that they identify a time when the facts would have prompted a reasonably diligent plaintiff to begin investigating. *But the limitations period does not being to run until the plaintiff thereafter discovers or a reasonably diligent plaintiff would have discovered "the facts constituting the violation," including scienter – irrespective of whether the actual plaintiff undertook a reasonably diligent investigation.*

*Merck*, 130 S. Ct. at 1798 (emphasis added). While this language weighs in favor of plaintiffs on the statute of limitations question, the Court need not resolve the issue because it finds that the complaint fails to plead adequately a securities fraud claim.

3.   *Whether the complaint adequately pleads a materially misleading statement or omission*

Defendants seek dismissal of plaintiffs' securities fraud claims under sections 10(b) and 20(a) of the Exchange Act on the grounds that the complaint fails to allege that defendants made the necessary false statements or material omissions. Because the viability of plaintiffs' section 20(a) claim depends on whether they have adequately alleged an underlying section 10(b) claim, the Court addresses section 10(b) first.

Section 10(b) makes it unlawful for any person to "use or employ, in connection with the purchase or sale of any security . . . , any manipulative or deceptive device or contrivance in contravention of such rules or regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). Rule

29

10b–5 implements this section by making it unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading[.]" 17 C.F.R. § 240.10b–5(b).

To state a claim under section 10(b), a complaint must include six elements:  (1) a material misstatement or omission; (2) scienter – an intent to deceive or defraud; (3) in connection with the purchase or sale of a security; (4) through the use of interstate commerce or a national securities exchange; (5) upon which plaintiffs relied; and (6) which caused injury to plaintiffs.  *In re XM Satellite Radio Holdings Sec. Litig.*, 479 F. Supp. 2d 165, 175 (D.D.C. 2007), citing *In re Baan Co. Sec. Litig.*, 103 F. Supp. 2d 1, 11 (D.D.C. 2000).

Under the PSLRA, a complaint must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading" and must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u–4(b)(1), (2).  With respect to omissions, a company must disclose information "'when silence would make other statements misleading or false.'"  *XM Satellite*, 479 F. Supp. 2d at 178, quoting *Taylor v. First Union Corp.*, 857 F.2d 240, 243–44 (4th Cir. 1999) and *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 268 (2d Cir. 1993) ("A duty to disclose arises whenever secret information renders prior public statements materially misleading[.]"); *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1330 (3d Cir. 2002) ("To be actionable, a statement or omission must have been misleading at the time it was made; liability cannot be imposed on the basis of subsequent events.").

In addition, the misstatement or omission must be material.  "A statement or omission is material if a reasonable investor would consider it important in deciding whether to buy or sell a

stock." *XM Satellite*, 479 F. Supp. 2d at 176, citing *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).   "'The touchstone of the [materiality] inquiry is . . . whether defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered.'"   *Id.* at 178, quoting *Halperin v. eBanker USA.com, Inc.*, 296 F.3d 352, 357 (2d Cir. 2002).

In this case, the complaint expresses a series of general concerns about how CCC was structured and managed, and it takes issue with the overall wisdom of the company's chosen business model.  But the theory underlying the fraud claims in particular emerged more clearly at the motions hearing.  Counsel for plaintiffs told the Court:

> The offering claim, in its essence, is a claim that CCC failed to disclose that it was experiencing a liquidity crisis in June of 2007, just days before the offering memorandum was published.  We're not talking about generic liquidity problems; we're talking about a very specific liquidity crisis that was happening days before the [O]ffering.

AM Tr. at 20.  Counsel went on:

> That's the gravamen of the complaint, is that the company was experiencing a liquidity crisis certainly by the June 7th to June 14th time frame, as revealed by internal e-mail correspondence that only became public upon filing of a complaint by the liquidator of Carlyle Capital, which was filed in July of 2010.

*Id*.

Plaintiffs submit that the omitted information about the financial condition of CCC at the time of the Offering was "sufficiently material to affect the 'total mix' of information available to prospective investors, who, if given full disclosure" may have been dissuaded from investing. Pls.' Opp. at 11.  Specifically, plaintiffs place emphasis on an e-mail sent by defendant Stomber to CCC's directors just days before the Offering on June 13, 2007, which stated:

> We are having a major liquidity event so I invoked "emergency powers" on the balance sheet.  The liquidity cushion is currently at $148MM, which is technically above 20% of our current MTM equity position.  But please take no comfort in that, we could be margin called for up to another $70MM and therefore bring the cushion down to about 11%.  Therefore, we need independent Board Member approval to go under 20% – that is the purpose of the liquidity cushion – to be there so we don['t] not have to sell securities at depressed prices during a margin call. Therefore, I ask you for your formal approval.

Compl. ¶ 64.

According to plaintiffs, the Offering Memorandum was misleading because it did not disclose this "liquidity event" to investors prior to the Offering, and it did not accurately describe the decline in the company's fair value reserves.  They contend that the disclosures in the Offering Memorandum and Supplement – including the twenty-five page "Risk Factors" section – were insufficient, because while they itemized things that *might* go wrong, they did not disclose that something had *already* gone wrong.  Pls.' Opp. at 11–12, quoting *Eckstein v. Balcor Film Investors*, 8 F.3d 1121, 1127 (7th Cir. 1993) ("[A] 'prospectus stating a risk that such thing could happen is a far cry from one stating that this had happened . . . . The former does not put an investor on notice of the latter.'"); *SEC v. Merchant Capital, LLC*, 483 F.3d 747, 768 (11th Cir. 2007) ("[G]eneral cautionary language did not render misrepresentations immaterial where management knew about specific negative events that had already occurred."); *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 710 (3d Cir. 1996) (same); *Rubinstein v. Collins*, 20 F.3d 160, 171 (5th Cir. 1994) ("The inclusion of general cautionary language regarding a prediction would not excuse the alleged failure to reveal known material, adverse facts.")

In the supplemental pleading submitted in response to the Court's instructions, *see* PM Tr. at 64 ("I want to know exactly what you believe the operative omissions are and the operative statements are, and I want them organized by paragraph in the complaint. . . ."), plaintiffs

identified the particular material misstatements and omissions that constitute their claim that there was fraud in the Offering. *See* Supplemental Chart ("Supp. Chart") [Dkt. # 66 and # 67]. They are:

(1) "The omission from the Offering Memorandum of current fair value reserves . . . figures that were circulated internally, and which were considerably worse than the information provided in the OM." *Id*. at 1, citing Compl. ¶¶ 76, 77, 79.

(2) "The failure to disclose 'dramatic increase in the haircuts charged by CCC's repo lenders' that had occurred prior to the Offering." *Id*. at 2, citing Compl. ¶ 78.

(3) "The OM contained dividend projections that were rendered misleading by the material omissions." *Id*. at 3, citing Compl. ¶ 79.

(4) "The failure to disclose the liquidity crisis that began prior to the preparation of the OM, and that illustrated the failure of CCC's business model." *Id*. at 5–6, citing Compl. ¶¶ 79, 81, 108.

(5) "The failure to 'disclose the fact that CCC's Board of Directors had twice recently approved reductions in the Liquidity Cushion to 15% and 10%, respectively, and . . . that Defendants knew that the Liquidity Cushion was likely to imminently fall (and remain) well below 20% due to impending margin calls about which the Defendants already knew were coming." *Id.* at 10–11, Compl. ¶ 82.

The Court will address each category in turn.

    *a.  Alleged omission of current fair value reserves*

Plaintiffs complain that the Offering Memorandum did not include financial data that was circulated internally and was "considerably worse" than the information that was reported. Supp. Chart at 1.  In particular, plaintiffs make the following allegations in the complaint:

• "The Offering Memorandum described CCC's purported financial condition, including its capital allocation and use of leverage, as of March 31, 2007.  The omission of complete financial data for the period following March 31, 2007 rendered the Offering Memorandum misleading to a material extent, because . . . as described above, CCC's financial condition had deteriorated significantly in the three months between March 31, 2007 and the Offering, when [p]laintiffs purchased RDSs and other investors purchased Shares, by which date CCC's very survival was already in doubt." Compl. ¶ 76.

• "The Offering Memorandum contained an intentionally deceptive and very brief description of certain of CCC's 'Recent Developments.' . . . This section

contained statements that CCC's fair value reserves had declined by only
$17.3 million between January 1, 2007 and June 13, 2007 . . . . The foregoing
presentation, even assuming that it accurately conveyed the information
obtained by CCC . . . was rendered misleading by the omission of the internal
data previously relied upon by Defendants in their internal communications
and assessment of CCC's performance." *Id.* ¶ 77.

- A statement in the Offering Memorandum concerning target ranges for the
payment of dividends stating that "we do not believe that changes in interest
rates or fluctuations in our fair value reserves and total equity per Class B
share will affect our targeted dividends" was "rendered misleading by the
material omission of disclosure of the calamitous declines in CCC's fair value
reserves and massive impairment of its liquidity that had occurred as of the
Offering . . . ." *Id.* ¶ 79.

