# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____
                                        )
D.J. WU, *et al.*,                      )
                                        )
                    Plaintiffs,         )
                                        )
        v.                              )       Civil Action No. 11-2287 (ABJ)
                                        )
JOHN CRUMPTON STOMBER, *et al.*,        )
                                        )
                    Defendants.         )
_____ )

## MEMORANDUM OPINION

This matter is before the Court on plaintiffs' motion for leave to file an amended consolidated complaint and to amend the judgment pursuant to Federal Rules of Civil Procedure 15(a)(2) and 59(e). Plaintiffs have also appealed the judgment, which was entered on August 13, 2012. Since plaintiffs have not satisfied the requirements of Rule 59(e), and the proposed amendments do not cure the flaws in the complaint that was the subject of the Court's prior Memorandum Opinion, the motion will be denied.

## BACKGROUND

The facts giving rise to this lawsuit are set out in detail in the Court's Memorandum Opinion of August 2012. Mem. Op. [Dkt. # 74] at 1–18. The Carlyle Capital Corporation ("CCC") was an off-shore investment for sophisticated investors. CCC Offering Memorandum ("Off. Mem.") [Dkt. # 52-3] at cover, 13. Its primary business consisted of buying residential mortgage-backed securities using "a very high degree of leverage." *Id.* at 12–13. CCC securities were initially sold to investors through private placements in 2006, and then they were sold to a

select group of buyers in a global offering of shares in July 2007 (the "Offering").[1]  Original

Consolidated Am. Compl. [Dkt. # 42] ¶¶ 30, 41.[2]  In preparation for the Offering, CCC issued an

Offering Memorandum on June 19, 2007, and a Supplemental Offering Memorandum

("Supplement") on June 29, 2007 (together "Offering documents").  [Dkt. #s 52-3 and 52-6].  In

March of 2008, CCC entered into liquidation as conditions in the real estate market and the

global economy deteriorated.  Compl. ¶¶ 61, 142; *see* Mem. Op. at 1–18.

Plaintiffs are CCC investors who filed suit against CCC, its management firm, two

affiliates of the management firm, and CCC's directors and officers.  Compl. ¶¶ 4–22.  They

brought the action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of two

proposed classes:  (1) "all persons who purchased or otherwise acquired Class B Shares or

Restricted Depository Shares ("RDSs") of CCC in its Offering and were damaged thereby"; and

(2) "all persons who purchased or otherwise acquired Class B Shares of CCC in market

purchases during the period from July 4, 2007 through March 17, 2008 . . . and were damaged

thereby . . . ."  *Id.* ¶ 30.  The gravamen of plaintiffs' claim was that the June 19, 2007 Offering

Memorandum was materially false and misleading because while it disclosed the risk that

liquidity issues that would threaten the company *could* occur, it omitted information that would

have alerted investors to the fact that those events had already begun to occur.  AM Tr. at 20:5–

21:3.  Plaintiffs also contended that after the Offering, defendants continued to conceal the

---

1       Two types of securities were sold during the Offering:  Class B Shares and Restricted
Depository Shares ("RDSs").  Off. Mem. at cover.  Class B shares were issued from CCC and
were sold only outside the United States to foreign investors.  *Id.*  RDSs were issued by the Bank
of New York and sold to investors in the United States, as well as to foreign investors.  *Id.*

2       All citations to "Compl." refer to the original consolidated complaint filed on December
5, 2011 [Dkt. # 42], and citations to "Am. Compl." refer to the proposed amended consolidated
complaint filed on September 10, 2012 [Dkt. # 75-1].

worsening financial condition of the company until CCC collapsed in March of 2008. *See, e.g.,* Compl. ¶¶ 127–28.

A. Complaints:  Initial Filings, Amendments, and Consolidation

Plaintiffs initially filed four related cases:

- *Phelps v. Stomber*, 11-cv-1142.  Plaintiffs filed this action on June 21, 2011, alleging violations of federal securities laws against CCC's management firm, two affiliates of the management firm, and CCC's directors and officers;

- *Phelps v. Carlyle Capital Corp.*, 11-cv-1143.  Plaintiffs filed a second action on June 21, 2011, alleging the same violations of federal securities law as in *Phelps v. Stomber* against CCC;

- *Glaubach v. Carlyle Capital Corp.*, 11-cv-1523.  Plaintiff Jonathan Glaubach filed this action on August 24, 2011, asserting one claim under the laws of the United Kingdom against CCC, its management firm, two affiliates of the management firm, and CCC's directors and officers; and

- *Wu v. Stomber*, 11-cv-2287.  Plaintiff Wu and four other plaintiffs filed an action in New York state court, asserting claims of common law fraud, negligent misrepresentation, and violations of Dutch statutory laws against CCC, its management firm, two affiliates of the management firm, and CCC's directors and officers.  The case was removed to federal court and subsequently transferred to the D.C. District Court on December 14, 2011.

On October 7, 2011, the Court granted plaintiffs' motion to consolidate both of the *Phelps* actions, 11-cv-1142 and 11-cv-1143, and the *Glaubach* action, 11-cv-1523.  Order [Dkt. # 22].  At the time of the consolidation, the *Wu* action had not yet been transferred to this Court, so it was not consolidated with the others.  After the consolidation, plaintiffs filed amended complaints with the Court's permission.  Glaubach Am. Compl. [Dkt. # 32]; McLister Group (the plaintiffs in *Phelps*) Am. Compl. [Dkt. # 27].  On November 16, 2011, after considering the competing motions for appointment as lead plaintiff, filed by the McLister Group [Dkt. # 3] and plaintiff Glaubach [Dkt. # 4], the Court found that the McLister Group best satisfied the requirements and purpose of the lead plaintiff procedure in the Private Securities Litigation

Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u–4.  Mem. Op. and Order [Dkt. # 37] at 1.  It

therefore granted the McLister Group's motion and denied Glaubach's motion.  *Id.*  Glaubach

subsequently filed a motion for reconsideration [Dkt. # 40], which was denied.  [Dkt. # 64].