But these allegations do not survive closer scrutiny. While plaintiffs claim that the
Offering Memorandum was misleading because it only included financial data up until March
31, 2007, the memorandum expressly disclosed in two separate sections – both entitled "Recent
Developments" – that from April 1, 2007 to June 13, 2007, CCC's "fair value reserves declined
by approximately $28.9 million (unaudited) as of March 31, 2007 to an estimated $(4.9) million
(unaudited) as of June 13, 2007 . . . ." Off. Mem. at 8, 60; *see also id.* at 41–42 ("Subsequent to
March 31, 2007, there have been changes to our capitalization . . . .").[14] It is difficult for the
Court to conclude that the Offering Memorandum did not put investors on notice of the fact that
CCC's business model had recently shown signs of major strain given the clear disclosure that a
$29 million loss had occurred in the last three months.

Plaintiffs acknowledge that the loss was disclosed, but they complain that the financial
data was only "provided in the context of their earnings to date, which in the [O]ffering

---

14      The Court, on a motion to dismiss, may consider "any documents either attached to or
incorporated [by reference] in the complaint." *Williams v. Chu*, 641 F. Supp. 2d 31, 34 (D.D.C.
2009) (alteration in original). Both the Offering Memorandum and the Supplemental Offering
Memorandum are repeatedly referenced in the complaint. *See, e.g.,* Compl. ¶ 55, ¶¶ 78–80, ¶ 83,
¶ 94. Thus, the Court may properly consider them here.

[M]emorandum at least were certainly positive." AM Tr. at 72. But there is no requirement that negative information be presented with the particular spin that plaintiffs say they would have preferred. What matters is whether the relevant facts were disclosed and were clearly available to plaintiffs.

At the motions hearing, it became apparent that plaintiffs' fundamental contention on this issue is not that the Offering document did not disclose the recent reversals at all, but rather that its description of events was not as alarming as the numbers that were being discussed internally at the same time. Paragraph 77 of the complaint points to an e-mail defendant Stomber sent the Board on June 13, 2007, stating that the "Fair Value Reserve was down $63.9 MM from inception and $76.2 MM for the year." Compl. ¶ 77. So plaintiffs' claim is that defendants knew the extent of the impact on the fair value reserves on June 13th, but they understated it when they described it to investors in the Offering Memorandum on June 19th as a $28.9 million loss.

While that may be a fair critique of the figures provided in the original Offering Memorandum, plaintiffs fail to acknowledge that the Supplemental Offering Memorandum, which was part of the Offering, *did* provide that information. The Supplement was issued ten days after the initial memorandum placed investors on notice that there had been a significant loss. And it provided more financial information for the period from April 1, 2007 to June 26, 2007. It expressly stated that CCC's "fair value reserves declined by approximately $84.2 million (unaudited) from approximately $24.0 million (unaudited) as of March 31, 2007 to an estimated $(60.2) million (unaudited) as of June 26, 2007 . . . ." Supp. Off. Mem. at 8–9.

Under these circumstances, the complaint does not state a plausible claim that there was a misleading omission that is actionable under federal securities law. Nine days after the original

35

Offering Memorandum was issued, defendants announced that the Offering would be postponed and that a supplemental offering memorandum would be released with more information about terms of the offering and the price of shares.  Compl. ¶ 83.  The document was issued the next day, on June 29, 2007, and the cover proclaimed that it "form[ed] part of and must be read in conjunction with" the Offering Memorandum.  Supp. Off. Mem. at 1.  It expressly informed investors that the information contained in the Supplement "supersede[d]" any inconsistent information in the Offering Memorandum.  *Id.*  The Supplement announced that the price of the shares had been reduced and that the size of the Offering had been decreased.  *See* Compl. ¶ 84.  Most significantly for plaintiffs' fraud claims, it specifically disclosed the "recent development" that CCC had experienced an $84.2 million loss.  *Id.* at 8–9.  Thus, the complaint and the documents it references reveal that potential investors were fully informed of the financial state of the company before they were able to purchase any shares.

Plaintiffs urge the Court to assess the adequacy of the disclosures in the initial Offering Memorandum alone – in effect freezing the record as of the date it was issued – and they argue that the Supplement was not part of the Offering.  They contend that the statements in the Supplement were insufficient to cure the alleged omissions in the initial memorandum because they were not "distributed to investors, and the disclosure was not sufficiently prominent or timely to enable investors (the vast majority of whom had already submitted their subscription documents) to benefit from it in advance of the Offering.  Nor did it advise investors, as it should have, that they could withdraw from the Offering."  Pls.' Opp. at 14 (emphasis in original) (footnotes omitted).  But plaintiffs have failed to provide case law that would justify ignoring the disclosures in the document, and the cases they cite address different factual circumstances.  *Id.* at 14 n. 18, citing *Caruso v. Metex Corp.*, NO. CV 89-0571, 1992 WL 237299, at *10 (E.D.N.Y.

July 30, 1992) (finding that information contained in a Supplemental Proxy Statement distributed to shareholders four business days before a vote was untimely); *Maywalt v. Parker & Parsley Petroleum Co.*, 808 F. Supp. 1037, 1045 (S.D.N.Y. 1992) (holding that plaintiffs adequately pled fraud where supplemental prospectus documents issued eleven and five days before shareholder meeting where a vote of shareholder proxies that had been solicited "pursuant to the materially defective Original Prospectus" occurred).   Moreover, other courts have adopted a contrary approach, fully considering supplemental materials when assessing the falsity of a prospectus. *See In re Boston Scientific Corp. Sec. Litig.*, No 10-10593, 2011 WL 4381889, at *3 (D. Mass Sept. 19, 2011) (finding that prospectus supplemented by a document filed on the same day as the closing did not contain misrepresentations or omissions).

Here, the Offering closed on July 11, 2007, Supp. Off. Mem. at 9, and the Supplement was issued almost two weeks earlier, on June 29, 2007, *id.* at 1.  Plaintiffs cannot insist on the one hand that defendants were bound to disclose developments that were unfolding at the time of the Offering and also maintain that the document where those very facts were disclosed is of no moment.  Indeed, plaintiffs allege that the Offering was postponed and could not proceed until the Supplement had been issued because the price of the shares was not yet determined. Compl. ¶¶ 83–84.   Thus, because the "Offering" consisted of both the original Offering Memorandum and the Supplement, and the information concerning the drop in the fair value reserves was fully disclosed first in the Offering Memorandum and then more comprehensively in the Supplement, there was no actionable omission or misrepresentation.  *See In re Airgate PCS, Inc. Sec. Litig.*, 389 F. Supp. 2d 1360, 1369 (N.D. Ga. 2005) (finding that plaintiffs could not rely on statement in a Registration Statement when an Amended Registration Statement was

filed prior to the date on which plaintiffs purchased their shares and did not include the allegedly misleading information.).

The Court also finds that the disclosures in the Supplement, which were contained in a separate section entitled "Recent Developments" in a relatively brief eleven-page document, were sufficiently prominent and did not constitute "buried facts."  *See Kas v. Financial Gen. Bankshares, Inc.*, 796 F.2d 508, 516 (D.C. Cir. 1986) (finding that a disclosure is inadequate under the "buried facts" doctrine if there is *some* conceivable danger that the reasonable shareholder would fail to realize the correlation and overall import of the various facts interspersed throughout the [document].")  Given the highly sophisticated investors and the unambiguous disclosures contained in the Offering documents, the allegations here do not give rise to a "conceivable danger" that investors would not understand the import of the information in the Supplement.  Whether the individual investors paid attention to the available information has no bearing on the truth or falsity of the offering documents, and it is largely irrelevant since plaintiffs do not allege actual reliance with respect to the Offering.  PM Tr. at 13.

b. *Alleged failure to disclose haircuts charged by repo lenders*

The complaint avers that the Offering Memorandum failed to disclose "dramatic increase in the haircuts charged by CCC's repo lenders" that occurred prior to the Offering.  Compl. ¶ 78. Specifically, the complaint alleges:

> In the Offering Memorandum, [d]efendants further represented that the decline in fair value reserves between March and June 2007 was simply and purportedly "a result of changes in the interest rates."  While literally true, this statement was rendered misleading by the omission of the fact that the decline was due in large part due to a dramatic increase in the haircuts charged by CCC's business model.  The use of the more innocuous term "interest rates" was rendered misleading by [d]efendants' material omission of the fact that the "haircuts" charged by repo lenders had increased substantially.

*Id*.  So, the question before the Court is whether something that plaintiffs acknowledge was literally true – the statement in the Offering Memorandum that "[a]s a result of changes in interest rates . . . our fair value reserves declined . . . [,]" Off. Mem. at 8, 60 – was rendered false by an omission.