    After the appointment of the lead plaintiff, on December 5, 2011, plaintiffs filed a

consolidated amended complaint alleging eleven counts including claims of securities fraud

under sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b),

78t(a), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.  Compl. ¶¶ 156–74, 192–208.  The

complaint also included common law fraud and negligent misrepresentation allegations, as well

as claims under the laws of the United Kingdom and the Netherlands.  *Id.* ¶¶ 175–91, 209–27.

B.  Motion to Dismiss

    On January 17, 2012, defendants moved to dismiss the consolidated complaint, pursuant

to Federal Rules of Civil Procedure 9(b) and 12(b)(6) and the PSLRA, for failure to state a claim

upon which relief can be granted.  Defs.' Mots. to Dismiss [Dkt. #s 51 and 52]; Defs.' Replies

[Dkt. #s 62 and 63].[3]  Plaintiffs opposed the motions.  Pls.' Mem. of Points and Authorities in

Opp. to Mots. to Dismiss ("Pls.' Opp. to Defs.' Mots. to Dismiss") [Dkt. # 56].  On March 13,

2012, plaintiffs also moved to strike certain exhibits submitted in support of defendants' motion

to dismiss, as well as the factual assertions based on those exhibits.  Pls.' Mem. in Support of

Mot. to Strike [Dkt. # 58-1]; Pls.' Reply in Support of Mot. to Strike [Dkt. # 61].  Defendants

opposed the motion.  [Dkt. #s 59 and 60].

---

3    Defendants also moved to dismiss *Wu v. Stomber* on December 27, 2011 as being
"improperly duplicative of *Phelps et al. v. Stomber et al.*"  Civil Action No. 11-cv-2287 [Dkt. #
26].

On May 23, 2012, the Court held a hearing on the motions to dismiss.[4]  At the motions hearing and in a minute order issued the following day, the Court denied plaintiffs' motion to strike.  PM Tr. at 59, 62; Minute Order (May 24, 2012).  The Court also ordered plaintiffs to create a chart that listed every statement in the Offering documents that they alleged was false as well as every omission that they alleged was actionable because it rendered the Offering documents to be false.  PM Tr. 63–68; *see also* Pls.' 2012 Chart [Dkt. # 66-1].  Defendants were then permitted to complete a second column pointing out when and where they contended the allegedly omitted facts had actually been disclosed and responding to the alleged affirmative misrepresentations as well.  Defs.' 2012 Chart [Dkt. # 67-1].

C.  <u>August 2012 Opinion and Subsequent Filings</u>

On August 13, 2012, the Court issued its opinion granting defendants' motion to dismiss. Mem. Op. [Dkt. # 74].  The Court divided plaintiffs' claims into four categories:  (1) federal securities claims pertaining to the Offering; (2) federal securities claims pertaining to the aftermarket; (3) common law claims pertaining to the Offering; and (4) common law claims pertaining to the aftermarket.  *Id.* at 20–21.  It then resolved them as follows:

- *Federal Offering Claims*:  dismissed for failure to allege a materially misleading statement or omission and failure to allege loss causation, Mem. Op. at 29–53;

- *Federal Aftermarket Claims*:  dismissed under *Morrison v. Nat'l Australia Bank*, 130 S. Ct. 2869 (2010), Mem. Op. at 22–24;

---

4       At the hearing, counsel for the lead plaintiffs stated that they had withdrawn the U.K. claim.  PM Tr. at 42–43.  Because plaintiff Glaubach, who was not part of the lead plaintiff group, expressed concern at the time of the Court's ruling on the lead plaintiff designation that the lead plaintiffs would be unable to pursue the U.K. claim adequately, the Court granted counsel for Glaubach the opportunity to file an individual opposition to the motion to dismiss on this claim.  Glaubach filed his opposition on June 6, 2012, [Dkt. # 70], and the Court considered his arguments in connection with that aspect of the motion to dismiss.

- *Common Law Offering Claims*:  dismissed for failure to allege a materially misleading statement or omission and for failure to plead reliance, Mem. Op. at 53–57; and

- *Common Law Aftermarket Claims*:  dismissed for failure to plead reliance, Mem. Op. at 59–60.[5]

The Court also dismissed the claim brought under the laws of the United Kingdom because the shares were not offered in the United Kingdom and for several other reasons.  *See* Mem. Op. at 60–64.  The Court also granted defendants' motion to dismiss the *Wu* case.  Mem. Op. at 64–66.

On September 10, 2012, plaintiffs filed a motion pursuant to Rules 15(a)(2) and 59(e) for leave to file an amended consolidated complaint and to amend the judgment.  Pls.' Mot. for Leave to File Am. Consolidated Compl. and/or to Amend J. ("Pls.' Mot.") [Dkt. # 75]; *see also* Am. Consolidated Compl., Ex. A to Pls.' Mot. ("Am. Compl.") [Dkt. # 75-1].  The proposed amended consolidated complaint alleges four claims:  (1) claims under Section 10(b) of the Exchange Act and Rule 10b-5; (2) claims under Section 20(a) of the Exchange Act; (3) common law fraud; and (4) negligent misrepresentation.  Am. Compl. ¶¶ 171–97.[6]  Defendants opposed plaintiffs' motion, Defs.' Mem. in Opp. to Pls.' Mot. [Dkt. #s 80 and 81], and plaintiffs filed a reply to defendants' opposition.  Pls.' Reply in Support of Mot. for Leave to File Am. Consolidated Compl. and/or to Amend J. ("Pls.' Reply") [Dkt. # 83].

---

5       At the motions hearing, plaintiffs explained that the Dutch law claim was only pled as an alternative to the common law claims asserted under U.S. law in Counts IX and X.  Compl. ¶¶ 209–12; PM Tr. at 41.  Based on this representation, the Court dismissed the Dutch law claim after determining that U.S. law should apply to the common law claims.  Mem. Op. at 57–59.