Plaintiffs first complain that what was absent were the adjectives ("dramatic" increase) and pejorative slang ("haircuts") that would have added color to the disclosure.  But the use of "more innocuous terms" does not give rise to a fraud claim.  The D.C. Circuit has explained that when making disclosures, companies are not required to use the pejorative terminology that plaintiffs, in hindsight, would have preferred them to use.  *See Kowal v. MCI Comm'cns Corp.*, 16 F.3d 1271, 1277 (D.C. Cir. 1994) ("Since the use of a particular pejorative adjective will not alter the total mix of information available to the investing public . . . such statements are immaterial as a matter of law and cannot serve as the basis of a 10b-5 action under any theory.") (internal citation omitted); *see also XM Satellite*, 479 F. Supp. 2d at 181 (finding that defendant "had no duty to couch these disclosures in the particular pejorative terms that the plaintiffs now suggest . . . . ").  Thus, the fact that defendants did not use the specific terminology preferred by plaintiffs does not mean the disclosures were misleading.

Second, the Offering Memorandum did more than simply note that interest rates had gone up.  That information was presented in the context of clear warnings that CCC's business model was completely dependent on repo loans, and that even a small increase in in the rates could have devastating results.  *See, e.g.*, Off. Mem. at 12 ("We may lose money if short-term interest rates or long-term interest rates rise sharply or otherwise change in a manner not anticipated by us. Moreover, in the event of a significant rising interest rate environment, mortgage and loan

defaults may increase and result in credit losses that would affect our liquidity and operating results.").

Finally, defendants point out that the Offering Memorandum "does not disclose any increases in haircuts because none occurred in this time period." Supp. Chart at 2. It is true that the Court cannot make findings of fact at this stage; it is bound to accept plaintiffs' factual contentions on their face. But the Court "need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint." *Hughes v. Abell*, 634 F. Supp. 2d 110, 113 (D.D.C. 2009), quoting *Kowal*, 16 F.3d at 1276. Here, when reciting the facts, plaintiffs allege only that "during May 2007, a number of CCC's lenders *started to request* haircuts of 3%." Compl. ¶ 62 (emphasis added). Plaintiffs do not allege that lenders were actually insisting upon higher haircut rates or that CCC had been required to pay them. As defendants argued: "It is one thing to say that some of CCC's lenders sought increased haircuts, and another thing altogether to say that CCC was required to pay such haircuts." CD Reply [Dkt. # 63] at 18. The only paragraph in the complaint that claims that CCC was faced with that requirement is paragraph 68, which describes a call for increased haircuts in the period around August 2007. But that was after the Offering was complete. Compl. ¶ 68. So, the Court is not required to accept plaintiffs' conclusion that the Offering Memorandum was rendered misleading by an omission of the "fact" that the haircuts charged by repo lenders had increased when that fact has not been alleged. Compl. ¶ 78. For all of these reasons, then, category two does not allege an actionable omission either.

c. *Alleged misleading dividend projections*

Plaintiffs allege that the Offering Memorandum contained dividend projections that "were rendered misleading by material omissions."  Supp. Chart. at 4, citing Compl. ¶ 79.  In particular, plaintiffs aver:

> In the Offering Memorandum, Defendants further represented that "we are targeting the payment of a dividend within a range of approximately $0.51 to $0.56 per Class B share (unaudited) for the quarter ending September 30, 2007 and within a range of approximately $0.53 to $0.58 per Class B share (unaudited) for the quarter ending December 31, 2007," and that "we do not believe that these changes in interest rates or the fluctuations in our fair value reserves and total equity per Class B share will affect our targeted dividends for the quarters ending September 30, 2007 and December 31, 2007."  These statements were rendered misleading by the material omission of disclosure of the calamitous declines in CCC's fair value reserves and massive impairment of its liquidity that had occurred as of the Offering, and were expected to occur in the near future, which had substantially reduced the prospects for achievement of the stated purported dividend objectives.

Compl. ¶ 79.

The D.C. Circuit requires that "where plaintiffs seek to base a claim of securities fraud on false and misleading projections or statements of optimism, their complaint must also plead sufficient facts that if true would substantiate the charge that the company lacked a reasonable basis for its projections or issued them in less than good faith."  *Kowal*, 16 F.3d at 1278; *see also XM Satellite Radio*, 479 F. Supp. 2d at 176 (stating that plaintiffs "must . . . identify in the complaint with specificity some reason why the discrepancy between a company's optimistic projections and its subsequently disappointing results is attributable to fraud") (internal citation omitted); *In re GE Sec. Litig.*, --- F. Supp. 2d ---, No. 09 Civ. 1951, 2012 WL 90191, at *20 (S.D.N.Y. Jan. 11, 2012) (finding actual knowledge of falsity necessary to state a claim for a forward-looking statement under PSLRA).

So, what facts do plaintiffs allege that would substantiate a claim that CCC lacked a reasonable basis for its projections, or that it issued them in less than good faith?  Paragraph 79 claims that it was the allegedly omitted information about the "calamitous declines in CCC's fair value reserves" and "massive impairment of its liquidity" that undermined the integrity of the projections.   But there is no requirement that defendants adopt plaintiffs' hyperbolic characterizations of the facts, so the omission of such adjectives as "calamitous" or "massive" is not actionable.   And the facts themselves were not omitted.   As noted above, the decline in CCC's fair value reserves was reported, both in the Offering Memorandum and the Supplement.   *See* Off. Mem. at 8, 60; Supp. Off. Mem. 8–9 (disclosing that the fair value reserves had declined by approximately $84.2 million).

The same is true with regard to the liquidity issues.  As the Court discusses in more detail below, the allegation that the Offering documents failed to disclose the changes in the company's liquidity position is belied by the Offering Memorandum, which plainly informed investors that "in the past, we have deviated from [the liquidity cushion] guidelines . . . and we may do so again in the future."  Off. Mem. at 7, 74.

Ultimately, the complaint is flawed because it does not identify "with specificity some reason why the discrepancy between . . . the projections and its subsequently disappointing results is attributable to fraud."  *XM Satellite*, 479 F. Supp. 2d at 176.  Instead, it alleges only that the supposedly omitted circumstances "substantially reduced the prospects for achievement of the stated purported dividend objectives."   Compl. ¶ 79.   There is no allegation that the projections were unreasonably based when defendants made them; all that plaintiffs allege is that in order to assess the validity of the projections, they would have liked to have had the full information about the decline in CCC's fair value reserves and liquidity position.  But they were

provided with information revealing a significant decline, and it does not seem to have deterred them from investing.   Thus, these allegations do not rise to the level of fraud and therefore cannot support an inference that defendants "lacked a reasonable basis for [their] projections." *Kowal*, 16 F.3d at 1278.

Nor are the allegations sufficient to suggest that defendants issued the projections in "less than good faith." *Id*.   The Offering Memorandum was more than candid in informing potential investors that the projections were simply targets – they were not firm promises of what an investment in CCC would definitely yield:

- "[W]e are *targeting* the payment of a dividend within a range of approximately $0.51 to $0.56 per Class B Share (unaudited) for the quarter ending September 30, 2007 and within a range of approximately $0.53 to $0.58 per Class B share (unaudited) for the quarter ending December 31, 2007.   *These are targeted dividend ranges and not forecasts or commitments.   They are based on certain assumptions and we cannot assure you that they will be realized.*"   Off. Mem. at 5 (emphasis added); *see also id*. at 52.

- "The information below sets out the basis for the statements relating to our targeted dividend payments.   This information is provided solely for purposes of lending perspective on our dividend targets, and not for any other purpose and is unaudited. **These statements do not constitute a profit or earnings forecast and we cannot assure you that we will pay dividends at the targeted level or at all.**   We also cannot assure you that that [sic] the forward-looking assumptions are likely to prove accurate.   You must form your own assessment concerning whether these assumptions are likely to prove accurate, and whether there are other factors that should be considered.   Whether these assumptions will be realized will depend on market conditions and other circumstances beyond our control.   In particular, there can be no assurance that our investment portfolio or any part of our investment in it will perform in accordance with any of the assumptions set forth below."   *Id*. at 39 (emphasis in original).

Since the Offering contained these caveats, including a warning that CCC might pay no dividends *at all,* the complaint does not state a plausible claim that defendants issued the dividend projections in bad faith.

d. *Alleged failure to disclose the "liquidity crisis" that occurred prior to the Offering*

The fourth category of alleged omissions is the claim that CCC "fail[ed] to disclose the liquidity crisis that began prior to the preparation of the [Offering Memorandum], and that illustrated the failure of CCC's business model."  Supp. Chart. at 5–10.  Here again, plaintiffs point to paragraph 79 in the complaint, which alleges that the dividend projections omitted disclosure of "massive impairment of [CCC's] liquidity which had occurred as of the Offering, and [was] expected to occur in the near future."  Compl. ¶ 79.  Plaintiffs also direct the Court to the following allegations:

- "The Defendants . . . made sure that the Offering Memorandum, contained no description of the very serious adverse events that had already occurred, and had already caused very substantial unrealized losses, and, at the very least, should have raised serious doubt about the viability of CCC's business model."  *Id.* ¶ 81.[15]

- "[T]he Offering itself was inherently fraudulent, as it was designed in part to perpetuate the appearance that CCC remained profitable, or even viable.  If Defendants . . . had made full and honest disclosure about CCC's condition as of late June and early July[] 2007, it would have been impossible to conduct the Offering."  *Id.* ¶ 108.