6       Plaintiffs also preserved the claims from their prior complaint that were not included in the proposed amended complaint.  Am. Compl. ¶ 198.  Additionally, the class in the amended complaint only includes "all persons who purchased or otherwise acquired Class B Shares or RDSs of CCC in its Offering and were damaged thereby."  Am. Compl. ¶ 30.  Unlike the original consolidated complaint, it does not include an "Aftermarket Class."

The day after filing their Rule 59(e) and 15(a)(2) motion, plaintiffs also appealed the Court's decision to the D.C. Circuit.  Notice of Appeal [Dkt. # 76].  On September 24, 2012, the Court of Appeals ordered that the appeal be held in abeyance pending this Court's resolution of plaintiffs' post-judgment motion.  Order [Dkt. # 79].

On February 26, 2013, the Court ordered plaintiffs to itemize all of the alleged misrepresentations and omissions included in the amended consolidated complaint that were not included in the original consolidated complaint, and to specify the paragraphs in the amended consolidated complaint where each of the "new" allegations could be found.  Minute Order (Feb. 26, 2013); *see also* Pls.' 2013 Chart [Dkt. # 84].  The Court also permitted defendants to file a supplemental chart identifying where in their view, the allegedly omitted facts had been disclosed in either the Offering Memorandum or Supplemental Memorandum.  *Id.*; *see also* Defs.' 2013 Chart [Dkt. # 87].  The Court then granted plaintiffs' motion to file a supplemental reply.  Minute Order (Mar. 25, 2013); *see also* Pls.' 2013 Supplemental Reply Chart [Dkt. # 88].

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 15(a)(2) provides that "the Court should freely give leave [to amend a pleading] when justice so requires."  However, "once a final judgment has been entered, a court cannot permit an amendment unless the plaintiff first satisfies Rule 59(e)'s more stringent standard for setting aside that judgment."  *Ciralsky v. CIA*, 355 F.3d 661, 673 (D.C. Cir. 2004) (internal quotation marks omitted).

"Motions under Fed. R. Civ. P. 59(e) are disfavored and relief from judgment is granted only when the moving party establishes extraordinary circumstances."  *Niedermeier v. Office of Max S. Baucus*, 153 F. Supp. 2d 23, 28 (D.D.C. 2001), citing *Anyanwutaku v. Moore*, 151 F.3d 1053, 1057 (D.C. Cir. 1998).  Specifically, "'[a] Rule 59(e) motion is discretionary and need not

7

be granted unless the district court finds that there is an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'" *Ciralsky*, 355 F.3d at 671, quoting *Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996).

"Rule 59(e) . . . 'may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment.'" *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 486 n.5 (2008), quoting 11 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2810.1 (2d ed. 1995); *see also Estate of Gaither ex rel. Gaither v. District of Columbia*, 771 F. Supp. 2d 5, 10 (D.D.C. 2011) ("In this Circuit, it is well-established that motions for reconsideration, whatever their procedural basis, cannot be used as an opportunity to reargue facts and theories upon which a court has already ruled, nor as a vehicle for presenting theories or arguments that could have been advanced earlier.") (internal quotation marks and citations omitted).

## ANALYSIS

Plaintiffs have failed to meet the stringent standard for setting aside a judgment under Rule 59(e). While the proposed amended consolidated complaint adds some context and color to the original factual allegations, at bottom, it is grounded upon the same theories and the same alleged omissions that have already been considered and addressed at length by the Court. Moreover, the added factual allegations are based upon the same set of documents and internal emails that were the basis for the original consolidated complaint that was dismissed. Thus, nothing new has been discovered and the law has not changed, so the Court cannot find that the showing required under Rule 59(e) has been met.

The Court granted the motion to dismiss the federal claims on several grounds.  It ruled first that there was no actionable falsehood:  the complaint did not plausibly allege a securities fraud claim grounded on omissions.  And second, it held that the necessary causation allegations were insufficient as a matter of law.  The amended consolidated complaint takes on the misrepresentation issue as it seeks to deepen the reader's understanding of the importance of the information plaintiffs believe should have been disclosed and to provide greater detail about why the disclosures that were made were insufficient.  But it does not add anything to cure the causation problem.[7]  So, for that reason alone, the proposed amendments with respect to the federal claims are futile, and the motion to set aside the judgment on the federal claims should be denied.

Moreover, the proposed amendment does not cure the failure to allege a materially misleading statement or omission.  And, none of the other grounds advanced in support of plaintiffs' motion warrant an amendment of the judgment.

---

[7]     Plaintiffs contend that their loss causation allegations contained in paragraphs 69–70, 140–50, and 152–55 of the proposed amended complaint are more than sufficient to overcome a motion to dismiss.  Pls.' Mot. at 12; Pls.' Reply at 11–14.  But most of these allegations were previously presented to the Court, considered, and rejected.  *Compare* Am. Compl. ¶¶ 144–50 and 153–55 *with* Compl. ¶¶ 119–42 (making identical or substantially similar arguments); *see also* Mem. Op. at 50–52 (addressing those arguments).  The remaining paragraphs provide additional background information about the repurchase loan agreements ("repo") market, the market conditions during the relevant time, and CCC's financial losses but these paragraphs "suggest[]that the loss resulted from the poor performance of CCC's business model, including the ongoing margin calls, haircuts, and liquidity issues, all of which were fully disclosed in the Offering Memorandum."  *See* Mem. Op. at 51.  Finally, to the extent plaintiffs' loss causation argument is still based on the price inflation theory, *see* Am. Compl. ¶ 150, the Court has already explained that such allegations are insufficient to establish loss causation.  *See* Mem. Op. at 51–52.

A. The factual allegations added to the complaint do not cure the failure to allege an actionable omission.[8]

A review of the new complaint reveals that it seeks to bring the same case that has already been fully considered and dismissed.   And the Court's review of the supplemental material filed in support of the motion for leave to amend confirms that the amended complaint does not advance any allegations that were not fully addressed in the Memorandum Opinion.