The Court notes first that these are highly conclusory allegations.  But giving plaintiffs the benefit of the doubt, the gist of paragraph 81 is that while the Offering Memorandum warned that adverse events *could* occur, it failed to disclose the fact that certain of those events had *already happened*.  This was one of plaintiffs' main points of emphasis at the motions hearing. AM Tr. at 20 ("CCC failed to disclose that it was experiencing a liquidity crisis in June of 2007, just days before the [O]ffering [M]emorandum was published.  We're not talking about generic

---

15    Plaintiffs allege that, by the end of June 2007, the liquidity cushion had declined to less than zero if the proceeds from the bridge loan of $191 million are not taken into account. Compl. ¶ 69.  But if the proceeds of the bridge loan are considered, the cushion was $186,100,000 and "represented 27% of adjusted capital."  *Id.*

liquidity problems; we're talking about a very specific liquidity crisis that was happening days before the Offering.")

But as noted above, both the Offering Memorandum and the Supplement did specifically reveal that bad things were happening. The "Recent Developments" section of the Offering Memorandum highlights serious adverse events, *see* Off. Mem. at 8, and the Supplement made it clear that CCC's value had significantly declined. *See* Supp. Off. Mem. at 8–9. If, as plaintiffs plead in paragraph 81, it is true that these facts "should have raised serious doubts about the viability of CCC's business model," Compl. ¶ 81, then the disclosures were sufficient to "raise serious doubts" in the minds of potential investors.

Even if plaintiffs' theory is more specific – that defendants should have put investors on notice of recent liquidity issues in particular – the complaint fails to state a fraud claim. Plaintiffs point to the an email sent to CCC's Directors on June 13 in which defendant Stomber stated that "[w]e are having a major liquidity event so I invoked 'emergency powers' on the balance sheet." Compl. ¶ 64. But plaintiffs fail to specify the reason why it was misleading for defendants to omit this particular circumstance from its clear disclosure of recent losses. *Rubke v. Capitol Bancorp Ltd*., 551 F.3d 1156, 1162 (9th Cir. 2009) ("A securities fraud complaint based on a purportedly misleading omission must specify the reason or reasons why the statements made . . . were misleading or untrue, not simply why the statements were incomplete.") (internal quotation marks and citation omitted). As the Court has already noted, the Offering Memorandum and Supplement disclosed the significant decline in fair value reserves and the changes in interest rates that occurred prior to the Offering. And plaintiffs have failed to connect the omission of the "liquidity event" to any statement in the Offering documents that was rendered misleading by its absence, as the PSLRA requires.

Finally, plaintiffs' claim that investors were not put on notice of the risks associated with CCC's business model is belied by the twenty-five pages' worth of warnings and disclosures in the Offering Memorandum that detailed exactly what could go wrong with these particular types of investments.  Off. Mem at 10–36.

e.  *Alleged failure to disclose the fact that the Board had already approved reducing the liquidity cushion*

The final category of alleged omissions concerns the claim that the Offering Memorandum described the liquidity cushion but failed to disclose the fact that CCC's Board of Directors had "twice recently approved reductions in the [l]iquidity [c]ushion to 15% and 10%" and that defendants knew that the liquidity cushion was "likely to imminently fall (and remain) well below 20% due to impending margin calls about which the [d]efendants already knew were coming."  Supp. Chart at 10–11, citing Compl. ¶ 82.  Although similar to the fourth category, this allegation is more specific than the alleged omission of a generalized "liquidity crisis."

The notion that it was actionable for defendants to omit information about approved reductions in the liquidity cushion is not supported by either the allegations in the complaint or the documents referenced in the complaint.  The email from Stomber that plaintiffs rely upon as establishing the existence of the liquidity event does not indicate that the cushion was actually reduced; it simply asks for approval to do so in the future if necessary.  Compl. ¶ 64.  Indeed, even as of the date of the email, the cushion was still holding above 20 percent.  *Id.*  This did not give rise to a need for further disclosure since the Offering Memorandum already clearly warned investors:  "In the past, we have deviated from these guidelines with the approval of a majority of our independent directors *and we may do so again in the future*."  Off. Mem. at 7, 74 (emphasis added).  Moreover, other documents incorporated by the complaint confirm that the Board merely approved the notion that the cushion *could* be reduced – it was never actually

46

reduced prior to the Offering.  *See* 2Q Report, Ex. 12 to CD Mem., [Dkt. # 52-14] at 14 ("During the quarter ended June 30, 2007, our liquidity cushion was never less than 20% of our Adjusted Equity plus pre-capital.").

The Offering Memorandum also expressly disclosed that CCC could "change [its] investment strategy or investment guidelines at any time without the consent of shareholders." Off. Mem. at 10.  In light of the clear warning that the liquidity cushion could be reduced at any time, no investor could have fairly relied on the permanent availability of the 20 percent liquidity cushion when choosing to participate in the Offering.  Finally, the complaint alleges that defendants "knew" that the liquidity cushion was likely to fall and remain below 20 percent. Compl. ¶ 82.  But plaintiffs fail to allege any facts that would support this conclusion.  So, this allegation does not assert an actionable claim either.

Thus, plaintiff has failed to identify any materially misleading statements or omissions that are actionable under section 10(b) of the Exchange Act.  Although the federal securities claims could be dismissed on these grounds alone, the Court will also address defendants' argument concerning loss causation.[16]

4.   *Whether the complaint adequately pleads loss causation*

Even if the complaint could be construed to allege an actionable fraudulent statement or omission, the fraud claims also fail on loss causation grounds.  The PSLRA requires a plaintiff to prove that the act or omission of the defendant "caused the loss for which the plaintiff seeks to

---

16     Defendants also seek dismissal on the grounds that plaintiffs do not adequately plead reliance or scienter.  CD Mem. at 49–54, 64–68; CD Reply at 11, 26–28.  The Court does not reach these arguments because it finds that the federal Offering claims fail on falsity and loss causation grounds.  However, the Court notes that it appears that plaintiff would be entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972), because their claims are based primarily on omissions.  *See* Supp. Chart. [Dkt. # 67]; *In re Interbank Funding Corp. Sec. Litig.*, 629 F.3d 213, 219 (D.C. Cir. 2010).

recover damages." 15 U.S.C. § 78u–4(b)(4).[17]   In *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 342 (2005), the Supreme Court reversed a Ninth Circuit decision holding that to establish this element, a plaintiff need only prove that "the price on the date of purchase [of the securities at issue] was inflated because of the misrepresentation."   *Id.* at 341.   The Court ruled that plaintiffs may no longer advance claims based on that theory, and that they must demonstrate instead that their loss or injury was "occasioned by the lie."   *Id.* at 344. Emphasizing the common law foundation of the securities fraud cause of action, particularly the requirement that a plaintiff show "actual" damages, the Court explained:

> [A] person who "misrepresents the financial condition of a corporation in order to sell its stock" becomes liable to a relying purchaser "for the loss" the purchaser sustains "when the facts . . . become generally known" and "as a result" share value "depreciate[s]."

*Id.* at 344, citing Restatement (Second) of Torts, § 548A, Comment b, at 107.   Ultimately, the Court found that:

> [T]he complaint's failure to claim that Dura's share price fell significantly after the truth became known suggests that the plaintiffs considered the allegation of purchase price inflation alone sufficient.   The complaint contains nothing that suggests otherwise.

---

17      Plaintiffs argue that loss causation is a "fact-intensive inquiry, which is typically inappropriate to consider on a motion to dismiss." Pls.' Opp. at 35, citing *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 427 n.4 (3d Cir. 2007); *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 197 (2d Cir. 2003).   The Court recognizes that there are cases where loss causation involves factual inquiries that are not well-suited for the motion to dismiss stage.   Here, however, the question that must be resolved is whether the allegations in the complaint are sufficient to plead loss causation, which is appropriate for consideration on a motion to dismiss.   *See* CD Reply at 29, quoting *Wilamowsky v. Take Two Interactive Software, Inc.*, 818 F. Supp. 2d 744, 757 (S.D.N.Y. 2011) (responding to the same argument that "[s]uch a rationale, however, would call for courts to sidestep analysis of essentially *any* loss causation pleadings until summary judgment – a result at odds with *Dura* and the Court's obligation to analyze whether a pleading contains sufficient 'factual content . . . to draw the reasonable inference that the defendant is liable for the misconduct alleged'") (citing *Iqbal*, 556 U.S. at 665).   That rationale is applicable to this case.