The Court took pains to ensure that it would not overlook anything in the amended pleading that was new, so on February 26, 2013, it ordered plaintiffs to prepare a summary chart:

> The submission must itemize all of the alleged misrepresentations and omissions included in the amended complaint that were not included in the consolidated complaint that was the subject of the Court's Memorandum Opinion and Order dated August 13, 2012, and it must specify the paragraphs in the amended consolidated complaint where each of the "new" allegations can be found.

Minute Order (Feb. 26, 2013).  Plaintiffs filed the requested table on March 8, and in the column entitled "Misrepresentations and Omissions," it listed only two.  *See* Dkt. # 84, which plaintiffs entitled:  "Plaintiffs' Lists of (1) Misrepresentations and Omissions, and (2) New Allegations Pertaining to the Alleged Omissions in the Proposed Further Amended Complaints," ("Pls.' 2013 Chart") at 2–3, Column A.  For each, plaintiffs then identified a series of "added allegations pertaining to why the omission was misleading."  In other words, plaintiffs all but conceded by their failure to answer the Court's inquiry directly that there are no new actionable omissions alleged in the new pleading – and that what is "new" is additional factual context.

---

8      The proposed amended consolidated complaint alleges that some of the plaintiffs executed their subscription agreements even before the Offering Memorandum was published. Am. Compl. ¶¶ 81, 97.  The Court wonders how those plaintiffs can claim that they were defrauded by the alleged omissions in the Offering documents if they made their decision to buy before the documents were released.

This conclusion is borne out by a comparison of the two "Misrepresentations and Omissions" proffered in response to the Court's order and the original consolidated complaint that was dismissed.   When listing the supposedly new misrepresentations and omissions contained in the amended pleading, plaintiffs point to paragraph 88 of the amended consolidated complaint, which alleges:

> The Offering Memorandum failed to disclose the liquidity crisis that had occurred and was continuing to occur at CCC in June 2007, that was described by Stomber internally as a "major liquidity event" and his seizing of "emergency powers."

Pls.' 2013 Chart at 2, Column A.  In other words, plaintiffs have explained to the Court that their new action is predicated on a concern that the Offering Memorandum did not tell investors what Stomber told the Board about liquidity problems in a June 2007 email.[9]  Plaintiffs underscored the point when they submitted an unsolicited reply to the defendants' responsive chart and explained:  "the only actionable omission alleged is the failure to disclose the liquidity crisis." Pls.' 2013 Supplemental Reply Chart [Dkt. # 88] at 1.

---

9       The email that plaintiffs rely on was sent by defendant Stomber – who served as CCC's Chief Executive Offer, Chief Investment Officer and President, and director – on June 13, 2007, to the CCC Board of Directors. In the email, Stomber told the Board that the Offering would be postponed because of "volatile market conditions" and the uncertainty of the valuation of CCC's balance sheet. Am. Compl. ¶ 75.  Stomber added:

> We are having a major liquidity event so I invoked "emergency powers" on the balance sheet.  The liquidity cushion is currently at $148MM, which is technically above 20% of our current MTM equity position.  But please take no comfort in that, we could be margin called for up to another $70MM and therefore bring the cushion down to about 11%.  Therefore, we need independent Board Member approval to go under 20% – that is the purpose of the liquidity cushion – to be there so we don['t] not have to sell securities at depressed prices during a margin call.  Therefore, I ask you for your formal approval.

*Id.* (alteration in original).

But according to the materials submitted to the Court in connection with the motions to dismiss, the original consolidated complaint that was the subject of the Court's order also alleged that CCC "fail[ed] to disclose the liquidity crisis that began prior to the preparation of the [Offering Memorandum], and that illustrated the failure of CCC's business model."  *See* Pls.' 2012 Chart [Dkt. # 66-1] at 1–2, citing paragraphs 79, 81, 108 of the original consolidated complaint.[10]   According to plaintiffs, the original consolidated complaint that was previously dismissed also specifically alleged that the Offering Memorandum failed to disclose the fact that the Board had approved reductions in the liquidity cushion, and the Stomber email was the centerpiece of those allegations.  *See* Pls.' 2012 Chart at 2, citing paragraph 82 of the original consolidated complaint.

It is true that paragraph 88 of the amended consolidated complaint now points to the failure to disclose the liquidity crisis and the email from Stomber more specifically than the original consolidated complaint did.  Am. Compl. ¶ 88; *see also* Compl. ¶¶ 79, 81, 108.  But since plaintiffs focused on the liquidity issue in general and the Stomber email in particular so intently in opposing to the motion to dismiss, *see* Mem. Op. at 31, citing AM Tr. at 20 ("That's the gravamen of the complaint, is that the company was experiencing a liquidity crises certainly by the June 7th to June 14th time frame, as revealed by internal e-mail correspondence . . . ."), the Court considered those aspects of the case when it issued its opinion.  *See* Mem. Op. at 31–32 and 45–46 ("Even if plaintiffs' theory is more specific – that defendants should have put investors on notice of recent liquidity issues in particular – the complaint fails to state a fraud

_____

10      At the hearing on the motion to dismiss the original consolidated complaint, the Court ordered plaintiffs to prepare this supplemental chart for a specific purpose: "I want to know exactly what you believe the operative omissions are . . . ."  PM Tr. at 64.

claim.").   Indeed, the Memorandum Opinion specifically assessed whether the Stomber email

established that the Offering Memorandum was misleading:

> The notion that it was actionable for defendants to omit information about approved reductions in the liquidity cushion is not supported by either the allegations in the complaint or the documents referenced in the complaint.   The email from Stomber that plaintiffs rely upon as establishing the existence of the liquidity event does not indicate that the cushion was actually reduced; it simply asks for approval to do so in the future if necessary.   Compl. ¶ 64.   Indeed, even as of the date of the email, the cushion was still holding above 20 percent.   *Id.*   This did not give rise to a need for further disclosure since the Offering Memorandum already clearly warned investors:   "In the past, we have deviated from these guidelines with the approval of a majority of our independent directors *and we may do so again in the future*."   Off. Mem. at 7, 74 (emphasis added).   Moreover, other documents incorporated by the complaint confirm that the Board merely approved the notion that the cushion *could* be reduced – it was never actually reduced prior to the Offering.   *See* 2Q Report, Ex. 12 to CD Mem., [Dkt. # 52-14] at 14 ("During the quarter ended June 30, 2007, our liquidity cushion was never less than 20% of our Adjusted Equity plus pre-capital.").
>
> The Offering Memorandum also expressly disclosed that CCC could "change [its] investment strategy or investment guidelines at any time without the consent of shareholders."   Off. Mem. at 10.   In light of the clear warning that the liquidity cushion could be reduced at any time, no investor could have fairly relied on the permanent availability of the 20 percent liquidity cushion when choosing to participate in the Offering.