*Id*. at 347.  The Court also noted that "it should not prove burdensome for a plaintiff who has suffered an economic loss to provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind."  *Id*.

The parties agree that, following *Dura*, there tend to be two ways to plead loss causation: (1) "corrective disclosure" – which requires a plaintiff to allege that the revelation of fraud caused the stock price to drop; and (2) "materialization of risk" – which requires a plaintiff to allege that the misrepresentations and omissions concealed a risk that later materialized and caused the plaintiff's losses.  CD Mem. at 56; Pls.' Opp. at 35–37.  Defendants argue that the second theory has not yet been recognized by the D.C. Circuit,[18] and that plaintiffs do not adequately allege loss causation under either method in any event.

First, defendants contend that plaintiffs do not allege that a corrective disclosure "'reveal[ed] to the market in some sense the fraudulent nature of the practices about which [plaintiffs] complain.'"  CD Mem. at 57, quoting *Katyle v. Penn. Nat'l Gaming, Inc.*, 637 F.3d 462, 473 (4th Cir. 2011).  In other words, plaintiffs do not allege any link between what has been identified as the fraudulent conduct – that is, defendants' supposed concealment of the worsening financial condition of the company prior to the Offering – and the financial collapse of CCC.  *Id*. at 57.  Second, defendants insist that plaintiffs do not plead the "materialization of the risk" doctrine because they do not "explain how or to what extent [d]efendants' statements *concealed* risks that materialized to cause their losses."  *Id*. at 59.

---

18      Even if there were binding precedent in this Circuit, it is unclear whether such a theory would apply to the factual circumstance of the case, given the deteriorating market conditions at the time of CCC's collapse.  *See In re Williams Sec. Litig. - WCG Subclass*, 558 F.3d 1130, 1143 (10th Cir. 2009) ("Bankruptcy might have been a possibility from the moment of the spinoff . . . but there are too many potential intervening causes to say that bankruptcy was [the company]'s legally foreseeable destiny such that its trading price at bankruptcy equaled its true value on the day the spinoff was announced.").

At the hearing, plaintiffs took the position that the Supreme Court's decision in *Dura* requires only that the complaint allege some causal relationship between the fraud and the loss. AM Tr. at 121 ("[A]ll that's required is that there be a causal relationship between the subject matter of the earlier misrepresentations or omissions and the later decline in the price of the security."); *see also* Pls.' Opp. at 34.  Claiming they meet this test, plaintiffs direct the Court to paragraph 128 of the complaint, which alleges:

> Defendants' efforts to conceal the true state of affairs at CCC had prevented the price of its shares from collapsing completely.   By September 14, 2007, the market price of CCC shares had declined to approximately $14 per share, a relatively modest decline (given CCC's calamitous performance from the Offering price of $19 per share.  If the true state of affairs at CCC had been known by the investing public, however, the shares would have traded for less than $1.00.

Compl. ¶ 128.  In an earlier paragraph in the complaint, plaintiffs assert that on September 10 and 11, 2007, defendants made a series of partial disclosures at the annual investor conference, which caused CCC's share price to decline to $14 per share on September 14, 2007, *id.* ¶ 126–28, and then ultimately dropped to $8 per share on November 9, 2007, *id.* ¶¶ 133–35.[19]  While these allegations trace the decline in value of CCC stock during the fall of 2007, they do not make the necessary connection that it was the disclosure of the previously undisclosed information that caused a price drop.  Rather, they simply make an assertion that the continued concealment stopped the stock price from dropping more significantly during that time period.[20]

---

19      Even plaintiffs agree that the "partial disclosures" made in the Fall of 2007 are not alone enough to establish loss causation.  AM Tr. at 122.

20      Along these same lines, plaintiffs point to paragraphs 133 through 135 as establishing loss causation, which allege that misrepresentations and omissions made by defendants in November 2007 "caused the price of CCC shares to recover somewhat, as CCC shares traded in the range of $10–12 for the next three months."  Compl. ¶¶ 133–35.  But these allegations are essentially one of price inflation, a theory which the Supreme Court explicitly rejected in *Dura*. *See Dura*, 125 S. Ct. at 1631 ("[A]t the moment the transaction takes places, the plaintiff has

Plaintiffs also submit that paragraph 140 establishes loss causation:

> On March 5, 2008, CCC issued a press release, indicating that, during the week between February 28 and March 5, it had received margin calls from lenders requiring it to post an additional $60 million of collateral.  CCC could not meet all of those demands, which led at least one lender to send a default notice . . . .

*Id*. ¶ 140.   This assertion does not allege a causal relationship between the Offering Memorandum and the financial loss either.  This paragraph suggests that the loss resulted from the poor performance of CCC's business model, including the ongoing margin calls, haircuts, and liquidity issues, all of which were fully disclosed in the Offering Memorandum.

The complaint also includes several conclusory allegations regarding loss causation. *E.g.*, *id*. ¶ 221 (alleging that that the "totality of the circumstances around the decline in trading prices of CCC stock combine to negate any inference that the economic loss . . . was caused by changed market conditions . . . or other facts unrelated to [d]efendants' fraudulent conduct . . . ."); *id*. ¶ 166 (same).   But alleging that something resulted from the "totality of the circumstances" hardly meets the loss causation standard set forth in *Dura* that the fraud be "occasioned by the lie."  544 U.S. at 344.

Other paragraphs in the complaint also appear to advance the price inflation theory of loss causation, which, the Court noted earlier, is no longer viable after *Dura*.  *E.g.*, Compl. ¶ 34 (alleging that a common question among members of proposed class is "whether the prices of CCC shares during the Class Period were artificially inflated because of the Defendants' conduct . . . ."); *id*. ¶ 162 (alleging in the section 10(b) claim that "[d]efendants' scheme operated as a

---

suffered no loss; the inflated purchase payment is offset by ownership of a share that *at that instant* possesses equivalent value.")  Although these allegations do not concern plaintiffs' initial purchase of the securities, the rationale applies equally.

Moreover, these allegations are also insufficient to establish loss causation because they fail to allege that when the truth about something misrepresented at the time of the Offering Memorandum became known, the stock price dropped.

fraud or deceit on [p]laintiffs . . . because the false and misleading statements concerning the financial and operation condition of CCC enabled the Offering to be carried out at all and to be carried out at a price of $19 per Share or RDS").[21]   These allegations are insufficient to establish loss causation.

Moreover, plaintiffs' own allegations provide other clear reasons for the drop in stock price.  For example, paragraph 140 alleges that the press release issued on March 5, 2008, revealed a rush of margin calls from lenders, and that the share prices dropped 60 percent from approximately $15 per share to $5 per share.  *Id*. ¶ 140.  Those margin calls were not misrepresented in the Offering Memorandum, nor were they omitted because they did not occur until late February 2008.  Furthermore, the Offering Memorandum plainly disclosed that the liquidity cushion may not be sufficient to cover margin calls.  Off. Mem. at 10, 14.  Similarly, paragraph 141 alleges that on March 12, 2008, CCC announced that lenders would soon take possession of its assets because it could not meet the margin calls from lenders, and that revelation led to a 95 percent drop from $3 per share to $0.15 per share.  Compl. ¶ 141; *see also id*. ¶ 144 ("alleging that "[d]efendants refused to timely liquidate RMBS positions that would have increased CCC's [l]iquidity [c]ushion and, ultimately, reduced its losses").  Indeed, there is not a single allegation in the section of the complaint entitled "The Collapse of CCC" that attributes any loss in the value of the shares to the revelation of some misstatement or omission in the Offering Memorandum or Supplement.  Plaintiffs must allege what portion, if any, of the drop in stock price was "occasioned by the lie," *see Dura*, 544 U.S. at 344, and they have failed to do so.

---

21     Although the Court does not consider these claims because they are barred by *Morrison*, it notes that the inflated price theory also runs throughout the aftermarket claims.  *See, e.g.*, Compl. ¶¶ 197, 222.

Reading the complaint as whole, it is appears that the theory underlying this case is that CCC was doomed from the start – that borrowing money to buy RMBSs without sufficient liquidity was simply bad business. *Id.* ¶ 108 ("In light of the material adverse facts [defendants] and their advisors knew about the precarious condition of CCC and its business model, [d]efendants never should have proceeded with the Offering"); *id.* ¶ 110 ("[Defendants] failed to utilize the funds obtained from CCC's Offering in order to maintain and increase CCC's [l]iquidity [c]ushion but . . . used those funds to buy more RMBS"); *id.* ¶ 201 ("The resulting collapse in market prices of CCC stock was foreseeable at the time of the Offering . . . ."). Plaintiffs may have a point, but following a misguided plan, or even mismanaging a viable plan, is not tantamount to securities fraud, particularly when the details of CCC's investment strategy and the attendant risks were plainly disclosed in detail in the Offering Memorandum. Thus, plaintiffs have not adequately alleged loss causation, and the federal securities claims are dismissible on these grounds as well.