*Id.* at 46–47.

The "new factual allegations pertinent to the alleged omission," *see* Pls.' 2013 Chart at 2,

Column B, do not alter this result.   Moreover, plaintiffs have not advanced any reasons why

these facts – which are based on the same set of documents that prompted the initial complaints –

were not included in the consolidated complaint or could not have been presented to the Court

when it had the complaint before it.   *Natural Res. Def. Council, Inc. v. EPA*, 705 F. Supp. 698,

702 (D.D.C. 1989), *vacated on other grounds*, 707 F. Supp. 3 (D.D.C. 1989) ("Nor may the

[Rule 59(e)] motion present evidence which was available but not offered at the original motion

or trial."); *see also Niedermeier*, 153 F. Supp. 2d at 28 ("It is well established that plaintiff cannot resuscitate her case post-dismissal by alleging facts or legal theories that were available to her at the inception of her case.").

> B. Plaintiffs' identification of statements allegedly rendered misleading by the omissions does not change the result.

In the Memorandum Opinion, the Court also stated that the original consolidated complaint did not state a fraud claim because plaintiffs had also "failed to connect the omission of the 'liquidity event' to any statement in the Offering documents that was rendered misleading by its absence . . . ." Mem. Op. at 45. Plaintiffs contend that their proposed amended complaint resolves this problem. In paragraph 92 of the amended complaint, plaintiffs identify four specific statements from the Offering Memorandum that they allege were rendered misleading by CCC's alleged failure to disclose the existence of the liquidity event referenced in the Stomber email. *See* Am. Compl. ¶ 92.

At bottom, plaintiffs' argument is that the four identified statements from the Offering Memorandum were misleading because they warned about risks that *could* happen, but the Stomber e-mail reveals that the company should have disclosed that those events had already occurred. *See* Am. Compl. ¶ 92; *see also id.* ¶¶ 93–94. Even if this argument was not clearly articulated in the original consolidated complaint, plaintiffs advanced it in their opposition to defendants' motions to dismiss and at the motions hearing. *See* Pls.' Opp. to Defs.' Mots. to Dismiss at 11–12; AM Tr. at 20. And the Court rejected the argument on the grounds that plaintiffs had not plausibly alleged: (1) that these risks had already been realized; or (2) that the adverse events that had occurred – such as the substantial decline in fair value reserves – were not disclosed in the Offering Memorandum. Mem. Op. at 32, 40, 44–45. Additionally, the four

allegedly misleading statements that plaintiffs identify in their amended complaint are restatements of their prior arguments and provide no grounds for altering the judgment.

First, plaintiffs contend that the Offering Memorandum's statements that CCC's investment guidelines required it to maintain a liquidity cushion equal to no less than 20% of the company's adjusted capital was rendered misleading by the failure to disclose the ongoing liquidity crisis. Am. Compl. ¶ 92(a). These allegedly misleading statements were previously identified in the original consolidated complaint and in prior supplemental pleadings and rejected by the Court. *Compare* Am. Compl. ¶ 92(a), *with* Compl. ¶ 82, Pls.' Opp. to Defs.' Mots. to Dismiss at 25, 29, 80, *and* Pls.' 2012 Chart at 2; *see also* Mem. Op. at 46–47.[11]

Second, plaintiffs allege that the Offering Memorandum's statements that "'the amount of collateral required to be posted *may* increase rapidly' and that 'total degree of leverage we employ *may* result in the market value of our investments being highly volatile and giving rise to rapidly changing collateral posting requirements' were misleading, because these conditions had already occurred." Am. Compl. ¶ 92(b) (alteration in original). The Memorandum Opinion also addressed this argument. It explained that "the Court is not required to accept plaintiffs' conclusion that the Offering Memorandum was rendered misleading by an omission of the 'fact'

---

11    One of plaintiffs' allegations is that CCC should not have considered a $191 million bridge loan from Citigroup as part of its liquidity cushion because it was not unencumbered and it was required to be repaid to Citigroup upon the completion of the Offering. Am. Compl. ¶ 92(a). According to plaintiff, without the benefit of the bridge loan, CCC's liquidity cushion was less than zero on June 30, 2007, and the Offering Memorandum was misleading because it failed to disclose that circumstance. *Id.* This argument fails because the Stomber email that plaintiffs rely upon as establishing the existence of the liquidity event did not say that the liquidity cushion was below 20%; rather Stomber stated that the liquidity cushion was "technically above 20%," and he only sought authority to reduce the cushion if necessary. *See* Mem. Op. at 32, 46. Therefore, the company cannot be liable for failing to disclose that the liquidity position was below 20% when it did not believe that to be the case.

that the haircuts[12] charged by repo[13] lenders had increased when that fact has not been alleged." Mem. Op. at 40.  Since the proposed amended complaint fails to resolve this problem, it does not present a reason for the Court to amend its judgment.[14]

The third and fourth allegedly misleading statements relate to the viability of CCC's business model and its dividend projections.  Plaintiffs assert that the Offering Memorandum failed to disclose that changes in market conditions had already decreased CCC's ability "to obtain the credit necessary to utilize the leverage called for by its business model, and had caused the cost of CCC's financings to increase relative to the income that could be derived." Am. Compl. ¶ 92(c).  They also allege that CCC failed to disclose that the declines in the net asset value of their investments "had *already* worsened CCC's credit availability, and would impact its reported results."  *Id.* at ¶ 92(d) (emphasis in original).