### B.  Federal Aftermarket Claims

As set forth above, the Court concluded that the federal securities claims pertaining to the aftermarket (Counts VII and VIII) must be dismissed under the Supreme Court's decision in *Morrison*, 130 S. Ct. at 2883, because those securities were not bought or sold in the United States.

### C.  Common Law Offering Claims

Since the federal claims related to the Offering do not survive, the Court turns its attention to the common law claims. Count III alleges common law fraud and Count IV alleges negligent misrepresentation. The parties agree that under District of Columbia choice of law principles, the Court should apply District of Columbia law to the Offering claims. PM Tr. at 42; 53–54; *see also Sloan v. Urban Title Servs., Inc.*, 689 F. Supp. 2d 94, 105 (D.D.C. 2010)

("Where no true conflict exists [between the laws of competing jurisdictions], a court applies the law of the District of Columbia by default.")

To state a claim for common law fraud in the District of Columbia, a plaintiff must allege "with particularity," Fed. R. Civ. P. 9(b), that the "defendant, with the intent to induce reliance, knowingly misrepresented or omitted a material fact upon which the plaintiff reasonably relied to his detriment." *Media Gen. Inc. v. Tomlin*, 532 F.3d 854, 858 (D.C. Cir. 2008) (internal citation omitted). "To prevail on such a claim, 'the plaintiff must also have suffered some injury as a consequence of his reliance on the misrepresentation [or omission]." *Busby v. Capital One, N.A.*, 772 F. Supp. 2d 268, 275 (D.D.C. 2011), quoting *Chedick v. Nash*, 151 F.3d 1077, 1081 (D.C. Cir. 1998). Under D.C. law, a plaintiff alleging negligent misrepresentation must establish that "(1) the defendant negligently communicated false information, (2) the defendant intended or should have recognized that the plaintiff would likely be imperiled by action taken in reliance upon his misrepresentation, and (3) that plaintiff reasonably relied upon the false information to his detriment." *Ponder v. Chase Home Finance, LLC*, No. 10-425 (BJR), --- F. Supp. 2d ---, 2012 WL 1931237, at *5 (D.D.C. May 23, 2012).

While plaintiffs are correct that the common law fraud claim is not subject to the PSLRA's heightened pleading requirements, it is still governed by Federal Rule of Civil Procedure 9(b), which requires plaintiffs to plead with particularity the "who, what, when, where, and how" concerning the circumstances of the fraud. *Anderson v. USAA Cas. Ins. Co.*, 221 F.R.D. 250, 253 (D.D.C. 2004) (internal citations omitted). Here, because the common law claims depend upon the existence of a false statement or material omission, Counts III and IV fall because plaintiffs have not alleged an actionable false statement or omission. In addition, the complaint fails to allege facts that would support an inference of reliance. *See* CD Mem. at 86

("The complaint here contains no allegations that any named Plaintiff actually received and read the Offering Memorandum, nor do Plaintiffs allege that they read and relied on any subsequent communications by CCC or Stomber to CCC's investors.")

Plaintiffs contend that they are entitled to two presumptions of reliance in this case: (1) a common law presumption arising from a "uniform set of written material misrepresentations"; and (2) the "*Affiliated Ute*" presumption of reliance. Pls.' Opp. at 61–63. With respect to the common law presumption of reliance, plaintiffs point to *McNabb v. Thomas*, 190 F.2d 608, 611 (D.C. Cir. 1951) and *Weinberg v. Hertz Corp.*, 499 N.Y.S.2d 693, 696 (N.Y. App. Div. 1986). (1st Cir. 1986).   Both of these cases require that before a presumption of reliance can attach, a plaintiff must adequately allege that there was, in fact, a misrepresentation made and that the misrepresentation was material. *McNabb*, 190 F.2d at 611 ("Even if made and if considered material, thereby giving rise to the presumption that it induced the action complained of . . . "); *Weinberg*, 499 N.Y.S.2d at 696 ("[O]nce it has been determined that the representations alleged are *material* and *actionable* . . . the issue of reliance may be presumed . . . . ") (emphasis added).  Plaintiffs fail to make this predicate showing because they cannot point to any actionable misrepresentations or omissions.

But the claims would founder even if plaintiffs could get over that hurdle.  Plaintiffs cannot point to any allegation in the complaint where actual, individual reliance is alleged with respect to any one of them.  *See In re Newbridge Networks Sec. Litig.*, 926 F. Supp. 1163, 1175 (D.D.C. 1996) (granting motion to dismiss on grounds that plaintiffs failed to "present individualized, specific allegations of reliance by each plaintiff").

Plaintiffs argue that they need not allege actual reliance because they are entitled to a presumption of reliance under the theory articulated by the Supreme Court in *Affiliated Ute*

*Citizens v. United States*, 406 U.S. 128, 153–154 (1972). *See* Compl. ¶ 68 (alleging that plaintiffs "may be presumed to have relied on any material misrepresentations in and/or omissions from the Offering Memoranda by acquiring CCC securities at the Offering price in the Offering"). In *Affiliated Ute*, the Court ruled that when a federal securities fraud case "involv[es] primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery." *Id*. at 153. Rather, "reliance on the omitted information may be presumed where such information is material." *In re Interbank Funding Corp. Sec. Litig*., 668 F. Supp. 2d 44, 49 (D.D.C. 2009), citing *Black v. Finantra Capital, Inc.*, 418 F.3d 203, 209 (2d Cir. 2005). Plaintiffs contend that their common law Offering claims primarily concern omissions and therefore the presumption applies. Pls.' Opp. at 62. The Court disagrees.

*Affiliated Ute* addressed a federal claim brought under section 10(b) of the Securities Exchange Act. 406 U.S. at 150–154. There is no precedent in this Circuit applying the *Affiliated Ute* presumption to a common law fraud claim. In fact, another court in this district has expressly rejected the application of the presumption to common law fraud claims. *Woodward & Lothrop, Inc. v. Baron*, Civil Action No. 84-0513, 1984 WL 861, at *2 (D.D.C. June 19, 1984) (finding that "neither plaintiffs nor the Court [has] identified case law extending [*Affiliated Ute*] to the common law fraud cause of action asserted in this case"); *see also Banque Arabe Et Internationale D'Investissement v. Maryland National Bank*, 850 F. Supp. 1199, 1220–1222 (S.D.N.Y. 1994) ("[T]his Court will not apply the *Affiliated Ute* presumption to a common-law claim for fraud, and [plaintiff] must establish the element of reliance in order to make out a claim

of fraudulent inducement.").  Thus, the common law claims with respect to the Offering also fail because they do not allege reliance with the level of particularity required by Rule 9(b). [22]

### D.  Common Law Aftermarket Claims

Plaintiffs also allege common law fraud and negligent misrepresentation claims pertaining to the aftermarket period.  Count IX asserts a claim for common law fraud, Count X asserts a claim for negligent misrepresentation, and Count XI asserts a claim under the Civil Code of the Netherlands, which the parties represented is similar to a tort claim under U.S law.  PM Tr. at 45–48.  As plaintiffs explained at the hearing, the Dutch law claim is an alternative to the common law claims asserted under U.S. law in Counts IX and X.  *Id*. at 41.  If the Court determines that U.S. law should apply to the common law claims, the Dutch law claim may be dismissed.

#### 1.  *District of Columbia law applies to the aftermarket claims.*

The Court must make a choice of law determination with respect to the aftermarket claims, and, here, the parties dispute which forum's laws should apply.  Plaintiffs argue that the Court should apply the law of the Netherlands to the claims because that is the forum where the Class B shares were traded after the Offering.  Pls.' Opp. at 56–58.  According to plaintiffs, "[t]he Netherlands is the place where the Aftermarket Plaintiffs . . . acted in reliance on the

---

[22]     The Court also notes that even if the common law offering claims did allege an actionable misrepresentation or omission, they would likely be barred by the applicable statute of limitations.  Under D.C. law, the common law claims are subject to a three-year statute of limitations period.  D.C. Code § 12-301(8).  Because there is a strong argument that plaintiffs were aware, at the latest, of the financial difficulties that led to CCC's demise on February 27, 2008, when CCC issued the annual report for the year ending December 31, 2007, and plaintiffs did not file their claims until June 2011, the common law fraud claims are likely time-barred.  Defendants also contend that the common law claims are preempted by the Securities Litigation Uniform Standards Act, 15 U.S.C. § 78bb(f)(1)–(2).  CD Mem. at 86–89.  Because the Court determines that plaintiffs fail to state a claim, it does not reach these grounds for dismissal.

misrepresentations and omissions." *Id*. at 58 (internal quotation marks and citation omitted). They also argue that the Netherlands is the jurisdiction "whose policy would be more advanced by the application of its law." *Id*. at 59. Defendants advocate for the application of U.S. law, and, in particular, the law of the District of Columbia. CD Mem. at 80–81.