With respect to the viability of CCC's business model, the Court has explained that "[i]t is difficult for the Court to conclude that the Offering Memorandum did not put investors on notice of the fact that CCC's business model had recently shown signs of major strain given the clear disclosure that a $29 million loss had occurred in the last three months."  Mem. Op. at 34. In response, plaintiffs argue that the disclosure of the $29 million loss was a misleading partial

---

12     A "haircut" is the "difference between the amount of a loan and the market value of the collateral securing the loan."  Black's Law Dictionary 781 (9th ed. 2009).

13     A repurchase agreement (also known as "repo") is a "short-term loan agreement by which one party sells a security to another party but promises to buy back the security on a specified date at a specified price."  Black's Law Dictionary 1419 (9th ed. 2009).

14     In the amended complaint, plaintiffs allege that a number of repo lenders "requested" haircuts of 3% to roll existing repos with CCC and that based on market conditions, "CCC would have little to no success, at any point in time, in attempting to negotiate haircuts that were more favorable than those that were generally available under prevailing market conditions."  Am. Compl. ¶ 68.  This statement still falls short of curing plaintiffs' failure to allege "that lenders were actually insisting upon higher haircut rates or that CCC had been required to pay them." Mem. Op. at 40.

disclosure that understated the amount of the decline and "failed to disclose that CCC's business model was failing." Pls.' 2013 Supplemental Reply Chart at 1–3. Plaintiffs made this same argument during the hearing on the motion to dismiss and the Court considered and rejected it in its prior opinion. Mem. Op. at 35. The Court explained that CCC was not required to provide the "negative information" about its losses with the particular "spin" or the level of alarm that plaintiffs preferred as long as the relevant facts were disclosed and clearly available to plaintiffs. *Id.*[15]

With respect to CCC's dividend projections, plaintiffs also allege that "due to the declines in the value of its portfolio, and other market conditions discussed herein, it rendered impossible a net dividend to investors in excess of 10%." Am. Compl. ¶ 92(d). This assertion is based partly on the allegation that a dividend of 10% or more would have been impossible if repo lenders charged haircuts of 3% or more. *Id.* ¶ 54. As the Court has already explained, since plaintiffs have not actually alleged that CCC was required to pay haircuts of 3% or more, plaintiffs have not pled the existence of a condition that "rendered impossible a net dividend to investors in excess of 10%." *See* Mem. Op. at 40.[16]

C. The disclosures in the Supplemental Offering Memorandum properly bear on the sufficiency of plaintiffs' claims.

Plaintiffs argue that the judgment entered in this case was flawed because the Court pointed to disclosures set forth in the Supplemental Offering Memorandum as well as warnings

---

15    The Court has also noted that the Supplemental Offering Memorandum, which was part of the Offering, disclosed additional information about CCC's $84.2 million loss as of June 26, 2007. Mem. Op. at 35, citing Supplemental Off. Mem. at 8–9.

16    In addition to the four allegedly misleading statements, plaintiffs also argue that CCC's disclosure of declines in the fair value reserves were insufficient to inform investors of the gravity of the liquidity crisis that was occurring. Am. Compl. ¶ 94. The Court has already acknowledged and rejected this argument. *See* Mem. Op. at 36–38.

and disclosures in the initial Offering Memorandum when it concluded that investors had been fully apprised of the material facts.  Pls.' Reply at 8–11.  These contentions do not merit an amendment of the judgment.

First of all, plaintiffs' suggestions that the Supplemental Offering Memorandum is somehow irrelevant, and that the Court should treat the record of disclosures to potential investors as if it was frozen as of the date of the Offering Memorandum, Pls.' Reply at 8–9, are inconsistent with their own theory of the case.  This is a case involving omissions, not false statements.  Plaintiffs have emphasized that an omission is an ongoing misrepresentation, and they specifically took the position that the defendants were required to update the information that had been supplied to the marketplace as events unfolded and more information became available:  "Plaintiffs do not allege any affirmative misrepresentations relating to CCC's fair value reserves as of the record date of June 13, 2007 . . . .  Plaintiffs' allegation is only one of omission of other data that were relied upon internally, and a failure to timely provide updated data."  Pls.' Opp. to Defs.' Mots. to Dismiss at 29, n.31; *see also* Am. Compl. ¶ 178 ("Plaintiffs would not have invested in CCC securities pursuant to the Offering had they known about CCC's liquidity crisis and effective insolvency in June 2007 *and through the consummation of the Offering*.") (emphasis added); Pls.' Reply at 16.[17]  If the gist of plaintiffs' complaint is that the insiders who were privy to a deteriorating situation did not update the information that had

---

[17]    At this point in the proceedings, plaintiffs maintain:  "[T]his action alleges an omission, which by its very nature, is ongoing – Defendants' omission in this action could have been cured by a timely and complete [Offering Memorandum], or a timely and complete supplement, coupled with providing a procedure for investors to withdraw their subscriptions and notice to investors of how to withdraw."  Pls.' Reply at 16.  Thus, plaintiffs appear to acknowledge that a supplement could cure an omission. The other information that they now insist would have also been necessary does not bear on the question of whether or not there was a material misstatement or omission, particularly in the absence of any allegation that any plaintiff actually sought to withdraw a subscription that had already been executed.

been shared with the investing public, the updated information that was in fact provided before the Offering was complete is a significant part of the analysis.