The District of Columbia's choice-of-law rules require the Court to consider "the governmental policies underlying the applicable laws and determine[] which jurisdiction's policy would be the most advanced by the application of its law to the facts of the case, taking into consideration (1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence, nationality, place of incorporation and place of business of the parties; and (4) the place where the relationship is centered." *Radosti v. Envision EMI, LLC*, 717 F. Supp. 2d 37, 59 (D.D.C. 2010) (internal citations omitted). Application of those factors here compels the application of U.S. law, and the District of Columbia law, in particular.

According to the complaint, the alleged conduct that gave rise to plaintiffs' claims occurred either in D.C. or in New York. *See, e.g.,* Compl. ¶¶ 9–10 (alleging that CCC's and TC Groups' principal places of business were in Washington, D.C.); *id*. ¶ 90 (alleging that the RDSs sold in the Offering were issued by the Bank of New York). The only allegations connecting this case with the Netherlands are that the Offering Memorandum was filed with a Dutch regulator and that the Class B shares were traded on a Dutch exchange. *Id*. ¶ 75. Indeed, even plaintiffs' own allegations state that "CCC has no rational connection to the Netherlands other than Carlyle's decision to list CCC's shares there." *Id*. ¶ 109. Moreover, all of the parties in this case (except for defendant CCC, which is a Guernsey limited company) are residents of the United States and not of the Netherlands. *Id*. ¶¶ 4–11; *id*. ¶¶ 14–22. Because the United States has the

most significant relationship with the dispute, the Court will apply U.S. law to the common law claims, and Count XI asserting a claim under Dutch law will be dismissed.

With respect to the choice of law determination between the District of Columbia and New York, the Court concludes that D.C. law should apply.  The parties agree that because the elements of the fraud and negligent misrepresentation causes of action are essentially the same in both places, there is no conflict between the two jurisdictions.  CD Mem. at 81.; Pls.' Opp. at 56. And, as noted earlier, where there is no conflict between the laws of two potential jurisdictions, the law of the forum applies.  *Sloan v. Urban Title Servs., Inc*., 689 F. Supp. 2d 94, 105 (D.D.C. 2010).

      *2.   The aftermarket claims fail to plead reliance adequately.*

The complaint avers that public statements made by defendants after the Offering constituted fraud and negligent misrepresentation.  For these claims, plaintiffs generally allege that defendants misrepresented that CCC would adhere to and was adhering to its investment guidelines but that they deviated from them and employed the use of leverage beyond what was contemplated by the investment guidelines.  Compl. at 33.  According to plaintiffs, because defendants "misrepresent[ed] and conceal[ed] the true operating and financial condition of CCC," plaintiffs "purchase[ed] CCC securities at artificially inflated prices in the aftermarket." Compl. ¶ 193 (alleging aftermarket claim under section 10(B) which is incorporated in the common law fraud claims).

These claims are problematic for plaintiffs on the falsity element since the Offering documents plainly disclosed that CCC was free to vary from the investment guidelines, and that its liberal use of leverage exposed investors to considerable risk.  *See, e.g.,* Off. Mem. at 7, 10, 13.  Moreover, as noted above, common law fraud and negligent misrepresentation claims both

require a showing of reliance. *See Media Gen. Inc.*, 532 F.3d at 858 (finding that common law fraud requires an allegation that "plaintiff reasonably relied to his detriment"); *Ponder*, 2012 WL 1931237, at *5 (finding that a claim for negligent misrepresentation must allege that "plaintiff reasonably relied upon the false information to his detriment"). Here, the allegations in the complaint do not allege a plausible claim under *Iqbal* – much less rule Rule 9(b) – that plaintiffs relied on any statements made by defendants during the aftermarket period. The complaint merely alleges that plaintiffs made purchases in the aftermarket and that during that period, defendants' public statements were false and incomplete. But, the complaint does not indicate whether those statements came before or after plaintiffs' purchases, or whether plaintiffs were aware of them, so the Court cannot reasonably conclude that plaintiffs actually relied on these statements.

Plaintiffs contend that they are entitled to the *Affiliated Ute* presumption of reliance for these counts as well. It is not clear that the *Affiliate Ute* presumption would apply to the aftermarket claims because there is a strong argument that the challenged statements from that period are more fairly characterized as misrepresentations rather than omissions. But even if the claims arose from alleged omissions, the Court has declined to extend the federal *Affiliated Ute* doctrine to common law claims. Because the common law claims pertaining to the aftermarket fail on reliance grounds, Counts IX and X will be dismissed.

### E.  Claim under United Kingdom Law

Count VI of the complaint alleges a claim under section 90 of the United Kingdom's Financial Services and Markets Act of 2000 ("the FSMA"). Compl. ¶¶ 187–191.[23] The FSMA

---

[23]    At the hearing, counsel for the lead plaintiffs stated that they had withdrawn Count VI, representing that they had obtained an expert on the subject and "determined we can't plead facts right now that would support that claim." PM Tr. at 42–43. Because plaintiff Glaubach, who

allows investors to recover against "persons responsible" for losses resulting from certain misleading statements or omissions in a prospectus or supplementary prospectus. Compl. ¶ 190; CD Mem. at 76. According to plaintiff Glaubach, in order to state a claim under section 90 of the FSMA, a plaintiff must allege three elements in addition to showing there were misrepresentations in the prospectus: (1) there must be a sufficient nexus between the offering of the shares by the issuer and the United Kingdom; (2) the issuer must have offered the shares to the public in the United Kingdom; and (3) the United Kingdom must be the "home state" for the offering. Glaubach Opp. at 3, citing generally Blair Decl., Ex. 1 to Glaubach Opp. [Dkt. # 70-1]. Neither party directs the Court to any case law either in the United States or in the United Kingdom addressing these issues; however, both Glaubach and defendants attach declarations from experts who purport to have extensive experience with the FSMA. *See generally* Blair Decl.; Bompas Decl., Ex. 15 to CD Mem. [Dkt. # 52-17]. For all of the reasons set forth above, plaintiffs have not alleged facts that support a claim that there were misrepresentations in the prospectus. But even if the federal securities claims were to survive, the FSMA count should be dismissed.

     *1.   There is not a sufficient nexus between the Offering and the United Kingdom.*

Defendants argue that the complaint fails to satisfy all three prongs of the required test. CD Mem. at 76–78. First, they argue that there is not a sufficient nexus between the facts alleged in the complaint and the United Kingdom that would make application of U.K. law

---

was not part of the lead plaintiff group, expressed concern at the time of the Court's ruling on the lead plaintiff designation that the lead plaintiffs would be unable to pursue the FSMA claim adequately, the Court granted counsel for Glaubach the opportunity to file an individual opposition to the motion to dismiss on this claim. Glaubach filed his opposition on June 6, 2012, Glaubach's Opposition to Defs.' Mots. to Dismiss ("Glaubach Opp.") [Dkt. # 70], and the Court considered his arguments in connection with this aspect of the motion to dismiss.

appropriate. *Id*. at 76. They point out that all plaintiffs are residents of the United States, Compl. ¶¶ 4–8; all defendants are residents of the United States or Guernsey, *id.* ¶¶ 9–11, 14–17, 19–22; all plaintiffs were customers of New York banks, *id*. ¶ 99; and the solicitations occurred in the United States, *id*. ¶ 101. Further, the Offering Memorandum was registered with a Dutch regulatory body, *id*. ¶ 75, and it was traded on a Dutch exchange, *id*. ¶ 32, 109. CD Mem. at 76.

Plaintiffs respond that a sufficient nexus exists between the Offering and the United Kingdom because the managers and bookrunners for the Offering were six U.K. banks. Glaubach Opp. at 3, citing Off. Mem. at 147, 149–150, 163. These facts also appear in the complaint. Compl. ¶ 94. But the complaint also states that all but one of these U.K. banks were "wholly-owned subsidiar[ies] of one of the five principal United States brokerage firms which marketed CCC securities." *Id*. So, the connection to the United Kingdom is not as strong as Glaubach would lead the Court to believe. Moreover, what is clear from the Offering Memorandum is that this was a *global* offering, and that financial institutions all over the world, including banks in the United States and the United Kingdom, played varying roles in the Offering. Off. Mem. at cover; Compl. ¶ 99. Given the international nature of the Offering, the Court is not inclined to conclude that the fact that six banks in the United Kingdom acted as managers and bookrunners of the Offering is adequate to establish a sufficient nexus between the Offering and the United Kingdom that would support the application of the FSMA to this case. But even if plaintiffs could satisfy this element, they must satisfy the other two as well.