The Offering Memorandum was issued on June 19, 2007, Off. Mem. at cover, and it was only nine days later when CCC announced that the Offering would be postponed and revised. Compl. ¶ 83. The following day, on June 29, it issued the Supplemental Offering Memorandum, which announced that it "superseded" the original document. Supplemental Off. Mem. at 1. According to the amended consolidated complaint, there were four more days before the Offering was completed on July 3, although the Supplemental Offering Memorandum designated July 11 as the "Settlement Date." Am. Compl. ¶¶ 110–13.[18]

Second, plaintiffs' contention that the June 28 and June 29, 2007 press releases – announcing the postponement of the Offering and the publication of the Supplemental Offering Memorandum – were never intended to be seen by anyone in the United States, Am. Compl. ¶ 102, is undermined by their own allegations. The Offering Memorandum, which plaintiffs allege was distributed to most, if not all, participating investors, Am. Compl. ¶ 103, expressly put investors on notice of the fact that more information was forthcoming. Off. Mem. at cover. Specifically, the cover page stated that the actual number of shares offered and the results of the global Offering would be announced in a press release and a pricing statement on or about June 28, 2007. *Id.* Further, the June 28 and June 29 press releases that plaintiffs attached to their opposition to defendants' motions to dismiss [Dkt. #s 56-7 and 56-8] were printed from the CCC

---

18      The idea that investors did not have sufficient time to read the Supplemental Offering Memorandum before buying is belied by the allegations in paragraphs 99 and 100 of the amended consolidated complaint that some of the plaintiffs executed their subscription agreements on June 20 and 21; if it only took a day or two to read the approximately 240 page Offering Memorandum, there was enough time to read the approximately 12 page Supplemental Offering Memorandum. Indeed, the complaint alleges that some of the class members made the decision to buy before anything had been issued at all. Am. Compl. ¶ 97.

website, which is available in the United States.   And the press releases told investors how to

obtain a copy of the Supplement.   Am. Compl. ¶ 102.[19]   Moreover, plaintiffs' allegation that

there was no indication in the June 28 and June 29 press releases "that the [Supplement] would

contain any new, or previously unreported, financial information concerning CCC" is also belied

by their own quotations of the press releases, which stated that the Supplement "forms part of

and must be read in conjunction with the offering memorandum."   *See* Am. Compl. ¶¶ 102, 105.

Third, plaintiffs argue that the Supplemental Offering Memorandum was "meaningless"

because even if investors were actually aware of the Supplement, their subscriptions were

irrevocable and "there was simply nothing they could do to withdraw."  Pls.' Reply at 9; *see also*

Am. Compl. ¶ 106.  To support their contention, plaintiffs point to the following language from

the Offering Memorandum:

> If purchasing in the Regulation D Offering, upon the terms and subject to
> the conditions set forth in this Purchaser's Letter, the Investor hereby
> *irrevocably* agrees to purchase from the Company up to such number of
> RDSs as is set forth on the signature page hereof at any price between
> $20.00 and $22.00 per RDS as is published by the Company as the initial
> offering price for the RDSs and the Class B shares or such other price as is
> mutually agreed.

Off. Mem. at A-2 (emphasis added).  The Court notes that this argument does not apply to the

class members who executed their subscription documents before the publication of the Offering

Memorandum because those investors cannot argue that they decided to buy the securities based

on the allegedly misleading statements and omissions in the Offering documents.   *See* Am.

Compl. ¶¶ 81, 97.  Nor does it apply to any class members who executed their subscription

documents after the publication of the Supplemental Offering Memorandum because they had

---

19      Plaintiffs rely heavily on the fact that the press releases stated that they were not for
"publication or distribution in the United States. . . "  *See, e.g.,* Am. Compl. ¶¶ 102, 105, 109.
But this is not unusual because it was not a U.S. offering.  Off. Mem. at cover.

the benefit of the information contained in the Supplement.  *See* Am. Compl. ¶ 107 (stating that plaintiff Wu executed her subscription agreement on July 2, 2007, which was four days after the Supplement was published).  Therefore this argument could only apply to the class members who executed their subscription documents after the Offering Memorandum was issued and before it was superseded by the Supplement.

Plaintiffs assert that the language in the Offering Memorandum "is more than sufficient to support a plausible inference that the subscription agreements were legally irrevocable."  Pls.' Reply at 9.  Although the Court is bound to accept plaintiffs' factual allegations on their face, it need not accept inferences drawn by plaintiffs if those inferences are unsupported by facts alleged in the complaint, nor must it accept plaintiffs' legal conclusions.  *See Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002); *Kowal v. MCI Commc'n Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994).  In the Court's view, an allegation that something is "legally irrevocable" is a legal conclusion that need not be accepted on its face when one assesses the sufficiency of a complaint.  But even if it were a factual inference, it is not supported by the facts provided.

The Offering Memorandum provides that investors who execute subscription documents "irrevocably" agree to purchase "at any price between $20.00 and $22.00" per share or at a "mutually agreed" price.  Off. Mem. at A-2.  As plaintiffs allege in their complaint, the shares were ultimately offered at $19.00.  Am. Compl. ¶ 103.  Therefore, unless plaintiffs "mutually agreed" to this price, they were no longer "irrevocably" bound to purchase the securities.

Plaintiffs resist the plain meaning of the Offering Memorandum by arguing that "it is impossible to conceive" that a person who agrees to purchase securities at a higher rate can "obtain recission on the basis that she had somehow been harmed by having to pay an unexpectedly *lower* price" for the same securities.  Pls.' Reply at 10 (emphasis in original).  But

this is exactly what the Offering Memorandum allowed investors to do.  As the twenty-five page "Risk Factors" section of the Offering Memorandum explained, an investment in CCC "involve[d] substantial risks and uncertainties."  Off. Mem. at 10.  In light of these risks, a lower price for the securities might have signaled that the company was valuing its own stock differently and that its financial situation had declined.  The price range therefore gave investors the opportunity to investigate the reason for a lower price and reevaluate their decision to invest if the price went up *or* down.  *See* Defs.' Mem. in Opp. to Pls.' Mot. at 20.[20]