   2.   *Class B Shares were offered to the public in the United Kingdom.*

Defendants next contend that the complaint fails to allege that CCC intended to or offered securities to the public in the United Kingdom. But on this point, the Court agrees with the plaintiffs. As Glaubach points out, the complaint is quite clear that this was a *global* offering.

Glaubach Opp. at 4–5, citing Off. Mem. at cover, 162.   Moreover, the Offering Memorandum implicitly suggests that there will be purchasers in the United Kingdom when it states that Class B shares would be offered to individuals who meet certain requirements of the FSMA.   *Id*. at 162.

> 3.   *The United Kingdom was not the "home state" of the Offering.*

Finally, the complaint must allege facts that would support an inference that the United Kingdom was the "home state" of the Offering.   CD Mem. at 77, citing Bompas Decl. ¶¶ 62.2– 62.5.   The parties submit that "the issuer's home state would be its place of incorporation if that were a Member State in the European Union; otherwise it would be the Member State where first the securities were to be offered to the public or the issuer applied for trading on a regulated market."   Bompas Decl. ¶ 56 n. 23; Glaubach Opp. at 6–7 (discussing the same definition).   CCC was incorporated in Guernsey, Compl. ¶ 22, which is not part of the European Union, so the home state is either where (1) the securities were to be first offered, or (2) the issuer applied for trading on the regulated market.

Defendants' position is that CCC's home state was the Netherlands because that is where CCC applied to have the Class B shares traded on the Euronext exchange, CD Mem. at 77, citing Bompas Decl. ¶ 60.   Glaubach contends that the Netherlands may not necessarily be the home state and that it is "possible" that Class B shares were first sold in the United Kingdom prior to the Offering and the discovery is needed to ultimately resolve that question.   Glaubach Opp. at 6–7, citing Blair Decl. ¶¶ 47–49.   He submits that "[i]f evidence proves that there was an offer of the Class B shares in the UK and that it was the first offer in the European Union, then the UK would be the home [s]tate."   *Id*. at 7, citing Blair Decl. ¶ 50 (internal quotation marks omitted) (bracket in original).   But Glaubach points to no allegations in the complaint or the Offering

Memorandum and Supplement that would support this theory that there may have been sale of Class B shares before the Offering in the United Kingdom.   Indeed, Glaubach's expert, Mr. Blair, can only speculate:

> It therefore appears to me clear that there had been a series of offers of the Class B securities somewhere in the world well in advance of the offer made through the apparently approved prospectus.   These offers were made by private placement . . . . I have not been able to find anything in the prospectus to indicate where the offers were made, and that fact remains to be established by further evidence.  *But the possibility that the United Kingdom was the first place in the EU where an offer was made to the public does not seem to me improbable.*

Blair Decl. ¶ 49 (emphasis added).   Whether Mr. Blair believes a factual scenario supporting Glaubach's argument is *not improbable*, that is not the standard by which the Court must evaluate the sufficiency of a complaint.   Rather, Glaubach must point to factual allegations in the complaint that would plausibly support an inference that the United Kingdom was the home state, which he has failed to do.   Count VI therefore must be dismissed without prejudice.

### F.  The *Wu* Complaint

On September 1, 2011, plaintiffs Phelps, McLister, Wu, Liss, and Schaefer – the same plaintiffs who had already filed the instant case three months earlier – filed an action in New York state court.   That complaint, which contained factual allegations that were nearly identical to those in this case, advanced common law fraud and negligent misrepresentation claims as well as the same claim under Dutch law that has been asserted in the *Phelps* case.   *See Phelps v. Stomber*, Case No. 652425/2011 (N.Y. Sup. Ct. filed Sept. 1, 2011).   The plaintiffs were represented by the same counsel that represents them in this case.   On October 14, 2011, defendants removed the case to federal court, where it was docketed as *Phelps v. Stomber*, Case No. 11-cv-7271 (S.D.N.Y. removed Oct. 1, 2011).

On November 1, 2011, plaintiffs filed an amended complaint that substituted a new group of New York residents and entities for the original group of plaintiffs (except for plaintiff Wu).

Am. Compl., *Phelps v. Stomber*, No. 11-cv-7271 (S.D.N.Y. filed Nov. 1, 2011) [Dkt. # 6].  Then, the *Wu* plaintiffs sought to have the case transferred to this Court.  Mot. to Transfer, *Phelps v. Stomber*, No. 11-cv-7271 (S.D.N.Y. Nov. 21, 2001) [Dkt. # 10].  Defendants opposed the transfer.  They argued that the federal court in New York should dismiss the case on the grounds that transfer would be futile because the *Wu* case was duplicative of the *Phelps* action.  Def.'s Opp. to Mot. to Transfer*, Phelps v, Stomber*, No. 11-cv-7271 (S.D.N.Y. Nov. 29, 2012) [Dkt. # 12].  The federal judge in New York granted the motion to transfer but declined to resolve "whether plaintiffs' allegations [in the *Wu* case] are duplicative and reflective of procedural gamesmanship."  Order Granting Mot. to Transfer, *Phelps v. Stomber*, No. 11-cv-7271 (S.D.N.Y. Dec. 14, 2011) [Dkt. # 22].

Meanwhile, counsel for plaintiffs represented to the Court at a status hearing held on November 10, 2011, that "we had filed an action in state court in New York on behalf of the same plaintiffs."  Tr. of Status Hr'g, *Phelps v. Stomber*, No. 11-cv-1142 (D.D.C. Nov. 10, 2011), [Dkt. # 48] at 15.  Counsel also indicated that they were seeking to have the case transferred to the District of Columbia:  "this is a more appropriate forum [because] [t]his is the forum in which the earlier-filed actions were filed . . . [and] it is certainly the headquarters of the Carlyle entities."  *Id*. at 16.

Given the fact that the *Wu* action was filed by the same plaintiffs, who were represented by the same counsel and asserted the same claims against the same defendants as in this action, it is difficult to conclude that the New York action was anything other than an effort to import New York law and its more favorable statute of limitations into this case.  Indeed, in responding to defendants' opposition to the motion to transfer, plaintiffs informed the federal judge in New York that they "plead guilty as charged to bringing this action in New York, at least in part, due

to New York's six-year statute of limitations applicable to claims of fraud and negligent misrepresentation."  Pls.' Reply to Def.'s Opp. to Mot. to Transfer, *Wu v. Stomber*, No. 11-cv-2287 (D.D.C. filed Nov. 1, 2011) [Dkt. # 18], at 6.  As noted earlier, the statute of limitations for those claims in the District of Columbia is three years.  D.C. Code § 12-301; *see also C & E Servs., Inc. v. Ashland, Inc.*, 498 F. Supp. 2d 242, 261 (D.D.C. 2007).

Plaintiffs' argument that the case is not duplicative because it is brought by "entirely different plaintiffs" is not persuasive since the case was originally filed by the exact same plaintiffs as in the *Phelps* case.  Pls.' Opp. to Defs.' Mot. to Dismiss, *Wu v. Stomber*, No. 11-2287 (D.D.C. Jan. 13, 2012) [Dkt. # 28] at 3–4.  Plaintiffs also argue that the *Wu* action is not duplicative because New York's choice of law rules will apply "both as to substantive law and statutes of limitations."  Pls.' Opp., *Wu v. Stomber*, No. 11-2287, at 4.  That argument only strengthens the impression that the plaintiffs filed the *Wu* action in New York precisely to avoid the choice of law rules and shorter statute of limitations period in the District of Columbia.  Such forum shopping will not be permitted.  *See Curtis v. Citibank, N.A.*, 226 F.3d 133, 140 (2d Cir. 2000) ("[P]laintiffs may not file duplicative complaints in order to expand their legal rights."); *Serlin v. Arthur Andersen & Co.*, 3 F.3d 221, 224 (7th Cir. 1993) ("[T]he rules nowhere contemplate the filing of duplicative law suits to avoid statutes of limitations.").  Moreover, the Court notes that the added *Wu* plaintiffs' interests were fully represented by the lead plaintiffs in *Phelps*.[24]  Accordingly, defendants' motion to dismiss the *Wu* case will be granted and an Order to this effect will be entered in *Wu v. Stomber*, No. 11-cv-2287.

---

[24]     Because the Court finds that the *Wu* action is duplicative and must be dismissed, it does not reach plaintiffs' argument that the Court should consolidate the actions.

**IV.     CONCLUSION**

For the reasons set forth above, defendants' motions to dismiss [Dkts. # 51 and # 52] in

*Phelps v. Stomber*, No. 11-cv-1142, and [Dkt. # 26] in *Wu v. Stomber*, No. 11-cv-2287, will be

granted.   An identical memorandum opinion will be filed in both actions.   A separate order will

issue.

AMY BERMAN JACKSON
United States District Judge

DATE:  August 13, 2012