Finally, in granting defendants' motion to dismiss, the Court did not rely exclusively on the Supplemental Offering Memorandum, but it found that the many warnings in the Offering Memorandum put investors on notice of the risks associated with the investment.  *See* Mem. Op. at 34 (stating that by disclosing a recent $29 million loss, the Offering Memorandum notified investors that "CCC's business model had recently shown signs of major strain . . . ."), *id.* at 39 (stating that the Offering Memorandum warned that CCC's business model was completely dependent on repo loans and even a small increase in interest rates could have devastating results), *id.* at 42 (noting that the decline in CCC's fair value reserves was reported in the Offering Memorandum); *id.* at 43 (pointing to sections of the Offering Memorandum that provided "more than candid" information about the projected dividends); *id.* at 45 (observing that the "Recent Developments" section of the Offering Memorandum highlighted serious adverse events); *id.* at 46 (citing the twenty-five pages of warning and disclosures in the Offering

---

20      Plaintiffs also argue that the subscriptions were irrevocable as a matter of fact because the Offering documents did not indicate how or whether an investor could withdraw a subscription. Am. Compl. ¶ 96; Pls.' Reply at 10.  This argument also fails because the Offering Memorandum indicated that investor subscriptions were not irrevocable if the ultimate price of the securities fell outside a set range, Off. Mem. at A-2, and plaintiffs have not alleged that any class member attempted to withdraw his or her subscriptions and was unable to do so.

Memorandum as putting investors on notice of the risks associated with CCC's business model); *id.* at 47 (stating that the Offering Memorandum disclosed that CCC could "'change [its] investment strategy or investment guidelines at any time without the consent of shareholders'").

      D.  <u>The factual allegations added to the complaint do not cure the failure to allege reliance.</u>

The Court dismissed the common law claims partly because they failed to allege reliance with the level of particularity required by Rule 9(b).  Mem. Op. at 53–55.  Plaintiffs urge the Court to reconsider this decision on two grounds.  First, they contend that they are entitled to a presumption of reliance under the common law.  Am. Compl. ¶ 178.  The Court has already considered and rejected this argument, Mem. Op. at 55–57, and plaintiffs cannot use Rule 59(e) to "relitigate old matters."  *Exxon Shipping*, 554 U.S. at 486 n.5.

Second, plaintiffs submit that the proposed amended complaint sufficiently pleads reliance because it alleges that plaintiffs "directly relied on the actionable omissions of material facts."  Pls.' Mot. at 12–13, citing Am. Compl. ¶ 178.  Plaintiffs had all the tools to make this allegation in their prior complaints and a losing party cannot use a Rule 59 motion to ask the trial judge to reopen proceedings simply to present a new theory that could have been raised during the original proceedings.  *See Kattan v. District of Columbia*, 995 F.2d 274, 276 (D.C. Cir. 1993).

Moreover, the allegation that "Plaintiffs directly relied on the actionable omissions of material facts set forth above, as Plaintiffs would not have invested in CCC securities pursuant to the Offering had they known about CCC's liquidity crisis . . . .," Am. Compl. ¶ 178, is highly speculative and conclusory.  It is also unsupported by facts in the proposed amended complaint because the new complaint still fails to allege that plaintiffs actually read the Offering Memorandum or the Supplement and relied on the alleged misleading statements and omissions

in them.  *See* Mem. Op. at 54–55.  Since the proposed amended complaint does not cure the

failure to plausibly allege reliance, the motion for reconsideration also fails as to this issue.[21]

      E.   <u>The Wu Complaint</u>

      On August 13, 2012, the Court also entered an order dismissing *Wu v. Stomber*, 11-cv-

2287, [Dkt. # 30], and it set out its reasons for doing so in the Memorandum Opinion.  The Court

explained:  "Given the fact that the *Wu* action was filed by the same plaintiffs, who were

represented by the same counsel and asserted the same claims against the same defendants as in

this action, it is difficult to conclude that the New York action was anything other than an effort

to import New York law and its more favorable statute of limitations into this case."  Mem. Op.

at 65.  In so holding, the Court explained that plaintiffs' decision to replace the original plaintiffs

(except for Wu) with a new group of New York residents and entities did not alter its decision

because "the added *Wu* plaintiffs' interests were fully represented by the lead plaintiffs in

*Phelps*."  *Id.* at 66.

      Now, plaintiffs ask the Court to reverse its dismissal of *Wu* because plaintiff Wu – the

only individual who was a plaintiff in both the *Phelps* and *Wu* action – has been dropped from

the *Wu* case.  Pls.' Mot. at 13–14.  Plaintiffs claim that this eliminates any redundancy among the

parties in the two cases.  *Id.*  Plaintiffs offered to do this before, when the motion to dismiss was

pending.  *See* Pls.' Opp. to Defs.' Mot. to Dimiss, *Wu v. Stomber*, 11-cv-2287 [Dkt. # 28] at 7

n.7.  But changing the identity of the parties after the fact cannot change what the circumstances

---

21     The Court also notes that the direct reliance argument is unavailable to the plaintiffs who executed their subscription documents prior to the publication of the Offering Memorandum. *See* Am. Compl. ¶¶ 81, 97.  They cannot argue that they would not have made their purchases in the Offering if the Offering documents had disclosed the occurrence of a liquidity crisis in June 2007 because in fact, they made their decision to purchase before the Offering documents were even published.

were at the time the *Wu* action was filed – and it was those circumstances that gave rise to the Court's ruling.  Therefore, removing Wu as a plaintiff does not constitute grounds for amending the judgment.

## CONCLUSION

For the reasons set forth above and in the August 2012 Memorandum Opinion, plaintiffs' motions pursuant to Federal Rules of Civil Procedure 15(a)(2) and 59(e) for leave to file an amended consolidated complaint and to amend the judgment [Dkt. # 75] in *Phelps v. Stomber*, No. 11-cv-1142 and [Dkt. # 32] in *Wu v. Stomber*, No. 11-cv-2287 will be denied.  An identical memorandum opinion will be filed in both actions.  A separate order will issue.


AMY BERMAN JACKSON
United States District Judge

DATE: June 4, 2013